**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| WENDY B. DOLIN, Individually and as Independent Executor of the ESTATE OF STEWART DOLIN, Deceased, | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) Case No. 1:12-cv-06403<br>)<br>) The Honorable James B. Zagel |
| SMITHKLINE BEECHAM CORPORATION D/B/A GLAXOSMITHKLINE, a Pennsylvania Corporation; MYLAN, INC., a Pennsylvania Corporation; and H.D. SMITH WHOLESALE DRUG CO., a Delaware Corporation with its principal place of business in Illinois, | ) The Honorable Arlander Keys<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

**DEFENDANT MYLAN INC.'S MOTION TO DISMISS**

AND NOW comes Defendant Mylan Inc.,[1] by and through its undersigned counsel, and files this Motion to Dismiss pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). In support thereof, Mylan states further:

## I. INTRODUCTION AND SUMMARY

Plaintiff alleges that an FDA-approved generic drug – ostensibly, Mylan's paroxetine – caused Stewart Dolin ("Decedent") to commit suicide. (Docket No. 1-1, Complaint ("Compl.") at ¶ 1.) Paroxetine is the generic form of co-Defendant GlaxoSmithKline LLC's ("GSK") Paxil CR® ("Paxil"), a psychotropic drug approved by the U.S. Food and Drug Administration ("FDA") for, *inter alia*, treatment of major depressive disorder. Though Mylan is identified as the manufacturer of the supposedly defective product (see id. at ¶ 3), Plaintiff spends nearly two-hundred paragraphs in her Complaint describing GSK's clinical trials, regulatory activity, and potential liability. (See id. at ¶¶ 27-188.) In sum, Plaintiff avers that "GSK has been aware of Paxil's association with an increased risk of suicidality in adults for over 20 years, but concealed the risk, and instead promoted Paxil as safe and effective." (Id. at ¶ 27.)

Significantly, *none* of this alleged wrongdoing is attributed to Mylan. In fact, the bulk of Plaintiff's Complaint describes activity that predates the FDA's approval of Mylan's paroxetine and information that was unavailable to Mylan or the general public. (See Exhibit "A," at 1, 5 (approving ANDA 77-873 on June 29, 2007).) And after chronicling GSK's so-called

---

[1] Plaintiff suggests that the product (paroxetine) used by Decedent was manufactured by Mylan Inc. (See Compl. at ¶ 3.) This is incorrect. Mylan Inc. is a holding company; it does not manufacture or distribute any products. Instead, and without waiving or in any way conceding the issue of product identification, Mylan Pharmaceuticals Inc. ("MPI") – a wholly-owned subsidiary of Mylan Inc. – manufactures paroxetine pursuant to the FDA's approval of Abbreviated New Drug Application ("ANDA") 77-873. (See Letter from FDA to MPI Approving ANDA 77-873, June 29, 2007, attached hereto as Exhibit "A.") MPI is, at the time of removal, and was, at the time this action was filed, a corporation organized under the laws of the State of West Virginia with its principal place of business in West Virginia. Accordingly, MPI is a citizen of the state of West Virginia and is completely diverse from all other parties to this action. 28 U.S.C. § 1332(c)(1). For purposes of this brief, "Mylan" will refer to MPI and Mylan Inc., collectively.

concealment of the risks associated with Paxil/paroxetine for nearly forty pages, Plaintiff baldly (and paradoxically) suggests Mylan "knew or should have known" of these risks. (See Compl. at ¶¶ 28, 189-240.) Tellingly, when it came time for Plaintiff to explain what Mylan did wrong, she simply copied and pasted the same counts she had previously levied against GSK, pausing only to change the defendant's name, but with no Mylan-specific averments of fact.[2]

Yet the impetus for Plaintiff's seemingly nonsensical pleadings is obvious: Mylan is a generic manufacturer, and as such, cannot be held liable for Decedent's death. Just last year, the Supreme Court of the United States unequivocally held that claims based on the adequacy of warnings provided with FDA-approved generic drugs are impliedly preempted by federal law. See, generally PLIVA, Inc. v. Mensing, 131 S. Ct. 2567 (2011) reh'g denied, 132 S. Ct. 55. Based on Mensing, courts across the country have summarily dismissed the precise theories pursued by Plaintiff against Mylan.

For the reasons explained below, each and every cause of action presented against Mylan is preempted, fails to satisfy federal pleading standards, or both. As such, Mylan respectfully requests that this Honorable Court dismiss Counts IX-XV in their entirety, with prejudice.

## II. STANDARD

The United States Supreme Court has dispelled any notion that federal "notice pleading" principles under Rule 8 enable a plaintiff to survive a motion to dismiss by merely providing conclusory averments that recite the bare elements of a cause of action. See, generally Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a *formulaic recitation of the elements of a cause of action will not do*." Id. (internal modification omitted;

---

[2] Compare Compl. at ¶ 145; with Compl. at ¶ 200.

2

emphasis supplied). Rather, "[f]actual allegations must be enough to raise a right to relief above the speculative level." Id.

In Iqbal, the Court identified two "working principles" at the heart of Rule 8:

> *First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. *Second, only a complaint that states a plausible claim for relief survives a motion to dismiss*. Determining whether a complaint states a plausible claim for relief will … be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief.

Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-50 (2009) (internal citations, quotation marks omitted; emphasis supplied).

### III. ARGUMENT

#### a. All claims sounding in failure to warn are preempted.

Though couched in various legal theories, each of Plaintiff's claims against Mylan is, in substance, a boilerplate failure-to-warn claim. For example:

1. *Negligent Misrepresentation* (Count IX): Mylan "negligently omitted … information in its product labeling" regarding the risks associated with paroxetine. (Compl. at ¶ 191.)[3]
2. *Consumer Fraud* (Count X): Mylan provided "unfair, false, deceptive, and unconscionable representations and statements in its label …." (Id. at ¶ 200.)[4]
3. *Strict Liability Design Defect* (Count XI): "[I]nherent" dangers associated with paroxetine rendered it "unsafe," thereby "defeating ordinary consumer expectations." (Id. at ¶¶ 210-211.)[5]

---

[3] See, e.g. In re Darvocet, Darvon and Propoxyphene Prod. Liab. Lit., No. 2:11-md-2226-DCR, MDL No. 2226, 2012 WL 718618 (E.D. Ky. Mar. 5, 2012) (granting motion to dismiss claims for design defect, inadequate warnings, negligent design, negligent failure to warn, fraudulent nondisclosure, negligent misrepresentation, fraudulent misrepresentation, statutory negligence, breach of express warranty, and breach of implied warranty; as well as the so-called "failure-to-withdraw" claim).

[4] See, e.g. Mensing, 131 S. Ct. at 2572.

[5] See, e.g. In re Accutane Products Liab., MDL No. 1626, 2012 WL 3194952, at *3 (M.D. Fla. Aug. 7, 2012) ("Plaintiff's design defect claim is also preempted [by Mensing].").

4. *Strict Liability Failure to Warn* (Count XII): Mylan is liable due to "inadequate warnings or instruction" provided with paroxetine. (Id. at ¶ 214.)[6]
5. *Negligence* (Count XIII): Mylan failed to "adequately warn the medical community" regarding the risks associated with paroxetine. (Id. at ¶ 220.)[7]
6. *Breach of Express Warranty* (Count XIV): Mylan "expressly warranted" in its "packaging" and "labeling" that paroxetine was "safe and effective." (Id. at ¶ 226.)[8]
7. *Breach of Implied Warranty of Merchantability* (Count XV): "Mylan represented and warranted to physicians … that paroxetine was safe and effective." (Id. at ¶ 234.)[9]

Numerous courts have recognized that each of these theories is, at its core, premised on allegedly defective warnings.[10] But "any state-law claim involving a generic drug label or

---

[6] See, e.g. Eckhardt v. Qualitest Pharms. Inc., No. M-11-235, 2012 WL 1511817 (S.D. Tex. Apr. 30, 2012) (holding that failure-to-warn, manufacturing-defect, "failure-to-provide-any-information," "failure-to-update-labeling," failure-to-withdraw, design-defect, and fraud claims are preempted or insufficiently pled and therefore granting the generic manufacturers' motion to dismiss).

[7] See, e.g. Truddle v. Wyeth, LLC, No. 2:11-CV-00207-GHD, 2012 WL 3338715, at *2-7 (N.D. Miss. Aug. 14, 2012) (dismissing claims for negligence, strict liability, breach of warranties, misrepresentation and fraud, and negligence *per se* against manufacturer of FDA-approved generic drug).

[8] See, e.g. In re Fosamax (Alendronate Sodium) Prods. Liab. Litig. (No. II), MDL No. 2243 JAP-LHG, 2012 WL 181411 (D.N.J. Jan. 17, 2012) (holding that the plaintiff's claims – which "emanated from a general theory of failure to warn, but also included claims based upon various state law products liability theories, including, *inter alia,* defective design, negligence, fraud, misrepresentation, breach of express and implied warranties, violation of consumer protection statutes, restitution, and loss of consortium"—are preempted under Mensing and therefore granting the generic manufacturer's motion for judgment on the pleadings).

[9] See, e.g. Fullington v. PLIVA, Inc., No. 4:10CV00236 JLH, 2011 WL 6153608 (E.D. Ark. Dec. 12, 2011) (holding that the plaintiff's strict-liability, negligence, gross-negligence, fraudulent-misrepresentation, negligent-misrepresentation, fraudulent-concealment, and breach-of-implied-warranties claims fail post-Mensing and therefore granting the generic manufacturer's motion to dismiss).

[10] See, e.g. Brinkley v. Pfizer, Inc., No. 10-0274-CV-W-SOW, 2012 WL 1865402, at *3-6 (W.D. Mo. May 22, 2012) (granting motion for judgment on the pleadings on strict liability design defect, breach of express and implied warranties, violations of Missouri Merchandising Practices Act, failure to communicate warnings, failure to update warnings, and failure to withdraw or stop selling the product, holding "that plaintiff is simply trying to backdoor claims against [the generic manufacturer] that the Supreme Court have found to be preempted" and noting that, "at its core," the plaintiff's case is nothing more than a failure-to-warn claim); Fulgenzi v. PLIVA, Inc., No. 5:09CV1767, 2012 WL 1110009 (N.D. Ohio Mar. 31, 2012) (holding that all of the plaintiff's claims "are, at the core, failure-to-warn claims that are clearly preempted by Mensing" and therefore granting the generic defendant's motion to dismiss); Moretti v. Mutual Pharm. Co., No. 10-896, 2012 WL 465867, at *4 (D. Minn. Feb. 13, 2012) (granting motion for judgment on the pleadings on claims of negligence, misrepresentation, constructive fraud, violations of state statutes, negligent infliction of emotional distress, negligent misrepresentation, fraud by concealment, failure-to-communicate, failure-to-conduct-and-report-post-market-safety-surveillance, and failure-to-withdraw, and holding that "[d]espite the different 'labels' given these claims, the essence of these claims is that important safety information as to [a generic drug] was not disseminated, or made clear, to the public or to the medical community").

warning is preempted and must be dismissed with prejudice under Mensing." In re Accutane Prods. Liab. Lit., MDL No. 1626, 2011 WL 6224546, at *2 (M.D. Fla. Nov. 9, 2011).

The United States Supreme Court in Mensing held that state law failure-to-warn claims against manufacturers of generic pharmaceutical products are preempted, because it is "impossible" for generic manufacturers to simultaneously meet both state and federal law. Mensing, 131 S.Ct. at 2572. Regulations promulgated by the FDA pursuant to the Food, Drug, and Cosmetic Act ("FDCA") require that warnings provided with generic drugs be the "same" as those of the name-brand product. See 21 U.S.C. § 355(j)(2)(v).

Here, Plaintiff seeks to impose a state law duty upon Mylan to change the content of the warnings provided with paroxetine. However, to the extent Plaintiff can prove Decedent used paroxetine manufactured by Mylan, it is undisputed that it is a generic drug.[11] Accordingly, any attempt by Mylan to change its warnings would have run contrary to the federal requirement of "sameness," which Mylan met.[12] Whether grounded in a theory of strict liability failure to warn, strict liability design defect, negligence, warranty, consumer fraud, or otherwise, all of Plaintiff's

---

[11] See Compl. at ¶ 3; and Exhibit "A" (approving MPI's paroxetine as "bioequivalent" to the reference listed drug ("RLD"), Paxil). See, also Mensing, 131 S. Ct. at 2574 n.2 ("As we use it here, 'generic drug' refers to a drug designed to be a copy of a [RLD] (typically a brand-name drug), and thus identical in active ingredients, safety, and efficacy.").

[12] Compare MPI Paroxetine Label (revised 2009), attached hereto as Exhibit "B," with Paxil CR Label (revised 2009), attached hereto as Exhibit "C." These were the labels distributed at the time Decedent was allegedly prescribed paroxetine. (See Compl. at ¶ 15 (alleging Decedent was prescribed paroxetine in June 2010 and died the following month).) The Court may properly consider these FDA-approved labels, as well as the letter approving ANDA 77-873, in ruling on a motion to dismiss, because they are incorporated by reference in the Complaint, they are publicly available governmental documents, and as such, their authenticity cannot reasonably be questioned. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."); Salvio v. Amgen, Inc., 810 F. Supp. 2d 745, 751 (W.D. Pa. 2011) (holding that, where a plaintiff's complaint "incorporates by reference" the labeling provided with an FDA-approved product, the "actual warning" provided by the manufacturer should be considered in ruling upon a motion to dismiss); Horne v. Novartis Pharmaceuticals Corp., 541 F. Supp. 2d 768, 776-77 (W.D.N.C. 2008) ("[T]he Court may take judicial notice of and consider the public records of the FDA … without transforming this motion into a motion for summary judgment.").

causes of action purport to enforce a state-law duty requiring Mylan to change the allegedly inadequate warnings provided with paroxetine. But controlling Supreme Court precedent makes clear that federal law foreclosed such action. All of these theories, therefore, are preempted.[13, 14]

---

[13] See, e.g. Mensing v. Wyeth, Inc., 658 F.3d 867 (8th Cir. 2011) (vacating opinion pursuant to Supreme Court's decision; i.e., dismissing claims against generic manufacturers); Demahy v. Actavis, Inc., 650 F.3d 1045 (5th Cir. 2011) (per curiam) (holding that failure-to-warn claims against generic manufacturers are preempted and therefore granting generic manufacturer's motion to dismiss); Gaeta ex rel. A.G. v. Perrigo Pharms. Co., No. 09-15001, 2012 WL 605678 (9th Cir. Feb. 27, 2012) (vacating prior decision and affirming grant of summary judgment on claims for defective design, marketing defect, breach of express warranty, breach of implied warranty, negligence, gross negligence, and deceit by concealment); Phelps v. Wyeth, Inc., No. 6:09-CV-06168-TC, 2012 WL 1499343 (D. Or. Apr. 24, 2012) (holding that failure-to-warn, "misbranding," "failure-to-communicate-drug-safety-information," and "failure-to-test-and-monitor" claims fail under Mensing); Metz v. Wyeth LLC, --- F. Supp. 2d ----, No. 8:10-CV-2658-T-27AEP, 2012 WL 1058870 (M.D. Fla. Mar. 28, 2012) (holding that strict-liability, misrepresentation, fraud, and negligence-per-se claims are preempted or insufficiently pled and that the failure-to-effectively-communicate claim is barred by the learned-intermediary doctrine and therefore granting the generic defendant's motion to dismiss and motion for summary judgment); Cooper v. Wyeth, Inc., No. 09-929-JJB, 2012 WL 733846 (M.D. La. Mar. 6, 2012) (holding that the plaintiff's claims based on a purported failure to comply with federal duties to monitor the safety of drug products, report findings to the FDA failure-to-withdraw, and failure-to-communicate are preempted); Bowman v. Wyeth, LLC, No. 10-1946 JNE/SER, 2012 WL 684116 (D. Minn. Mar. 2, 2012) (granting motion for judgment on the pleadings as to claims for negligence, negligent misrepresentation, and fraud; and rejecting assertion that failure-to-withdraw claim survives Mensing); Schrock v. PLIVA USA, Inc., No. 08-453-M, 2011 WL 6122768 (W.D. Okla. Dec. 8, 2011) (holding that a breach-of-warranties claim is preempted under Mensing and therefore granting the generic manufacturer's motion to dismiss); Gross v. Pfizer, Inc., 825 F. Supp. 2d 654, 659 (D. Md. 2011), reconsideration denied (Jan. 27, 2012) (holding that Mensing barred failure-to-stop-selling-drug, failure-to-test-and-inspect-the-drug, warranty, and misrepresentation claims and therefore granting the generic manufacturer's motion for judgment on the pleadings); Guarino v. Wyeth LLC, No. 8:10-CV-2885-T-30TGW, 2011 WL 5358709 (M.D. Fla. Nov. 7, 2011) (holding that the plaintiffs' failure-to-warn and "failure-to-properly-communicate" claims are preempted by Mensing and therefore granting the generic manufacturer's motion to dismiss or, in the alternative, motion for judgment on the pleadings); Metz v. Wyeth, LLC, No. 8:10–CV–2658–T–27AEP, 2011 WL 5024448 (M.D. Fla. Oct. 20, 2011) (holding that the plaintiff's failure-to-warn, warranty, fraud, negligence per se, failure-to-notify-the-FDA, and failure-to-monitor claims fail post-Mensing and therefore granting the generic manufacturers' motion to dismiss); Henderson v. Sun Pharms. Indus., Ltd., No. 4:11-CV-0060-HLM, 2011 WL 4015658 (N.D. Ga. Aug. 22, 2011) (holding that failure-to-warn, design-defect, manufacturing-defect, and negligence claims are preempted or insufficiently pled and therefore granting denying the plaintiff's motion to amend the complaint).

[14] Because the claims are patently preempted, Mylan will not spend a significant amount of time addressing the sufficiency of Plaintiff's pleadings in support of her claims for negligent misrepresentation, consumer fraud, failure to warn, and negligence. Nevertheless, for the sake of completeness, Mylan notes the following. First, throughout her Complaint, Plaintiff suggests that Mylan breached a duty to warn Decedent, the "medical community," or the "general public" regarding the risks associated with paroxetine. (See, e.g. Compl. at ¶ 220(e).) However, Mylan had no such duty, as Illinois has adopted the learned intermediary doctrine. See Kirk v. Michael Reese Hosp. and Medical Center, 513 N.E.2d 387, 393 (Ill. 1987). Accordingly, beyond the fact that such theories are unquestionably

### b. Plaintiff does not state a design defect claim upon which relief can be granted.

Plaintiff's design defect claim centers upon the "inherent" risks associated with paroxetine (Compl. at ¶ 211), and is properly considered a disguised failure-to-warn claim. As such, it falls squarely within the holding of Mensing and must be dismissed. Nevertheless, even if the claim had anything to do with paroxetine's design, it still fails. In order to establish a strict liability design defect claim under Illinois law,[15] a plaintiff must establish: (1) a defect in the product that results from the design; (2) the defect made the product unreasonably dangerous; (3) the defect existed at the time the product left the defendant's control; (4) the plaintiff suffered an injury; and (5) the injury was proximately caused by the defect. Mikolajczyk v. Ford Motor Co., 901 N.E.2d 329, 335 (Ill. 2008).[16]

---

preempted, they fail for this additional reason. Next, Plaintiff's "rote recitation of the elements" of her negligent misrepresentation count fails to put Mylan on notice of, *inter alia*, its "carelessness or negligence in ascertaining the truth of the statement by the party making it," given that GSK is alleged to have withheld safety information from the public. Tillman v. Taro Pharm. Indus. Ltd., No. 10-CV-04202, 2011 WL 3704762, at *6 (N.D. Ill. Aug. 17, 2011). Similarly, as to Plaintiff's fraud-based claims, the Complaint does not apprise Mylan of "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff," as required by Rule 9. General Elec. Capital Corp. v. Lease Resolution Corp., 128 F.3d 1074, 1078 (7th Cir. 1997) (citations omitted). More specifically, Plaintiff "fails to identify when or how these alleged false representations were made" or "to plead that [Mylan] was aware that any information that [it was] presenting to the medical community or to others was not correct." Tillman, 2011 WL 3704762, at **6-7. Moreover, given the widespread deception attributed to GSK, it is implausible to attribute to Mylan an intention to defraud simply by selling an FDA-approved drug with an FDA-approved label. See In Re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Products Liab. Litig., 692 F. Supp. 2d 1012, 1023-24 (S.D. Ill. 2010) aff'd sub nom. Walton v. Bayer Corp., 643 F.3d 994 (7th Cir. 2011). Finally, as to her warranty claims, Plaintiff fails to explain how Decedent relied on Mylan's representations when the paroxetine was chosen and prescribed by his physician. Further, Plaintiff does nothing to explain for what reason Decedent used paroxetine, or how she believes the drug was defective. See Tillman, 2011 WL 3704762, at *8. For all these reasons, Plaintiff's preempted claims fail for the additional reason that they do not satisfy federal pleading standards.

[15] For purposes of this Motion to Dismiss, Mylan assumes that Illinois substantive law governs Plaintiff's claims, based on Plaintiff's assertion that Decedent lived in Illinois, was prescribed paroxetine in Illinois, used paroxetine in Illinois, and died in Illinois. See Townsend v. Sears, Roebuck & Co., 879 N.E.2d 893, 905-07 (Ill. 2007) (discussing choice-of-law considerations). Mylan reserves the right to revisit this choice-of-law issue.

[16] Though Mylan refers to strict liability, the same analysis would apply to the extent Plaintiff suggests defectiveness in the design of paroxetine – *e.g.* negligence. See Jablonski v. Ford Motor Co.,

Though there are *five* elements to her claim, Plaintiff's design defect allegations against Mylan span only *four* sentences. First, Plaintiff suggests Mylan designed paroxetine, even though, as a generic drug, Mylan's paroxetine is simply a copy of GSK's Paxil. (See supra n.11.) Next, Plaintiff parrots the language from the "consumer expectations" and "risk-utility" tests adopted by Illinois courts, with no factual support whatsoever. Finally, Plaintiff includes stock language relating to causation. (See Compl. at ¶¶ 209-212.)

This is the epitome of a "formulaic recitation of the elements of a cause of action" – a practice expressly barred by the Supreme Court. Twombly, 550 U.S. at 555. Mylan submits that Plaintiff's threadbare allegations do not satisfy federal pleading standards for *any* element of her design defect claim, but the most glaring shortcoming of Plaintiff's design defect claim is that she doesn't allege a *defect* at all. She simply states that paroxetine is unreasonably dangerous due to its "inherent" risks. (Compl. at ¶ 211.)

For over thirty years, however, the Illinois Supreme Court has emphasized that "defect" and "unreasonably dangerous" are separate elements to be proven by a plaintiff. See, e.g. Hunt v. Blasius, 384 N.E.2d 368, 369-70 (Ill. 1978).[17] The plaintiffs in Hunt were passengers in a car that struck a road sign post. In support of their design defect claim, they alleged that the "design of the exit sign post was defective because it was not reasonably safe in the event that automobiles left the paved portion of the highway and collided with the post." Id. at 372. That is, the plaintiffs argued the product was defective *because* it was unreasonably dangerous. But this analysis improperly conflates two separate elements: "*The injuries must derive from a distinct defect in the product, a defect which subjects those exposed to the product to an*

---

955 N.E.2d 1138, 1154-55 (Ill. 2011) (indicating that strict liability and negligent design claims are "essentially identical").

[17] Accord Salerno v. Innovative Surveillance Tech., Inc., 932 N.E.2d 101, 108-09 (Ill. App. 2010) appeal denied, 942 N.E.2d 461 (Ill. 2010) ("The key inquiry is whether the allegedly defective condition made the product unreasonably dangerous.").

*unreasonable risk of harm.*" Id. (emphasis supplied).[18] Here, Plaintiff's Complaint suffers from the identical shortcoming highlighted in Hunt – she has failed to allege any defect and, therefore, cannot satisfy the first element of her design defect claim.

Moreover, Plaintiff does not include sufficient factual information in support of the second element of her so-called design defect claim – *i.e.* unreasonable dangerousness. There are two "*methods of proof* by which a plaintiff 'may demonstrate' that the element of unreasonable dangerousness is met." Mikolajczyk, 901 N.E.2d at 348 (emphasis in original). Those are the risk-utility test and the consumer expectations test. Id.

A plaintiff operating under the risk-utility test may carry her burden by proving "the availability and feasibility of alternate designs at the time of its manufacture, or that the design used did not conform with the design standards of the industry, design guidelines provided by an authoritative voluntary association, or design criteria set by legislation or governmental regulation." Anderson v. Hyster Co., 385 N.E.2d 690, 692 (Ill. App. 1979). On the other hand, "[u]nder the consumer-expectation test, a plaintiff must establish what an ordinary consumer purchasing the product would expect about the product and its safety." Calles v. Scripto-Tokai Corp., 864 N.E.2d 249, 254-56 (Ill. 2007).

The viability of Plaintiff's one-sentence consumer-expectations proof can be quickly dispatched. As already discussed, federal law barred Mylan from altering its label, and, of course, consumer expectations are necessarily guided by a product's warnings. Therefore, when warnings are adequate as a matter of law (because of preemption or otherwise), a plaintiff cannot then backdoor a collateral attack on the warnings under the guise of design claim:

---

[18] See, also Patterson v. Rohm Gesellschaft, 608 F. Supp. 1206, 1210-11 (N.D. Tex. 1985) (describing as "delightfully nonsensical" the plaintiff's argument "**that a product which does not have a defect can nevertheless, under the law, be defective**") (bold in original).

9

> [Defendant's] warnings met the federal requirements and [plaintiff's] design defect claim therefore fails the "consumer expectation" test. To rule otherwise would allow the anomalous circumstance that a consumer is entitled to expect a product to perform more safely than its government-mandated warnings indicate.

Papike v. Tambrands, Inc., 107 F.3d 737, 743 (9th Cir. 1997).[19]

Plaintiff's risk-utility proof fares no better. The product before the Court – paroxetine – has only one active ingredient: paroxetine. Mylan's inclusion of paroxetine in its paroxetine product is the only possible design. Plaintiff makes no suggestion whatsoever that there is an alternative design to this product, nor does she explain how Mylan failed to conform to industry or governmental standards. To the contrary, the pharmaceutical industry is heavily regulated, the FDA approved Mylan's ANDA to manufacture paroxetine, and the product remains on the market today with the ongoing approval of federal regulators. Further, Plaintiff recognizes that there are certain "inherent" risks associated with paroxetine (Compl. at ¶ 211), such that the risks cannot be "designed out."[20]

In these circumstances, Plaintiff's use of "magic words" in place of factual allegations fails to raise her claim beyond the speculative level. Accordingly, federal courts construing

---

[19] Accord Haddix v. Playtex Family Products Corp., 138 F.3d 681, 683-86 (7th Cir. 1998) (interpreting Illinois law and holding that, when a consumer is adequately warned of risks associated with a product, the plaintiff cannot recover via the consumer expectations test in connection with a design defect claim); Reece v. Good Samaritan Hosp., 953 P.2d 117, 123 (Wash. App. 1998) ("[T]he 'consumer expectation' test, cannot be met where, as here, a manufacturer has adequately warned consumers of the risks associated with using a product.").

[20] The scholars who crafted the doctrine of strict products liability recognized that some products, regardless of their design, are unsafe. David G. Owen, Inherent Product Hazards, 93 Ky. L.J. 377, 379-380 (2005). In an attempt to "avoid the possibility that the new 'strict liability' doctrine might be stretched further, to prevent it from being misconstrued as permitting a challenge to the design of products possessing such inherent dangers, Dean Prosser and the [American Law Institute] explicitly excluded such an obligation from the new strict tort doctrine." Id. at 380. See, also RESTATEMENT (SECOND) OF TORTS § 402A cmt. h (1965) (stating that ingredients which are "characteristic of the product itself either as to presence or quantity" are not properly considered defects); id. at cmt. k (stating that an "unavoidably unsafe" product "properly prepared, and accompanied by proper directions and warning, is not defective, nor is it unreasonably dangerous"; that is, the only avenues of relief when a product's danger cannot be "designed out" are claims for manufacturing defects or failure-to-warn).

Illinois law have properly dismissed complaints featuring similar threadbare allegations.[21] Otherwise, strict liability becomes absolute liability, which is contrary to Illinois law. See Woodill v. Parke Davis & Co., 402 N.E.2d 194, 199 (Ill. 1980) ("Strict liability is not the equivalent of absolute liability.").[22] Because Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation," Iqbal, 129 S.Ct. at 1949 (internal quotation marks omitted), dismissal is proper.

### c. Even if properly pleaded, Plaintiff's design defect claim is preempted.

#### i. It is "impossible" to independently satisfy both state and federal law.

Even if the Court were to determine Plaintiff adequately pleaded all five elements of her design defect claim in just four sentences, Mylan submits that the claim must still be dismissed as preempted. On the topic of impossibility preemption, Mensing holds that "[t]he question for 'impossibility' is whether the private party could independently do under federal law what state law requires of it." Mensing, 131 S. Ct. at 2579. "[W]hen a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes." Id. at 2580-81. Plaintiff's design defect claim is based on a

---

[21] See, e.g. Tillman, 2011 WL 3704762, at *4 (dismissing design defect claim which included only formulaic recitations of the elements with no "specific facts" regarding purported defects in the product); Mohr v. Targeted Genetics, Inc., No. 09-3170, 2009 WL 4021153, at **2-3 (C.D. Ill. Nov. 18, 2009) (granting motion to dismiss, because "the complaint includes little more than the 'magic words' which are typically used to support a product liability claim" and the plaintiff "alleged no specific facts which establish tortious conduct" on behalf of the moving defendant).

[22] The District Court for the District of Maryland addressed a nearly identical scenario and dismissed the plaintiff's design defect claims under Mensing and Twombly in favor of Mylan. See Grinage v. Mylan Pharmaceuticals, Inc., 840 F. Supp. 2d 862, 870 (D. Md. 2011) (dismissing the consumer expectations portion of the plaintiff's design defect claim, because "if [a generic drug] is dangerous beyond the expectations of the ordinary consumer, that can only be a symptom of Mylan's failure to update its label or communicate effectively with doctors"; dismissing the risk-utility portion of the plaintiff's design defect claim because the "plaintiff alleges nothing with regard to the utility of [the generic drug] or availability of less dangerous alternatives," and, therefore, has not satisfied federal pleading standards) (citing Twombly, 550 U.S. at 555).

11

supposed duty for Mylan to change the design of paroxetine. The question then becomes whether Mylan could have satisfied that duty unilaterally. Clearly it could not.

The Hatch-Waxman Amendments sets forth the standards by which generic drugs are approved by the FDA. 21 U.S.C. § 355(j). The ANDA applicant must show, *inter alia*, that (1) its warning label is the same as the RLD's and that (2) its drug's active pharmaceutical ingredient is bioequivalent to the RLD's. The FDA approved MPI's ANDA 77-873 to market paroxetine based on the federal agency's determination that the generic product is "bioequivalent" to the RLD, Paxil. (See Exhibit "A," at 1.) As such, the FDA would have never approved Mylan's ANDA had MPI submitted for consideration a product with a different active ingredient.[23] Similarly, if Mylan unilaterally changed the active pharmaceutical ingredient in paroxetine after its ANDA was approved, Mylan would have been in violation of federal law.[24]

Thus, Plaintiff's design defect claims fail for the same reason as the failure-to-warn claims in Mensing:

> The FDCA … prevented the Generic Defendants from altering unilaterally the design of the drug itself. A generic drug manufacturer must ensure that its product has the same active ingredient, route of administration, dosage form, and strength as the reference listed drug already approved by the FDA, unless the manufacturer has received special permission from the FDA to alter any of the drug's characteristics. See 21 U.S.C. § 3550. In Mensing, the Court held that "impossibility preemption" exists where federal law prohibits a private party from taking an action required by state law without first obtaining special approval from the federal government …. Accordingly, [a plaintiff] cannot show that an alternative drug design was available to the Generic Defendants, and her design defect claims will be dismissed as preempted.

Johnson v. Teva Pharmaceuticals USA, Inc., No. 2:10 CV 404, 2012 WL 1866839, at *4 (W.D. La. May 21, 2012) (citations omitted). The vast majority of courts to address this issue agree.[25]

---

[23] See 21 U.S.C. § 355(j)(2)(A)(ii)(I).
[24] See 21 U.S.C. § 355(a).
[25] See, e.g. Lyman v. Pfizer, Inc., No. 2:09-CV-262, 2012 WL 368675, at *4 (D. Vt. Feb. 3, 2012) (holding that design-defect claims "are preempted as well by Mensing's logic" and the duty of

Moreover, because the practical import of Plaintiff's theory would necessitate the withdrawal of Mylan's paroxetine from the market altogether, Plaintiff's allegations amount to a "failure-to-withdraw" claim.[26] However, Illinois does not recognize a duty to withdraw or recall an allegedly defective product, so the Court needn't reach the question of preemption.[27]

And in any event, the option of withdrawing a product from the market does not provide Plaintiff an end around <u>Mensing</u>. First, the Supreme Court and several federal appellate courts have already held that a failure-to-withdraw theory cannot survive <u>Mensing</u>.[28] What is more, if

---

"sameness"); <u>In re Pamidronate Products Liab. Litig.</u>, 842 F. Supp. 2d 479, 484 (E.D.N.Y. 2012) (holding that the duty of "sameness" also preempts design defect claims); <u>Aucoin v. Amneal Pharmaceuticals, LLC</u>, No. 11-1275, 2012 WL 2990697, at *9 (E.D. La. July 20, 2012) (holding that the reasoning of <u>Mensing</u> equally applied to a design defect claim because "Defendant could not alter the design of the drug without violating federal law and th[e] duty of sameness"); <u>Lashley v. Pfizer, Inc.</u>, --- F.Supp.2d ----, No. 1:09CV749HSO-JMR, 2012 WL 2459148, at *11 (S.D. Miss. June 27, 2012) ("Because [the generic manufacturer] could not have altered their package inserts without FDA approval, Plaintiffs' claim based upon defective design is preempted by federal law."); <u>Coney v. Mylan Pharms. Inc.</u>, --- F. Supp. 2d ----, No. 6:11-cv-00035-BAE, 2012 WL 170143 (N.D. Ga. Jan. 19, 2012) (holding that the plaintiff's strict-liability defective-design-or-manufacture, negligence, gross-negligence, and fraudulent-concealment claims are preempted, insufficiently pled, or both); <u>In re: Fosamax (Alendronate Sodium) Prods. Liab. Lit.</u>, No. 08-008 (GEB-LHG), 2011 WL 5903623, at *6 (D. N.J. Nov. 21, 2011) (holding that design defect claims are preempted, "because FDA requires generic Fosamax to have the same active ingredient as Fosamax …."); <u>Stevens v. Pliva, Inc.</u>, No. 6:10-0886, 2011 WL 6224569, at *2 (W.D. La. Nov. 15, 2011) (holding that, to the extent the plaintiff's design defect claim even satisfied the pleading standards, "federal law pre-empts state laws imposing the duty to change a drug's design upon generic drug manufacturers") <u>report and recommendation adopted</u>, 2011 WL 6224556 (W.D. La. Dec. 2, 2011).

[26] See <u>Robinson v. McNeil Consumer Healthcare</u>, 615 F.3d 861, 867 (7th Cir. 2010) (Posner, J.) (observing that a design defect claim applied to an FDA-approved drug implies "that the drug should be taken off the market"). Plaintiff raises these failure-to-withdraw theories explicitly in her negligence count. (<u>See</u> Compl. at ¶ 220.)

[27] See <u>Rogers v. Clark Equipment Co.</u>, 744 N.E.2d 364, 370 (Ill. App. 2001) ("[A]bsent a statutory obligation or voluntary undertaking to retrofit, no Illinois case has imposed upon a manufacturer a duty to retrofit or recall where the allegedly dangerous condition was not discovered until after the product was sold."). Once again, Mylan reiterates that Plaintiff's central theory is GSK withheld safety information from the general public, including Mylan. It is implausible that Mylan was simultaneously kept in the dark regarding paroxetine's risks, yet also knowingly distributing a defective product.

[28] See, e.g. <u>Strayhorn v. Wyeth Pharmaceuticals, Inc.</u>, No. 11-2058-STA-CGC, 2012 WL 3261377, at *16 (W.D. Tenn. Aug. 8, 2012) ("[A]ll of Plaintiffs' assorted claims raising allegations that the Generic Defendants failed to remove metoclopramide from the market are invalid due to <u>Mensing</u> and <u>Smith</u>'s rejection of this theory."); <u>In re Darvocet, Darvon & Propoxyphene Products Liab. Litig.</u>, No. 2:11-MD-2226-DCR, 2012 WL 2457825, at *1 (E.D. Ky. June 22, 2012) (observing that the plaintiffs "failed to persuade either the Supreme Court or the Eighth Circuit on remand in <u>Mensing</u>, and the Sixth

13

the ability to withdraw a product from the market were sufficient to defeat impossibility preemption, "it is unclear when, outside of express preemption, the Supremacy Clause would have any force." Mensing, 131 S.Ct. at 2579. But Mensing bars "an approach to pre-emption that renders conflict pre-emption all but meaningless." Id.

> ii. *Design defect claims are preempted, as they would frustrate the purposes of Hatch-Waxman.*

Plaintiff's design defect claim also fails pursuant to "purposes-and-objectives" preemption. In passing the Hatch-Waxman Amendments, Congress could not have stated its purpose more clearly:

> THE PURPOSE OF TITLE I OF THE [HATCH–WAXMAN AMENDMENTS] IS TO MAKE AVAILABLE MORE LOW COST GENERIC DRUGS BY ESTABLISHING A GENERIC DRUG APPROVAL PROCEDURE FOR PIONEER DRUGS FIRST APPROVED AFTER 1962.

H.R.Rep. No. 98-857(I), at 14-15 (1984), reprinted in 1984 U.S.C.C.A.N. 2647, 2647-48 (capitals in original).[29] The lynchpin of so-called "purpose" preemption is whether a state's "law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Hines v. Davidowitz, 312 U.S. 52, 67 (1941). A state-law duty is not cognizable if it frustrates the purpose of federal law, regardless of "whether that 'obstacle' goes by the name of 'conflicting; contrary to; … repugnance; difference; irreconcilability; inconsistency; violation; curtailment; … interference,' or the like." Geier v. American Honda Co., 529 U.S. 861, 873 (2000) (quoting Hines, 312 U.S. at 67).

With the purposes of the Hatch-Waxman Amendments in mind, it is clear that claims which either expressly or impliedly mandate the removal of generic drugs from the market

---

Circuit in Smith v. Wyeth, Inc., 657 F.3d 420 (6th Cir. 2011) [as to the viability of failure-to-withdraw claims]").

[29] See, also Andrx Pharms., Inc. v. Biovail Corp. Int'l, 256 F.3d 799, 809 (D.C. Cir. 2001) (Hatch-Waxman's purpose is "to get generic drugs into the hands of patients at reasonable prices – fast.").

14

cannot stand. In the first section of Hatch-Waxman, Congress stated its purpose to make available more generic drugs to decrease costs for consumers and payers. Assuming compliance with Plaintiff's purported duty on Mylan to withdraw its paroxetine from the market, the cost-saving goals of Hatch-Waxman would be jeopardized.[30] On one hand, we have Congress carefully crafting federal law to "make available" generic drugs; on the other hand, Plaintiff advocates a state law duty which would take those generic drugs off the market. It is difficult to imagine a more blatant conflict between the express purposes of a federal statute and the practical effects of purported state-law duty.

> The District Court for the District of Maryland agreed:
>
> [T]he Court finds unavailing Plaintiff's argument that [a generic manufacturer] could have simply stopped manufacturing [a drug] and thus avoided violating either federal or state law. The Court is aware of no state law duty that would compel generic manufacturers to stop production of a drug that under federal law they have the authority to produce. Nor could such a state law duty exist, as it would directly conflict with the federal statutory scheme in which Congress vested sole authority with the FDA to determine whether a drug may be marketed in interstate commerce.

Gross, 825 F. Supp. 2d at 659 (citation omitted).[31]

## IV. CONCLUSION

Mylan respectfully requests that the Court dismiss Counts IX-XV of Plaintiff's Complaint in their entirety, with prejudice. To the extent Plaintiff's Complaint contains *any* facts, they relate only to a failure-to-warn theory. As the Supreme Court has foreclosed such claims, Mylan respectfully requests that the Court grant its Motion to Dismiss.

---

[30] In making this determination, the Supreme Court's "pre-emption cases ordinarily *assume* compliance with the state-law duty in question." Geier, 529 U.S. at 882 (emphasis original).

[31] Accord Moore v. Mylan Inc., 840 F. Supp. 2d 1337, 1352 n.14 (N.D. Ga. 2012) (holding that any state law duty mandating the withdrawal of an FDA-approved drug is preempted, because it "would directly conflict with the federal statutory scheme in which Congress vested sole authority with the FDA to determine whether a drug may be marketed in interstate commerce.").

Dated: August 21, 2012          Respectfully submitted,

By: /s/ Robert E. Haley

Robert E. Haley, Esq.
Swanson, Martin & Bell, LLP
330 N. Wabash, Suite 330
Chicago, IL 60611
P: (312) 321-9100
F: (312) 321-0990
rhaley@smbtrials.com

and

Clem C. Trischler, Esq.
*Pro Hac Vice Admission to be Sought*
Pietragallo Gordon Alfano Bosick & Raspanti, LLP
One Oxford Centre, 38th Floor
Pittsburgh, PA 15219
P: (412) 263-2000
F: (412) 263-2001
cct@pietragallo.com