**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| WENDY DOLIN, Individually and as Independent Executor of the ESTATE OF STEWART DOLIN, deceased,<br><br>        Plaintiff,<br><br>  v.<br><br>SMITHKLINE BEECHAM CORPORATION D/B/A GLAXOSMITHKLINE, a Pennsylvania Corporation; and MYLAN INC., a Pennsylvania Corporation,<br><br>        Defendants. | Case No. 1:12-CV-06403<br><br>Judge James B. Zagel |

**PLAINTIFF'S OPENING SUPPLEMENTAL BRIEF IN OPPOSITION TO
DEFENDANT GLAXOSMITHKLINE LLC'S MOTION FOR SUMMARY JUDGMENT
AND
DEFENDANT MYLAN INC.'S AMENDED MOTION TO DISMISS**

Pursuant to the Court's oral instruction and Minute Order (Doc. 96) on June 18, 2013, Plaintiff Wendy Dolin, by and through her counsel, respectfully submits this Opening Supplemental Brief in Opposition to Defendant GlaxoSmithKline LLC's ("GSK") Motion for Summary Judgment and Defendant Mylan Inc.'s ("Mylan") Amended Motion to Dismiss.

**I.    THE "PRODUCT" AT ISSUE AND ITS IMPACT ON DEFENDANT GLAXOSMITHKLINE LLC'S MOTION FOR SUMMARY JUDGMENT**

    **A.    Plaintiff Raises Two General Theories of Liability Against GSK: Strict Products Liability *and* Misrepresentation**

The Complaint alleges two general theories of liability against GSK. The first theory is grounded in Illinois products liability law (design and failure-to-warn defects)[1] and seeks to hold

---

[1] Under Illinois law, "[a] strict products liability claim may proceed under three different theories of liability: a manufacturing defect, a design defect, or a failure to warn." *Salerno v. Innovative Surveillance*

1

GSK liable for its role in putting a defective product on the market. The second theory is grounded in Illinois law governing misrepresentation (fraudulent and negligent misrepresentation, consumer protection, etc.),[2] and seeks to hold GSK liable for making material misrepresentations about Paxil's suicidal behavior risks. Under Illinois law, although each theory implicates issues of duty, causation, and injury, they each reflect different aspects of GSK's misconduct and, thus, warrant different analysis.[3] Plaintiff's products liability claims focus on the role GSK played in putting a defective product on the market, whereas Plaintiff's misrepresentation claims focus on the statements made by GSK that misled patients and doctors about an important risk associated with its antidepressant. *See Kellogg v. Wyeth*, 762 F. Supp. 2d 694, 705 (D. Vt. 2010) ("[A] drug manufacturer has a duty to warn physicians about the risks associated with use of the drug in the context of strict products liability. In the context of a negligence action, the duty owed by a drug manufacturer to a physician is to exercise due care in disseminating information about its product in order to avoid reasonably foreseeable risks.").

Plaintiff raises this distinction at the outset because it directly relates to the purpose of

---

*Tech., Inc.*, 932 N.E.2d 101, 108 (Ill. App. Ct. 2010) (citing *Mikolajczyk v. Ford Motor Co.*, 901 N.E.2d 329, 348 (Ill. 2008)).

[2] "To state a cause of action for negligent misrepresentation, the complaint must again allege a duty to plaintiff, a breach of the duty and injury proximately resulting from such breach. [citation omitted] Restatement (Second) of Torts § 311 (1965) provides *there may be liability for negligently giving false information to another if the information causes some physical harm to the person who justifiably relies on the information.*" *Snelten v. Schmidt Implement Co.*, 647 N.E.2d 1071, 1076 (Ill. Ct. App. 1995) (emphasis added).

[3] As discussed in Plaintiff's Opposition, GSK has attempted to conflate these two theories of liability. *See* Plaintiff's Opposition at 38-39. This tactic has been used by GSK in the past in an attempt to avoid addressing *both* theories of liability and to pigeonhole a plaintiff into a theory GSK believes is most suitable for dismissal or summary judgment. *See, e.g.*, *Forst v. SmithKline Beecham Corp.*, 602 F. Supp. 2d 960, 966 (E.D. Wis. 2009), *citing Pelfresne v. Village of Williams Bay*, 917 F.2d 1017, 1023 (7th Cir. 1990) (rejecting GSK's attempt to conflate theories of liability predicated on strict products liability with claims predicated on misrepresentation). Plaintiff will not belabor the point here, but it is important when considering GSK' Motion for Summary Judgment to evaluate potential liability against a theory of liability predicated on products liability and, separately, a theory predicated on misrepresentation. Both theories contemplate different types of duty (foreseeablilty) and causation.

2

this supplemental brief. Indeed, this distinction between products liability and misrepresentation is one of the central differences between *Foster v. American Home Products Corp.*, 29 F.3d 165 (4th Cir. 1994) and *Conte v. Wyeth, Inc.*, 85 Cal. Rptr. 3d 299 (Cal. Dist. Ct. App. 2008) and *Wyeth, Inc. v. Weeks*, -- So. 3d. --, 2013 WL 135753 (Ala. Jan. 11, 2013). In *Foster*, the court refused to consider the merits of the plaintiff's misrepresentation claims outside of the rubric of products liability law. *See* Plaintiff's Opposition at 32-33. In *Conte* and *Weeks*, however, the Courts rejected *Foster*'s "everything-is-products-liability" approach, and engaged in a thoughtful analysis of misrepresentation law to determine whether there was potential liability. *See* Plaintiff's Opposition at 33-24. While this distinction between products liability and misrepresentation claims hinges on the law of each state, here in Illinois, these two causes of action are distinct. *Woodill v. Parke Davis & Co.*, 402 N.E.2d 194, 198 (Ill. 1980) ("[T]he failure-to-warn theory in strict liability has been upheld as a distinguishable doctrine from its counterpart in negligence, based on the fact that it is the inadequacy of the warning that is looked to, rather than the conduct of the particular manufacturer, to establish strict liability."); *see Sellers v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 881 F. Supp. 2d 992, 1007-10 (S.D. Ill. 2012) (discussing various ways in which a pharmaceutical company can be potentially liable for a prescription medication pursuant to different theories of liability including strict products liability, fraud, *and* negligence). Plaintiff submits that *both* theories of liability are viable against GSK.

    **B.**    **A Drug Is Not Merely a Pill, It Is a Precise Chemical Formula Which Must be Accompanied by Proper Instructions and Warnings for Use**

At oral argument on June 18, 2013, the Court raised an important question—one that *Foster*, *Conte*, and *Weeks* did not fully address—what is the product at issue in this case? This question plays an important role in understanding how, under Illinois products liability law, a brand name manufacturer could be considered in the chain of commerce / distribution for the

3

generic versions of its drugs and, thus, be potentially liable.[4] During a colloquy with GSK's Counsel, the Court explained:

> [W]hat occurred to me when I looked at *Conte* and *Wyeth*, and I deliberately read *Foster v American Home Products Corporation* and *Conte v. Wyeth* together, read the two of them together, the one thing that occurred to me is that nobody really paid a lot of attention to what the definition of "product" is. Everybody assumed that the products are these little grains in the capsule, and I think that's clearly the case in terms of public understanding.
>
> The difficulty I have with it here is the very law that allowed the generics to do what they're doing, because what the law said is, if you make it exactly the same way and you use the same set of warnings, you can sell this to people. And from this you take the model of Glaxo, and it makes a certain amount of sense, because the product that Glaxo produced, the one that people bought, was this pill. But the structure of the legislation which allows the generic manufacturer to do things that Glaxo would not be allowed to do if it started out with a piece of scientific basis and a formula, it struck me that perhaps the product is not the actual drug that comes up but the formula, the recipe, the way it's made, because that's basically what Glaxo has. They got this drug they have designed, they have figured out how to produce it in an effective dosage, they figured out a way to control it. So what they got is is they have a bunch of chemicals and a recipe for producing something, some useful drug, and maybe it's that recipe in that process that is the product.
>
> And you sort of get the hint that that's maybe what Congress was thinking, because Congress was basically saying, okay, we're going to relieve you from all these burdens that serve public health, we're going to relieve you from the burden of research, from the burden of a lot of chemists, you basically take all that stuff that they put in the patent application, which is the recipe, and this is the product. And for this reason, the maker of the recipe, the designer of the recipe, the inventor of the recipe, is basically responsible for the consequences of the use of the recipe, in which case you're talking about a product other than that pill or that capsule. And you can talk about that with me, but one of the things I'm going to ask you to do is brief that issue, and I'm obviously going to have the other side brief it, too.
>
> And what struck me was the fact that the structure of the law that Congress passed, essentially is a permission for them to use this product, and that's the product we're talking about today. Now, there are all kinds of reasons giving

---

[4] Plaintiff submits that determining what the relevant product is, while particularly important in the products liability context, is not as important for Plaintiff's misrepresentation claims. Unlike products liability claims which turn on the defect of the *product* and the defendant's relationship to that *product*, a misrepresentation claim centers on the defendant's duty to the plaintiff and whether that duty was breached by making false or materially misleading representations. Thus, defining the product does not bear upon the Plaintiff's misrepresentation claims, which warrant a separate analysis.

> historical aspect of what we define "product" as, it puts it on a little different footing, but it comes into the world on a very different footing. This is not the equivalent of suing Ford because its Chevy couldn't keep the wheels on the chassis, this is the very product.

(Transcript of Proceedings at 25-27 on June 18, 2013, *Dolin v. SmithKline Beecham Corp.* (12-cv-06403).) The Court recognized that, before one can analyze whether GSK is potentially liable under Illinois product liability law, a proper definition of the product is needed.

Plaintiff submits that the product at issue in this case was not the specific pill Stewart Dolin ingested prior to committing suicide, but the formulation of the drug (*i.e.*, paroxetine hydrochloride) coupled with its instructions / warnings for use (*i.e.*, the paroxetine hydrochloride product insert).

A drug is not just a pill, but a chemical recipe or formula developed and tested by a drug developer to treat specific medical conditions. *See* 21 U.S.C.A. § 321; 21 C.F.R. § 314.108(a) (defining a drug, for the purposes of market exclusivity as an active moiety); *see also Kirk v. Michael Reese Hosp. & Med. Ctr.*, 513 N.E.2d 387, 392 (Ill. 1987) ("Prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect.") (quoting *Stone v. Smith, Kline & French Laboratories*, 731 F.2d 1575, 1579 (11th Cir. 1984)). This is why, before a drug is permitted to be marketed in the United States and Illinois, a drug developer must submit a new drug application ("NDA") to the U.S. Food and Drug Administration ("FDA") to obtain approval for a specific formulation of the drug to treat a specific indication. 21 U.S.C. § 355(a); *see also* 225 ILCS 120/10, *et. seq.* & 255 ILCS 85/1 *et. seq.* (specifying that prescription drug must be FDA-approved for sale and distribution). The NDA must contain:

> (A) full reports of investigations which have been made to show whether or not such drug is safe for use and whether such drug is effective in use; (B) a full list of the articles used as components of such drug; (C) a full statement of the composition of such drug; (D) a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and packing of such drug; (E) such samples of such drug and of the articles used as components there-

5

>of as the Secretary may require; (F) specimens of the labeling proposed to be used for such drug, and (G) any assessments required under section 355c of this title.

21 U.S.C.A. § 355(b)(1). The FDA then reviews the NDA and decides whether the drug will be permitted to be sold in the United States. Once approved, the drug developer must continue to investigate and report any adverse events associated with the drug, *see* 21 C.F.R. § 314.80, and must submit any new information that may affect the FDA's previous conclusions about the drug's safety, effectiveness, or labeling, 21 U.S.C. § 355(k). At any time, the FDA has the ability to withdraw approval of a drug if it finds that the drug is not "safe" when used in accordance with its labeling. 21 U.S.C. § 355(e). Similarly, drugs that are adulterated or mislabeled in any way are prohibited from being involved in any commerce. *See* 21 U.S.C. § 351, 352.

After receiving FDA approval, a brand name drug developer is permitted to have exclusivity over the selling of the drug for a period of five years. *See* 21 C.F.R. § 314.108(b). Specifically, no other drug manufacturer is permitted to manufacture a drug with the same "active moiety," which is defined as "the molecule or ion, excluding those appended portions of the molecule that cause the drug to be an ester, salt (including a salt with hydrogen or coordination bonds), or other noncovalent derivative (such as a complex, chelate, or clathrate) of the molecule, responsible for the physiological or pharmacological action of the drug substance." *Id.* After the brand name drug developer loses exclusivity, however, generic manufacturers are permitted to submit abbreviated new drug applications ("ANDA"), to obtain approval to sell and market that same drug, so long as it is identical in all material respects to the drug approved in the initial NDA. *See* 21 U.S.C. § 355(j). In submitting the ANDA, the generic drug manufacturer must submit proof that it will produce and market the same drug at issue by demonstrating that it possesses the same active ingredients, contains the same dosing and route of administration, contains the same warning labels, is a bioequivalent, contains a (identical) description of

6

the drug's formula and composition, and is not protected by an existing / enforceable patent. *Id.* at (j)(2)(A)(i)-(viii); 21 C.F.R. § 320.1(c). Essentially, the law provides that a generic drug manufacturer can manufacture and market a previously approved drug so long as it puts to market the same formula and product insert that was used by the brand name developer. Indeed, recent Supreme Court case law has made it clear that a generic manufacturer cannot make any substantive changes to the drug's formula or design without going through the NDA process to create a new drug. *PLIVA, Inc. v. Mensing*, 131 S. Ct. 2567, 2578, 180 L. Ed. 2d 580 (2011) *reh'g denied,* 132 S. Ct. 55, 180 L. Ed. 2d 924 (U.S. 2011) ("Federal law, however, demanded that generic drug labels be the same at all times as the corresponding brand-name drug labels."); *Mut. Pharm. Co., Inc. v. Bartlett*, 133 S. Ct. 2466, 2475 (2013) ("The FDCA requires a generic drug to have the same active ingredients, route of administration, dosage form, strength, and labeling as the brand-name drug on which it is based. . . . Indeed, were Mutual to change the composition of its sulindac, the altered chemical would be a new drug that would require its own NDA to be marketed in interstate commerce."). This stands in stark contrast, however, to the obligations placed on the brand name drug developer:

> Yet through many amendments to the FDCA and to FDA regulations, it has remained a central premise of federal drug regulation that the [brand name] manufacturer bears responsibility for the content of its label at all times. It is charged both with crafting an adequate label and with ensuring that its warnings remain adequate as long as the drug is on the market. *See, e.g.*, 21 CFR § 201.80(e) (requiring a manufacturer to revise its label "to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug"); § 314.80(b) (placing responsibility for postmarketing surveillance on the manufacturer); 73 Fed.Reg. 49605 ("Manufacturers continue to have a responsibility under Federal law ... to maintain their labeling and update the labeling with new safety information").

*Wyeth v. Levine*, 555 U.S. 555, 570-71 (2009).

This regulatory framework was created to promote seemingly divergent aims. Specifically, the Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. 98-417, 98

7

Stat 1585 (1984) ("Hatch-Waxman Amendments") which created the NDA / ANDA process, was designed "to balance the interests of the generic drug manufacturers, who sought to avoid unnecessary testing, against the research investments of the pioneer manufacturers, at the same time mindful of the public need for safe commercial drugs." *Tri-Bio Labs, Inc. v. United States*, 836 F.2d 135, 139 (3d Cir. 1987). Thus, on one hand, Congress wanted to encourage new drug development while, on the other, provide a mechanism for "generic drug manufacturers to get their drugs to market both cheaply and quickly . . . by permitting manufacturers to forego duplicative clinical trials." *Stacel v. Teva Pharmaceuticals, USA*, 620 F. Supp. 2d 899, 907 (N.D. Ill. 2009). The Hatch-Waxman Amendments "reflect a statutory compromise of the competing concerns." *Tri-Bio Labs*, 836 F.2d at 139.

Brand name developers are responsible for ensuring that the drug formula and labeling are safe and effective and, in exchange, are rewarded with having a monopoly over selling the drug (with severely inflated prices) for a period of time. Thereafter, generic manufacturers are allowed to forgo any development costs associated with creating the brand name drug so long as they make appropriate copies. Generic manufacturers, therefore, do not make unique products or drugs. Rather, generic manufactures simply produce copies of the brand name product, relying on the accuracy and diligence of the brand name developer to monitor the safety of the drug and ensure proper labeling. Thus, the onus of the product's safety, whether in generic or brand name form, rests with the brand name manufacturer. Indeed, "[u]nder the FDCA, manufacturers, who have greater 'access to information about their drugs' than the FDA, [citation omitted], retain the ultimate responsibility for the safety of the products they sell." *Bartlett*, 133 S. Ct. at 2484 (J. Sotomayor dissenting) (quoting *Levine,* 555 U.S., at 578–579). Since brand name developers have unique access to in-depth clinical trial data and a full work-up of the clinical testing

8

performed in developing the drug—information to which generic manufacturers do not necessarily have full access—they bear the responsibility of ensuring that the drug is safe and properly labeled. The product in the context of prescription drugs, therefore, is not the pill developed by the brand name or generic manufacturer. The product is the formula and accompanying instructions / warnings for use that are created, monitored, and maintained by the brand name manufacturer.

This concept of a product is supported by Illinois law. Under the Illinois Food, Drug and Cosmetic Act, 410 ILCS 620/1, *et. seq.* and the Illinois Pharmacy Practice Act, 255 ILCS 85/1, *et seq.*, pharmacists are permitted to substitute brand name versions of a drug with any generic version without consent from the patient or physician unless the physician expressly states "may not substitute" on the prescription. 225 ILCS 85/25; 410 ILCS 620/3.14. Illinois law recognizes that generic versions of a drug are not distinct products, but rather, are federally permitted equivalents of brand name drugs. Thus, unless a physician specifically indicates a specific brand of a drug, Illinois law considers them to be the same product.

In this case, GSK developed, researched, and submitted a NDA to the FDA for paroxetine hydrochloride[5] to treat depression, which GSK named Paxil for branding purposes.[6] In 1992, the paroxetine hydrochloride NDA was approved by the FDA and GSK began selling paroxetine hydrochloride under the trade name Paxil. In 2003, GSK's patent over paroxetine hydrochloride expired, and various generic drug manufacturers, including Mylan, submitted ANDAs to market and sell generic paroxetine hydrochloride. Mylan received final approval from the FDA to sell

---

[5] Indeed, in Paxil's NDA, GSK and the FDA use paroxetine hydrochloride and Paxil interchangeably. It is not the name given to the product that makes a drug a drug—it is the formula and instructions / warnings for use that make a drug a viable treatment for a medical condition.

[6] Paroxetine hydrochloride is also known internationally under various trade names such as Aropax, Pexeva, Seroxat, Sereupin, and Brisdelle. Despite having different names, the drug is the same product: paroxetine hydrochloride.

GSK's paroxetine hydrochloride on March 8, 2004. Between 2004 and 2007, as described in the Complaint at ¶¶ 69-102 and Plaintiff's Opposition at 3-5, GSK altered the paroxetine hydrochloride label to warn of the increased risk of adult patients becoming suicidal while taking paroxetine and then, later, removed that warning from the label. After 2007, the label falsely stated that the suicidal behavior risk seen in children, adolescents and young adults did not extend to adults beyond age 24 despite GSK's clinical trial data to the contrary. In June 2010, Stewart Dolin began experiencing work-related anxiety and depression. His doctor prescribed him a 10 mg daily dose of *Paxil*, not "generic paroxetine hydrochloride." His prescription, however, was filled with Mylan's generic version of paroxetine hydrochloride without Stewart's consent or his physician's authority. This substitution occurred because, under Illinois law, Paxil and paroxetine hydrochloride are considered the *same product*, even if they are technically manufactured by different companies. This makes sense since GSK, not Mylan, has the resources, ability, and responsibility to ensure that paroxetine hydrochloride is safe and properly labeled.

### C. Illinois Strict Products Liability Law Support This Conception of Product

Under Illinois law, "[a]n item will be considered a product for purposes of the cause of action if to do so will effectuate the policy basis for imposing strict liability in tort." *Board of Educ. v. A, C and S, Inc.,* 546 N.E.2d 580, 591 (Ill. 1989). Accordingly, "the social policy justifications underlying the adoption of strict liability, rather than a dictionary definition of the term product, should be determinative of that issue." *Trent v. Brasch Mfg. Inc.,* 477 N.E.2d 1312, 1315 (Ill. Ct. App. 1985). The policy considerations to be considered include:

> 1) the public interest in life and health; 2) the invitations and solicitations of the manufacturer to purchase the product; 3) the justice of imposing the loss on the manufacturer who created the risk and reaped the profit; 4) the superior ability of the commercial enterprise to distribute the risk of injury as a cost of doing business; 5) the disparity in position and bargaining power that forces the consumer to depend entirely on the manufacturer; 6) the difficulty in requiring the injured

> party to trace back along the channel of trade to the source of the defect in order to prove negligence; and 7) whether the product is in the stream of commerce.

*Firkin v. U.S. Polychemical Corp.*, 835 F. Supp. 1048, 1051 (N.D. Ill. 1993) (J. Zagel) (citing *Trent,* 477 N.E.2d at 1315). These considerations support the conclusion that paroxetine hydrochloride's formula and instructions / warnings for use are the product at issue, not the particular pill Stewart Dolin happened to ingest.

"First, the public interest in life and health favors the imposition of strict liability here given the severity of the injury involved." *Firkin*, 835 F. Supp. at 1051. Indeed, the serious risk of suicidal behavior created by taking paroxetine hydrochloride weighs heavily in favor of requiring GSK to properly warn adults of these risks.[7] Second, it is undisputed that GSK has spent hundreds of millions of dollars on direct-to-consumer advertising and, in so doing, has solicited the use of paroxetine hydrochloride by consumers. *See, e.g.*, Meredith B. Rosenthal et al, Promotion of Prescription Drugs to Consumers, 347 NEW ENG. J. MED. 7, 498-505 (Feb. 2002) *available at* http://www.nejm.org/doi/pdf/10.1056/NEJMsa012075 (indicating in Table 2 that GSK spent $98 million in promoting paroxetine hydrochloride directly to consumers in the year 2000 alone). Third, justice would be served if GSK were held responsible. GSK, alone, is responsible for paroxetine hydrochloride's design and warning defect as it is the only entity that has full access to paroxetine hydrochloride's clinical trial data and is the *only* entity allowed to make changes to the design and labeling of paroxetine hydrochloride. Moreover, as alleged in the Complaint, GSK deliberately withheld data concerning Paxil's adult suicidal behavior risk (and continues to do so) from physicians and consumers. In light of the Supreme Court's *Mensing* and *Bartlett* decisions, it is unclear whether Plaintiff would have an available remedy

---

[7] According to GSK's own clinical trials, adult patients of all ages taking paroxetine hydrochloride are approximately seven times more likely to engage in suicidal behavior than patients taking placebo. (See Complaint at ¶ 79.)

11

absent a finding that GSK is potentially liable for its role in putting paroxetine hydrochloride on the market. It is difficult to imagine how eliminating any possible recourse for an aggrieved plaintiff qualifies as justice. *See Heller v. Cadral Corp.*, 406 N.E.2d 88, 89 (Ill. App. Ct. 1980) (in considering whether an item is a "product" for purposes of Illinois strict products liability, Court evaluated whether "other judicial remedies were available[.]").

Fourth, because GSK is one of the largest pharmaceutical companies in the world and has made billions of dollars on paroxetine hydrochloride alone, "it has superior ability to distribute the risk of injury as a cost of doing business." *Firkin*, 835 F. Supp. at 1051. GSK is arguably the only entity capable of doing so, which this Court recognized during oral argument on June 18, 2013:

> Although I have to tell you, in all honesty, this is not eliciting an enormous sense of sympathy for Glaxo on my part, because, basically, if this was their burden and you look at the prices they charge while the product is under patent, they're in complete control of it. If it's something that's deeply needed, their prices are going to go up in accounting for the warranty that they are functionally given. So they can adjust for this economically.

(Tscpt. of Proceedings at 23 on 6/18/2013, *Dolin v. SmithKline Beecham Corp.* (12-cv-06403).)

Fifth, GSK, as the brand name developer had unique access to data concerning paroxetine's suicidal behavior risks in adult patients. Neither Stewart Dolin nor his physician had access to this data. Thus, the fifth factor, which examines the "disparity in position" between the defendant and plaintiff, weighs heavily in favor of holding GSK strictly liable. Sixth, although tracing back the originator of the defect is not particularly difficult in this case, the fact that GSK is the originator of the defects suggests that holding GSK liable is sound public policy.

Finally, although GSK did not place the pill at issue here into the stream of commerce, GSK did place the product (*i.e.*, the formula and its instructions / warning for use) into the stream of commerce. Indeed, the Illinois Supreme Court has long recognized that a defendant's

12

participation in placing the specific item in the stream of commerce is "not an essential element in order that the doctrine of strict liability apply." *Connelly v. Uniroyal, Inc.*, 389 N.E.2d 155, 162 (Ill. 1979). "[P]articipation in the profits reaped by placing a defective product in the stream of commerce [ ] presents the same public policy reasons for the applicability of strict liability which supported the imposition of such liability on wholesalers, retailers and lessors." *Id.* at 163. Thus, "the loss caused by unsafe products should be borne by *those who create the risk of harm*[.]" *Hebel v. Sherman Equip.*, 442 N.E.2d 199, 205 (Ill. 1982). "[S]trict liability arises, not because of the defendant's legal relationship with the manufacturer or with other entities in the manufacturing-marketing system, but because of its 'participatory connection, for its personal profit or other benefit, with the injury-producing product and with the enterprise that created consumer demand for and reliance upon the product.'" *Id.* (quoting *Kasel v. Remington Arms Co.*, 101 Cal. Rptr. 314, 323 (Cal. Ct. App. 1972)). Here, GSK was the creator of the defects at issue, was in the only position to correct those defects, and obtained substantial profit from the sale of paroxetine hydrochloride.[8] Thus, all the considerations that would give rise to products liability suggest that a strict design defect and failure to warn claim against GSK is viable.

## II. IMPACT OF *MUTUAL PHARMACEUTICAL CO., INC. V. BARTLETT*, 133 S. CT. 2466 (2013) ON DEFENDANT MYLAN'S AMENDED MOTION TO DISMISS

In *Mensing* and *Bartlett*, the Supreme Court made it clear that failure-to-warn and design defect claims against a generic manufacturer are preempted by the FDCA because generic manufacturers are not permitted to change a generic drug's warnings and design. Thus, Plaintiff's claims against Mylan alleging that Mylan failed to make proper warnings or to make design

---

[8] Although GSK's sales of paroxetine hydrochloride have decreased from the several billion a year GSK made when the drug was on patent exclusivity, GSK still makes hundreds of millions a year on the sale of paroxetine hydrochloride each year. *See* GlaxoSmithKline, PLC, Annual Report (Form 20-F) at 53 (Mar. 13, 2012), *available at* http://www.gsk.com/content/dam/gsk/globals/documents/pdf/GSK-Form-20-F-2011.pdf.

changes to its generic paroxetine hydrochloride must fail. Plaintiff submits, however, that because of the unique facts of this case, Mylan could still be held liable under a theory of negligence. *See, e.g.*, *Acree v. Watson Pharmaceuticals, Inc.*, 10 C 7812, 2012 WL 5306296, at *5-7 (N.D. Ill. Oct. 26, 2012) (factual circumstances alleged in the complaint avoided legal issues of preemption under *Mensing* because there was a possible way to comply with both state and federal law) (J. Kennelly).

As a manufacturer of a drug, Mylan owed a duty to all consumers to ensure that the drugs it sold were reasonably safe and possessed proper warnings. Plaintiff alleges, however, that Mylan knew, based on the label changes that occurred between 2004 and 2007, that the drug label for paroxetine hydrochloride after 2007 failed to include any warning about the risk of adult suicidality. *See* Plaintiff's Opposition at 26-29. Thus, by continuing to sell paroxetine hydrochloride despite knowing its risks, Mylan breached its duty to all consumers. Although Mylan was not required to withdraw its version of paroxetine hydrochloride from the market, *see Bartlett*, 133 S. Ct. at 2477, or allowed to alter the warnings, *see Mensing*, 131 S.Ct. at 2577, Mylan *was* permitted to send "Dear Doctor" letters containing "important information about drugs to physicians and others responsible for patient care" provided Mylan's letters were "consistent with and not contrary to [the drug's] approved . . . labeling." *Mensing*, 131 S. Ct. at 2576 (quoting 21 C.F.R. § 201.100(d)(1)). Thus, Mylan's failure to send letters to physicians indicating that paroxetine's adult suicidal behavior risk was higher than the class-wide risk contained in the label (clinical trials of paroxetine specifically showed an approximate seven times greater risk of adult patients of all ages experiencing suicidal behavior) would not be preempted by the FDCA since compliance with state and federal law is possible. As the Court in *Lyman v. Pfizer, Inc.* explains:

14

> Although the *Mensing* Court concluded that generic drug manufacturers were precluded from issuing substantial additional warnings that were inconsistent with or contrary to the drug's approved labeling, it did not rule that generic drug manufacturers were precluded from issuing "labeling," as that term is defined in 21 U.S.C. § 321(m) and 21 C.F.R. § 202.1(l)(2), that is "consistent with and not contrary to ... approved or permitted labeling." 21 C.F.R. § 201.100(d)(1). Had the *Mensing* Court been presented with this precise question, it could not have used the same rationale to find preemption, because the *Mensing* Court based its decision on "impossibility." *Mensing,* 131 S.Ct. at 2577. Because it was not only possible—but required by federal law—to provide updated labeling that contained the new caution against use for longer than twelve weeks, the Generic Defendants cannot argue that it was not possible for them to change their labeling without violating federal law.

2:09-CV-262, 2012 WL 368675, at *5 (D. Vt. Feb. 3, 2012); *see Fisher v. Pelstring*, 817 F. Supp. 2d 791, 834 (D.S.C. 2011); *Sacks v. Endoscopy Ctr. of S. Nev.*, LLC, 2011 WL 4915174 (D. Nev. Jul. 28, 2011); *Brasley-Thrash v. Teva Pharm. USA, Inc.*, CIV.A. 10-00031-KD-N, 2011 WL 4025734, at *2-3 (S.D. Ala. Sept. 12, 2011); *Hutchison v. Endoscopy Ctr. of S. Nev.*, LLC, 2011 WL 6688744 (D. Nev. Oct. 5, 2011). Here, Plaintiff alleges that Mylan failed to issue "Dear Doctor" letters. (*See, e.g.*, Complaint at ¶ 220(i).) Thus, Mylan could be liable under a negligence theory that would not conflict with federal regulation. *See, Acree*, 2012 WL 5306296, at *7.

    By: /s/ R. Brent Wisner
        Bijan Esfandiari, Esq. (*pro hac vice*)
        Michael L. Baum, Esq. (*pro hac vice*)
        Frances M. Phares, Esq. (*pro hac vice*)
        R. Brent Wisner, Esq. (*pro hac vice*)
        BAUM HEDLUND ARISTEI & GOLDMAN, P.C.
        12100 Wilshire Blvd., Suite 950
        Los Angeles, CA 90025
        (310) 207-3233
        (310) 207-4204 (fax)

        and

        Joshua L. Weisberg, Esq.
        Lindsey A. Epstein, Esq.
        RAPOPORT LAW OFFICES, P.C.

20 North Clark Street, Suite 3500
Chicago, IL 60602
(312) 327-9880
(312) 327-9881 (fax)

*Attorneys for Plaintiff, Wendy Dolin*