IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WENDY DOLIN, Individually and as Independent Executor of the ESTATE OF STEWART DOLIN, deceased, <br><br> Plaintiff, <br><br> v. <br><br> SMITHKLINE BEECHAM CORPORATION D/B/A GLAXOSMITHKLINE, a Pennsylvania Corporation; and MYLAN INC., a Pennsylvania Corporation, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. 12-CV-06403 <br><br> Judge James B. Zagel |

**PLAINTIFF'S RESPONSE TO
DEFENDANT GLAXOSMITHKLINE LLC'S SUPPLEMENTAL BRIEFING IN
SUPPORT OF SUMMARY JUDGMENT**

Pursuant to the Court's oral instruction and Minute Order (Doc. 96) on June 18, 2013, Plaintiff Wendy Dolin, by and through her counsel, respectfully submits this Response to Defendant GlaxoSmithKline LLC's ("GSK") Supplemental Briefing in Support of Summary Judgment ("GSK's Supplemental Brief"):[1,2]

---

[1] By stipulation of the parties, Supplemental Response briefs were due Monday, August 5, 2013. (See Docket No. 97.) Plaintiff's counsel, however, through a clerical order, calendared the due date for Plaintiff's Supplemental Response for Wednesday, August 6, 2013. Nonetheless, GSK and Mylan do not object to Plaintiff filing her Supplemental Response brief out of time, based on Plaintiff's counsel's representation that only those arguments and issues raised in the Defendants' opening round of supplemental briefing (Docket Nos. 98 and 99) will be addressed herein. GSK and Mylan reserve the right to submit additional briefing to the extent this agreement of counsel is not honored.

[2] A response to Defendant Mylan, Inc's ("Mylan") Supplemental Brief in Support of the Amended Motion to Dismiss is unnecessary, as the issues at stake have been exhaustively briefed. Plaintiff maintains there remains a limited cause of action against Mylan based on

GSK's position—that it cannot be held liable for its conduct in placing a knowingly defective product into the stream of commerce because it did not manufacture the specific pill at issue—is not supported by the law or a basic sense of justice. Specifically, GSK argues that the product that caused the Decedent's injury in this case, *i.e.*, what prompted Mr. Dolin to commit suicide, was not the chemical compound he ingested, but the actual pill that Defendant Mylan, Inc. ("Mylan'") manufactured. This myopic view of what a product is under Illinois strict products liability law is based on self-serving policy considerations, carefully concocted to suggest that brand name manufactures have no role in the development, perception of safety, and labeling of both the brand name and generic versions of its drugs. Indeed, that GSK grounds its arguments in considerations of public policy while simultaneously arguing that an injured plaintiff be afforded absolutely no remedy speaks to the absurdity of GSK's position. More importantly, GSK's position is fundamentally belied by the bedrock principles of Illinois product liability law and the important role state tort law plays in ensuring that brand name drug manufactures properly label their drugs. Having now briefed these issues extensively, Plaintiff respectfully requests that the Court **DENY** GSK's Motion for Summary Judgment and allow this matter to proceed to discovery.

A. **GSK's Supplemental Brief Misapprehends the Hatch-Waxman Act and its Effect on State Tort Law**

The Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. 98-417, 98 Stat 1585 (1984) ("Hatch-Waxman Amendments") was enacted to improve patient access to pharmaceutical products by providing easier access to generic drugs while, at the same time, ensuring those drugs are safe and effective. *See Tri-Bio Labs, Inc. v. United States*, 836 F.2d

---

Mylan's failure to provide information to physicians about paroxetine's inconsistent labels between 2004 and 2007.

135, 139 (3d Cir. 1987). The Hatch-Waxman Amendments allow generic manufacturers to produce already approved drugs without having to go through the stringent regulatory hurdles associated with getting a new drug approved. *PLIVA, Inc. v. Mensing*, 131 S. Ct. 2567, 2574 (2011) (The Hatch-Waxman Amendments "allow[] manufacturers to develop generic drugs inexpensively, without duplicating the clinical trials already performed on the equivalent brand-name drug."). Generic manufactures are not required to prove that the drug they manufacture is safe and effective because that hurdle was already cleared by the branded manufacturer as part of the New Drug Application ("NDA") process. Thus, the entire regulatory system is predicated on the assumption that the product created and manufactured by the brand name company is the *same* product manufactured by the generic makers. *Stacel v. Teva Pharmaceuticals, USA*, 620 F. Supp. 2d 899, 905 (N.D. Ill. 2009) ("The underlying presumption is that so long as the drug is shown to be pharmaceutically equivalent to an existing reference-listed drug, and so long as it is used in the same manner as the reference-listed drug, FDA approval can be assumed without requiring duplication of previously-performed studies."). To hold otherwise would undermine the reason generic drug makers are allowed to sell generic versions of a drug without establishing safety and efficacy.

Nonetheless, in its Supplemental Brief, GSK baldly claims that the paroxetine sold by Mylan is a different product than the paroxetine sold by GSK. To substantiate this claim, GSK cites to 21 C.F.R. § 314.94 for a list of permissible differences between generics and brand name drugs. *See* GSK Supplemental Brief at 8. Each of these permissible "differences," however, relate to aspects of a generic drug that are unrelated to its chemical composition or its drug labeling. These "differences" include allowing generics to have different *inactive* ingredients, provided they do not interfere with the active drug, *see* 21 C.F.R. § 314.94(a)(9)(ii)-(v), and

3

allowing generic manufacturers to use different manufacturing methods, *see id.* at § 314.94(a)(9)(i). Indeed, the requirements for being able to sell a generic version of a drug as delineated in 21 C.F.R. § 314.94 make it abundantly clear that a generic version of a drug must be materially the same as the already approved brand name drug. 21 C.F.R. § 314.94(a)(1)-(9); see 21 U.S.C. § 355.

Moreover, GSK's reliance on *United States v. Generix Drug Corp.*, 460 U.S. 453, 460 (1983) for the proposition that generic and branded drugs are "different" products is misplaced. First, the *Generix* decision was issued before the Hatch-Waxman Amendments were enacted. Thus, *Generix* was interpreting the FDCA as it existed before the Hatch-Waxman Amendments created the modern generic regulatory scheme. Second, the issue presented in *Generix* was whether a generic version of a drug was subject to FDA regulation under the FDCA as it existed at that time. *Id.* The generic drug maker argued that, since it created drugs with the same active ingredients as the brand name drug, the FDA's approval of the brand name drug imputed to the brand name manufacturer. *Id.* The *Generix* Court, however, rejected the generic drug maker's argument because, in part, the generic drugs at issue were not bioequivalent to the brand name drug. *Id.* at 460-61. Indeed, the Court expressly limited its holding stating that "[w]e thus do not reach the issue of whether two demonstrably bioequivalent products, containing the same active ingredients but different excipients, might under some circumstances be the same 'drug.'" *Id.* at 461; *see United States v. Baxter Healthcare Corp.*, 712 F. Supp. 1352, 1357 (N.D. Ill. 1989) *aff'd,* 901 F.2d 1401 (7th Cir. 1990). Thus, reliance on *Generix* for the notion that Mylan's paroxetine is different from GSK's paroxetine when they are bioequivalent and contain the same active ingredients, route of administration, and labeling, is misplaced.

Finally, GSK argues that holding GSK liable for putting a defective product into the

stream of commerce when the injury was caused by a product manufactured by a generic drug maker would "undercut the careful balance Congress intended to establish" by the Hatch-Waxman Amendments. GSK Supplemental Brief at 7. GSK seems to suggest that, holding GSK accountable for the injuries sustained by defects in generic drugs – defects created, identified, and concealed by GSK – would create unfair competition between brand name and generic manufacturers. This position is simply untenable. While one of the objectives of the Hatch-Waxman Amendments was to allow "generic drug manufacturers to get their drugs to market both cheaply and quickly . . . by permitting manufacturers to forego duplicative clinical trials[,]" there is no indication that Congress intended that purpose to supplant the FDCA's overall purpose of providing consumers with safe and effective drugs. *Stacel*, 620 F. Supp. 2d at 907; see *Kellogg*, 612 F. Supp. 2d at 432. Holding that GSK is *potentially*[3] liable for putting into the stream of commerce a product that it knew possessed a product defect, *i.e.*, design and failure-to-warn, when it was reasonably foreseeable that consumers would be injured by a generic version of that product, does not undermine the policy objectives of the FDCA or Hatch-Waxman Amendments. Indeed, finding potential liability here promotes safer and properly labeled drugs by ensuring the company that creates, knows, and is in the position to correct the defect, has an incentive to do so.[4]

---

[3] It is important to consider that the issue here is not whether GSK is actually liable at this time, but whether a jury could reasonably determine that GSK is liable. As such, Plaintiff will need to prove at trial all the elements of products liability claims as applicable to GSK, which includes knowledge of the defect.

[4] Moreover, GSK's argument that there are no viable causes of action against GSK because the Hatch-Waxman Amendments do not "impose liability on branded manufacturers for injuries caused by a generic competitor's medication" is without merit. GSK Supplemental Brief at 7. Federal law does not create state law causes of action. GSK recognizes and argues this very point two pages later in quoting *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938). GSK Supplemental Brief at 9. Indeed, the opposite could be argued, that "[i]f Congress had intended

B.    **GSK's Supplemental Brief Incorrectly Focuses on the Issue of "Product Identification," Which Is Not at Issue in this Case**

GSK relies heavily on a series of Illinois cases (primarily involving asbestos) which hold that, to sustain a products liability cause of action against a manufacturer, a plaintiff must be able to prove that he or she was exposed to a manufacturer's product. *See* GSK Supplemental Brief at 10 (citing *Zimmer v. Celotex Corp.*, 549 N.E.2d 881, 884 (Ill. App. Ct. 1989); *Naden v. Celotex Corp.*, 546 N.E.2d 766, 769 (Ill. App. Ct. 1989); *Firkin v. U.S. Polychemical Corp.*, 91 C 3660, 1993 WL 271526, at *1 (N.D. Ill. July 16, 1993) (J. Zagel)). GSK argues that, since the Decedent did not ingest paroxetine manufactured by GSK, GSK cannot be held liable. This argument, which was made at length in GSK's original Motion for Summary Judgment, is only applicable if the Court assumes that the product at issue is the pill and not the chemical compound.[5] This is why the Court asked the parties to brief this issue. If, as Plaintiff submits, the product at issue is paroxetine hydrochloride and its accompanying label, not the specific pill the Decedent ingested, then it is clear that GSK placed the product into the stream of commerce and is subject to Illinois strict products liability law. *See*, e.g., *Hebel v. Sherman Equip.*, 442 N.E.2d 199, 205 (Ill. 1982) (imposing strict liability on the creator of a product even though it did not manufacturer it, because "the loss caused by unsafe products should be borne by those who create the risk of harm by participating in the manufacture, marketing and distribution of unsafe products; who derive economic benefit from placing them in the stream of commerce; and who are in a position to eliminate the unsafe character of the product and prevent the loss.");

---

to deprive injured parties of a long available form of compensation, it surely would have expressed that intent more clearly." *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 449 (2005).

[5] Moreover, the definition of a product does not impact whether GSK can separately be found liable under a theory of negligent misrepresentation, which is distinct from strict products liability.

*Connelly v. Uniroyal, Inc.*, 389 N.E.2d 155, 162 (Ill. 1979).

GSK relies heavily on *Smith v. Eli Lilly & Co.*, 560 N.E.2d 324 (Ill. 1990). In *Smith*, a plaintiff alleged she sustained injury caused by her mother's ingestion of diethylstilbestrol ("DES") while the plaintiff was *in utero*. *Id.* at 326. The alleged ingestion of DES by the plaintiff's mother occurred in 1952-1953, and the plaintiff sustained her injury in 1978. *Id.* In the plaintiff's complaint, she could not identify which company manufactured the DES that allegedly caused her injury, so she named 138 different defendants. *Id.* at 326-27. After substantial motions practice, the trial court narrowed down the potential defendants to eight drug manufactures of the DES at issue. *Id.* The trial court dismissed all claims against the manufacturers with the exception of a strict products liability count, holding that the manufacturers could be liable under a market share theory of liability, as espoused in the California Supreme Court case *Sindell v. Abbott Laboratories*, 607 P.2d 924 (Cal. 1980). *Id.* On appeal to the Illinois Supreme Court, the Court rejected the novel market share theory of liability. The Court's lengthy discussion focused the merits and demerits of a market share liability approach, noting that such a system would not promote safer products, not properly assign blame, and cannot properly take into account what connection each defendant had to the alleged injury. Id. at 335-45.

Despite GSK's bald assertions to the contrary, *Smith* does not stand for the notion that brand name manufacturers, who control the design and warning of both brand name and generic versions of their drug, cannot be held liable under strict products liability for injuries caused by that specific conduct. Indeed, many of the policy reasons for rejecting market share liability as expressed in Smith support finding GSK potentially liable— finding potential liability under strict products liability would promote safer products, properly assign blame for the defect and

7

injury, and correctly take into account the causal connection between GSK's failure to warn and the Decedent's injury.

Moreover, Plaintiff has not alleged a market share theory of liability. Plaintiff is aware of who created paroxetine's defects and who put the drug into the stream of commerce. Thus, Plaintiff has identified the product at issue—paroxetine hydrochloride—and has explained how GSK's failure to warn of suicidality played a substantial role in causing the Decedent's injury. Requiring a Plaintiff to prove that GSK specifically manufactured the specific pill that caused the Decedent's injury, despite a clear showing that GSK's misconduct caused the injury in question, would undermine the very purpose of products liability law:

> [t]he justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that *the consumer of such products is entitled to the maximum of protection* at the hands of someone, and the proper persons to afford it are those who market the products.

*Lowrie v. City of Evanston*, 365 N.E.2d 923, 928 (Ill. App. Ct. 1977) (emphasis added) (quoting Restatement (Second) of Torts, Explanatory Notes s 402A, comment c).

**C.     GSK's Espoused Policy Concerns Are Not Applicable in This Case**

GSK has expressed hyperbolic arguments about how using a definition of product which contemplates the chemical formula (as opposed to the pill) would create "*vast and limitless* liability" that GSK claims is unfair. GSK Supplemental Brief at 15 (emphasis added). GSK argues that, if it is potentially liable here, then it could be potentially liable forever, even if the company stops making and marketing the drug. This argument, however, is unavailing.

First, GSK has known for decades that paroxetine increases the risk of suicidality in adults. However, instead of making the appropriate warnings or informing patients and doctors of these risks, GSK engaged in a lengthy scheme to conceal these risks because it wanted to make more money. The liability at issue here does not stem from some newly discovered product defect that GSK did not know about until after the drug went generic. Rather, liability stems from the fact that GSK knew of the defect and intentionally refused to disclose it, even while the drug was still on patent. GSK was in *the only* position to correct paroxetine's warning label and in failing to do so, GSK caused the Decedent's injury.

Moreover, GSK's concern that liability here would make it indefinitely liable for any injury caused by generic versions of its drug is simply hyperbole. If GSK knew about a risk, concealed it, and it was discovered many years later that this failure-to-warn caused serious injuries, a basic sense of justice demands that GSK be liable. GSK's claims of unfairness would only manifest if GSK were held liable despite having no knowledge of the risk. However, to avoid that unfair result, the Court should not immunize GSK from any liability whatsoever, but rather, enforce the knowledge and forseeability elements of products liability law. *See, e.g.*, *Woodill v. Parke Davis & Co.*, 402 N.E.2d 194, 198 (Ill. 1980) ("We think that the imposition of a knowledge requirement is a proper limitation to place on a manufacturer's strict liability in tort predicated upon a failure to warn of a danger inherent in a product."). By limiting a brand name manufacturer to those injuries it could have reasonably foreseen and properly warn, there is no reasonable risk of "vast" and "limitless" liability.

Dated: August 6, 2013    By: /s/ R. Brent Wisner
                 Bijan Esfandiari, Esq. (*pro hac vice*)
                 Michael L. Baum, Esq. (*pro hac vice*)
                 Frances M. Phares, Esq. (*pro hac vice*)
                 R. Brent Wisner, Esq. (*pro hac vice*)

>BAUM HEDLUND ARISTEI & GOLDMAN, P.C.
>12100 Wilshire Blvd., Suite 950
>Los Angeles, CA 90025
>(310) 207-3233
>(310) 207-4204 (fax)
>
>and
>
>Joshua L. Weisberg, Esq.
>Lindsey A. Epstein, Esq.
>RAPOPORT LAW OFFICES, P.C.
>20 North Clark Street, Suite 3500
>Chicago, IL 60602
>(312) 327-9880
>(312) 327-9881 (fax)
>
>*Attorneys for Plaintiff, Wendy Dolin*