IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| WENDY B. DOLIN, Individually and as Independent Executor of the ESTATE OF STEWART DOLIN, Deceased, | ) ) ) | Case No. 1:12-cv-06403 |
| | ) | |
| Plaintiff, | ) | |
| | ) | Judge James B. Zagel |
| v. | ) | |
| | ) | |
| SMITHKLINE BEECHAM CORPORATION D/B/A GLAXOSMITHKLINE, a Pennsylvania Corporation, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT GLAXOSMITHKLINE LLC'S**
**MEMORANDUM OF LAW IN SUPPORT OF ITS**
**MOTION FOR SUMMARY JUDGMENT (FEDERAL PREEMPTION)**

**TABLE OF CONTENTS**

I.     INTRODUCTION ..................................................................................................1

II.    PAXIL'S REGULATORY HISTORY ...............................................................3

       A.    GSK's Interactions with FDA in the Decades Before Mr. Dolin's Death..............3

       B.    GSK's Revisions to the Paxil Labeling In the Years Before Mr. Dolin's Death. ...............................................................................................................4

       C.    For Over A Decade, FDA Has Used Only Data From Randomized, Double-Blind Placebo-Controlled Controlled Trials (Not Open-Label or Uncontrolled Data) To Assess The Risk Of Suicidality from SSRI Medications....................................................................................................11

III.   THE FDA REGULATORY PROCESS FOR PRESCRIPTION DRUGS  AND REQUIREMENTS FOR DRUG LABELING AND WARNINGS ..................11

       A.    FDA's New Drug Approval Process....................................................................12

       B.    FDA's Regulation of the Content of Drug Labeling and Warnings .....................12

       C.    Changes to the FDA-Approved Prescribing Information and Warnings...............15

IV.   ARGUMENT .....................................................................................................16

       A.    Standard for Summary Judgment........................................................................18

       B.    The Extensive Regulatory Record Establishes  Clear Evidence that FDA "Would Not Have Approved" –  and Instead Rejected – the Warning that Plaintiff Seeks. ...............................................................................................18

       C.    Plaintiff's Experts Point to No Basis For   GSK to Submit a CBE Labeling Supplement to FDA .........................................................................................29

V.    CONCLUSION..................................................................................................34

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Am. Home Prods. Corp. v. Johnson & Johnson,*
    672 F. Supp. 135 (S.D.N.Y. 1987) ....................................................... 31

*Auer v. Robbins,*
    519 U.S. 452 (1997).......................................................................... 31

*Brooks v. Howmedica,*
    273 F.3d 785 (8th Cir. 2001) (en banc) ................................................ 31

*Buckman Co. v. Plaintiffs' Legal Comm.,*
    531 U.S. 341 (2001)..................................................................... 12, 29

*Capital Cities Cable, Inc. v. Crisp,*
    467 U.S. 691 (1984)..................................................................... 17, 29

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986).......................................................................... 18

*City of New York v. FCC,*
    486 U.S. 57 (1988)........................................................................... 17

*Dobbs v. Wyeth Pharms.,*
    797 F. Supp. 2d 1264 (W.D. Okla. 2011).......................................... 22, 23, 25, 26

*Fla. Lime & Avocado Growers, Inc. v. Paul,*
    373 U.S. 132 (1963).......................................................................... 17

*Garcia v. Wyeth-Ayerst Labs.,*
    385 F.3d 961 (6th Cir. 2004) ............................................................. 29

*Geier v. Am. Honda Motor Co.,*
    529 U.S. 861 (2000)................................................................. 17, 28, 29

*Henley v. FDA,*
    77 F.3d 616 (2d Cir. 1996) ............................................................... 21

*In re Celexa & Lexapro Mktg. & Sales Practices Litig.,*
    779 F.3d 34 (1st Cir. 2015)....................................................... 15, 32, 34

*In re Fosamax (Alendronate Sodium) Prods. Liab. Litig.,*
    951 F. Supp. 2d 695 (D.N.J. 2013) ................................................ 16, 19

*Kordel v. United States,*
    335 U.S. 345 (1948).......................................................................... 12

*Mason v. SmithKline Beecham Corp.,*
    596 F.3d 387 (7th Cir. 2010) ............................................................... passim

*Matsushita Elec. Indus. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) ................................................................................. 18

*Nathan Kimmel, Inc. v. DowElanco,*
    275 F.3d 1199 (9th Cir. 2002) ............................................................... 29

*Pub. Citizen Health Research Grp. v. Comm'r, FDA,*
    740 F.2d 21 (D.C. Cir. 1984) ................................................................. 21

*Riegel v. Medtronic, Inc.,*
    552 U.S. 312 (2008) ................................................................................. 31

*Robinson v. McNeil Consumer Healthcare,*
    615 F.3d 861 (7th Cir. 2010) ....................................................... 3, 23, 24

*Thomas v. Hoffman-La Roche, Inc.,*
    949 F.2d 806 (5th Cir. 1992) ................................................................. 31

*U.S. v. Lane Labs-USA Inc.,*
    427 F.3d 219 (3d Cir. 2005) ................................................................... 16

*Wyeth v. Levine,*
    555 U.S. 555 (2009) ............................................................................. passim

**Constitutional Provisions**

U.S. Const. art. VI, cl. 2 ............................................................................. 16

**Statutes**

21 U.S.C. § 321 ................................................................................... 12, 14

21 U.S.C. § 331 ................................................................................... 14, 28

21 U.S.C. § 332 ................................................................................... 14, 28

21 U.S.C. § 333 ................................................................................... 14, 28

21 U.S.C. § 334 ................................................................................... 14, 28

21 U.S.C. § 337 ................................................................................... 12, 14

21 U.S.C. § 352 ............................................................................. 14, 18, 28

21 U.S.C. § 355 ........................................................................................ 12

21 U.S.C. § 393 ................................................................................................ 11

Federal Food, Drug, and Cosmetic Act,
    21 U.S.C. §§ 301, *et seq.* ........................................................................ 1, 11

Pub. L. No. 87-781, 76 Stat. 780 (1982) ........................................................ 17

**Rules**

Fed. R. Civ. P. 56 .............................................................................................. 1

N.D. Ill. L. R. 56.1 ............................................................................................ 1

**Regulations**

21 C.F.R. § 201 ................................................................................................ 13

21 C.F.R. § 201.56 ........................................................................................... 13

21 C.F.R. § 201.57 ...................................................................................... 22, 30

21 C.F.R. § 201.80 ................................................................................... passim

21 C.F.R. § 201.100 ..................................................................................... 13, 14

21 C.F.R. § 202.1 ............................................................................................. 12

21 C.F.R. § 314.3 ............................................................................................. 16

21 C.F.R. § 314.50 ........................................................................................... 15

21 C.F.R. § 314.70 ........................................................................................ 5, 15

21 C.F.R. § 314.80 ........................................................................................... 14

21 C.F.R. § 314.81 ........................................................................................... 14

21 C.F.R. § 314.105 ......................................................................................... 14

21 C.F.R. § 314.125 ..................................................................................... 12, 13

21 C.F.R. § 314.150 ......................................................................................... 14

39 Fed. Reg. 33,229 (Sept. 16, 1974) ............................................................. 30

40 Fed. Reg. 15,392 (Apr. 7, 1975) ................................................................. 15

40 Fed. Reg. 28,582 (July 7, 1975) ................................................................. 30

44 Fed. Reg. 37,434 (June 26, 1979) ............................................................... 30

71 Fed. Reg. 3922 (Jan. 24, 2006) .................................................................................... 13, 28, 31

73 Fed. Reg. 49,603 (Aug. 22, 2008) .............................................................................. passim

Defendant GlaxoSmithKline LLC ("GSK"), pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, hereby files this Memorandum of Law in Support of Its Motion for Summary Judgment on federal preemption grounds, respectfully showing the Court as follows:[1]

## I.     **INTRODUCTION**

In this case, Plaintiff seeks to hold GSK liable for not providing warnings in the labeling for Paxil® ("Paxil") about a risk of adult suicidality that the U.S. Food and Drug Administration ("FDA") explicitly considered, reviewed, and rejected.  Plaintiff's claims – that GSK should have provided different warnings, *i.e.*, that Paxil or paroxetine is associated with an increased risk of suicide or suicidal thoughts and behavior (suicidality) in patients of Stewart Dolin's age – fail because they are preempted by federal law.[2]  Those claims are preempted by the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301, *et seq.*, and its implementing regulations because they require warnings that directly conflict with – and violate – federal law governing the labeling and warnings for Paxil (paroxetine).  As determined by the U.S. Supreme Court in *Wyeth v. Levine*, 555 U.S. 555, 571-72 (2009), "where there is clear evidence that FDA would not have approved" the warning a plaintiff says should have been given, FDA's authority over prescription drug labeling preempts those claims.  Here a robust and abundant regulatory record concerning the alleged risk at issue meets (and surpasses) the standard set out in *Levine*.

Plaintiff argues that the drug's labeling is "false and misleading" because it states that "[s]hort-term studies did not show an increase in the risk of suicidality with antidepressants

---

[1]  GSK has also submitted a motion for summary judgment on each of Plaintiff's remaining claims. Either motion would be dispositive of all of Plaintiff's claims.

[2]  GSK preserves and does not waive its view that it had no duty in this case and cannot be held liable for Plaintiff's alleged injuries because it is undisputed that Mr. Dolin never ingested GSK's Paxil; instead, Mr. Dolin allegedly ingested generic paroxetine manufactured by Mylan, a competitor of GSK.  Thus, GSK owed no duty from an alleged injury stemming from use of a competitor's medicine and because its product (Paxil) never injured Mr. Dolin.  GSK has submitted a renewed motion for summary judgment on this and other grounds.

compared to placebo in adults beyond age 24". (Pl.'s Compl. at ¶¶ 105-106.) Plaintiff also argues that GSK should have maintained in the labeling Paxil-specific data about the risk of suicidality that FDA instructed GSK to remove, including data that she claims showed an increased risk "in adults of all ages". (*Id.* at ¶¶ 22, 82, 99-101.) Yet the undisputed and extensive regulatory record shows that GSK specifically asked FDA whether it would be permissible to keep the Paxil-specific analyses and language in the labeling. FDA rejected every one of those requests. FDA did so because the Agency had reviewed and evaluated that very data and decided that it was "***critical that the labeling is consistent for all of these products***," and it wanted "to ensure standardized labeling pertaining to adult suicidality with all of the drugs to treat major depressive disorder (MDD)." (Undisputed Fact Nos. 109-115.) The evidence submitted in support of GSK's Motion demonstrates "clear evidence" not only that the FDA "would not have approved" the warning Plaintiff claims GSK should have added, but it considered and refused to permit the warning that serves as the foundation of Plaintiff's case. Under the standard announced in the U.S. Supreme Court's decision in *Wyeth v. Levine*, 555 U.S. at 571, 581, Plaintiff's claims conflict with federal law.

Stewart Dolin was 57 years old when he committed suicide on July 15, 2010. Not once prior to July 2010 – or since then – did FDA require a warning about an increased risk of suicidality[3] with Paxil in patients over age 24. In its most recent labeling action regarding this possible risk in May 2007, FDA concluded that "***scientific data did not show [an] increased risk in adults older than 24***". (Undisputed Fact No. 105 (emphasis added).) That language remains in place today. Plaintiff's claims based on an unsupported and scientifically meritless warning fail as a matter of law.

---

3 "Suicidality" refers to suicidal thinking or behavior.

## II.     PAXIL'S REGULATORY HISTORY

As discussed in *Wyeth v. Levine* and the Seventh Circuit's preemption decisions (*Mason v. SmithKline Beecham Corp.*, 596 F.3d 387 (7th Cir. 2010) and *Robinson v. McNeil Consumer Healthcare*, 615 F.3d 861 (7th Cir. 2010)), the Court considers the regulatory record and FDA's activities in deciding whether federal law bars state-based tort law claims. Over the past twenty-plus years, at FDA's request and on its own initiative, GSK has provided FDA with extensive data, including data on suicides, suicide attempts, and suicidal behavior. Based on its review of this information and its own analyses, FDA ***publicly rejected*** the basis for Plaintiff's warning and has consistently reaffirmed the appropriateness of the paroxetine labeling that Plaintiff challenges. Indeed, FDA's most recent labeling action relating to the risk at issue in this lawsuit reveals that no such evidence supports her desired warning today.

### A.     GSK's Interactions with FDA in the Decades Before Mr. Dolin's Death.

Over the past two-plus decades, FDA has repeatedly monitored and evaluated the risk of adult suicidality for Paxil and other Selective Serotonin Reuptake Inhibitors ("SSRIs"). Starting even before Paxil's initial approval in 1992, FDA carefully evaluated the concern that SSRIs such as Paxil might lead to suicidality or suicide, and it found no credible evidence to support such an association – rejecting citizen petitions seeking to add suicidality warnings to another SSRI, and finding that the data did not suggest the "emergence of suicidality with paroxetine." (*See generally* Undisputed Fact Nos. 14-25.)

Following FDA's original approval of Paxil in 1992, GSK and FDA continued to monitor this potential risk. In 2002, FDA conducted an internal review of SSRIs to evaluate the state of scientific knowledge regarding a possible connection with suicide. FDA concluded that "[t]here were no significant differences in suicide rates between active treatments and placebo in any diagnostic category." (Undisputed Fact No. 39.) In May 2002 and February 2003, GSK

3

submitted to FDA analyses of the Paxil data relating to suicide and suicidality that showed no statistically significant difference in the risk of suicide between patients taking Paxil and those taking placebo. (Undisputed Fact Nos. 40-43.) On June 19, 2003, after reviewing these GSK submissions, FDA unequivocally stated: "There is no evidence that Paxil is associated with an increased risk of suicidal thinking in adults" and "[e]xtensive analysis of the data from studies of Paxil in adults and from postmarketing adverse event reports have not revealed an increase in the rate of suicidal thoughts or suicide attempts compared to placebo." (*See* Undisputed Fact No. 46.) Then, in January 2004, FDA concluded that "there does not appear to be an increased risk of completed suicide associated with assignment to either active drug or placebo in adults with MDD [Major Depressive Disorder]." (Undisputed Fact No. 53.) As explained in 2004 by Dr. Thomas Laughren, an FDA official involved in the Agency's evaluations of this issue: "[FDA] had been systematically looking at the adult data for almost that entire decade, you know, looking at both suicide item scores, looking at event data, and more recently had begun to accumulate the completed suicides in adults, had not seen a signal." (Undisputed Fact No. 73.)

### B. GSK's Revisions to the Paxil Labeling In the Years Before Mr. Dolin's Death.

In the spring of 2006, GSK submitted to FDA the results of a meta-analysis of Paxil randomized, double-blind placebo-controlled trials in adult patients with MDD, followed by the results of a meta-analysis of adult patients with non-MDD disorders. (Undisputed Fact No. 85.) (The randomized, double-blind placebo-controlled trials included in both meta-analyses had been the subject of previous correspondence with FDA. (*Id.*)) GSK's "Update April 5, 2006 Briefing Document," submitted to FDA in April 2006, included the following findings:

- "On the primary endpoint of **definitive suicidal behavior or ideation**, there was no statistically significant difference between adults with MDD treated with paroxetine compared to placebo (31/3455 (0.90%) vs. 11/1978 (0.56%); odds ratio = 1.3 (95% CI 0.7, 2.8); p=0.493)";

- "The results provide evidence of an increase in **suicide attempts** in adults with MDD treated with paroxetine compared to placebo; however, as the absolute number and incidence of events are very small (11/3455 (0.32%) for paroxetine, vs. 1/1978 (0.05%) for placebo; odds ratio = 6.7 (95% CI 1.1, 149.4); p=0.058), these data should be interpreted with caution";

- "There were proportionally slightly more events (suicidal behavior with or without ideation) in **young adults** between 18-24 years of age with MDD treated with paroxetine (5/230 (2.17%)) compared to placebo (0/104 (0%) than in older adults, however these data are not conclusive due to the relatively small size of the 18-24 age group and the small number of events. These trends are consistent with findings from previous analyses in pediatric and adolescents, and while it appears that the risk seen in pediatrics seems to extend beyond age 18, the extent to which this occurs is less clear"; and

- "Although not statistically significant, there were proportionally slightly more events (suicidal behavior with or without ideation) in **young adults** between 18-24 years of age with psychiatric disorders other than MDD treated with paroxetine (0.99% for paroxetine versus 0.25% for placebo). This finding was consistent across the non-MDD indications."

(Undisputed Fact No. 86.)

Shortly after that submission in April 2006, GSK had a telephone conference with FDA in which GSK advised of its plans to implement a change in the Warnings section of the Paxil labeling to describe this additional information from GSK's recently completed meta-analyses on the adult MDD and non-MDD data sets. (Undisputed Fact No. 88.) FDA did not object at the time to the implementation of GSK's proposed Changes Being Effected ("CBE") labeling supplement for Paxil, but advised that it had not yet completed its evaluations of GSK's analyses in adult patients or its review of the data on adult suicidality received from other antidepressant manufacturers. (Undisputed Fact No. 89.) FDA also advised GSK to remove any reference to FDA agreement to GSK's DHCP letter. (*Id.*) Following the discussions with FDA, on April 27, 2006, GSK submitted a CBE labeling supplement under 21 C.F.R. § 314.70(c)(6)(iii), formally proposing to implement these changes to Paxil's labeling (the "April 27, 2006 CBE labeling

supplement").[4]  (Undisputed Fact No. 90.)  The Paxil prescribing information included the

following statement to the Clinical Worsening and Suicide Risk subsection of the Warnings

section:

> Young adults, especially those with MDD, may be at increased risk for suicidal
> behavior during treatment with paroxetine.  An analysis of placebo-controlled
> trials of adults with psychiatric disorders showed a higher frequency of suicidal
> behavior in young adults (prospectively defined as aged 18-24 years) treated with
> paroxetine compared with placebo (17/776 [2.19%] versus 5/542 [0.92%]),
> although this difference was not statistically significant.  In the older age groups
> (aged 25-64 years and ≥65 years), no such increase was observed.  In adults with
> MDD (all ages), there was a statistically significant increase in the frequency of
> suicidal behavior in patients treated with paroxetine compared with placebo
> (11/3,455 [0.32%] versus 1/1,978 [0.05%]); all of the events were suicide
> attempts.  However, the majority of these attempts for paroxetine (8 of 11) were
> in younger adults aged 18-30 years.  These MDD data suggest that the higher
> frequency observed in the younger adult population across psychiatric disorders
> may extend beyond the age of 24.

(*See* Undisputed Fact No. 90.)  The statement "[i]t is also unknown whether the suicidality risk

extends to adults" was deleted.  However, the statement "a causal link between the emergence of

such symptoms and either the worsening of depression and/or the emergence of suicidal impulse

has not been established" remained.  (*See* Undisputed Fact No. 90.)

In an August 2006 letter to GSK accepting other unrelated changes to the labeling, FDA

expressly advised that it was "currently evaluating the pending applications," including GSK's

April 27, 2006 CBE labeling supplement, and "will comment on the changes in a separate letter."

(*See* Undisputed Fact No. 94.)

In November 2006, FDA released conclusions from its study involving over 372 clinical

trials and almost 100,000 patients.  (*See* Undisputed Fact No. 95.)  The following month, FDA

---

4  Also in April 2006, an article co-authored by FDA scientists, including Dr. Laughren, discussed the
results of FDA's analysis of suicide rates in placebo-controlled studies, and concluded that "[n]either use
of placebo nor of antidepressants in short-term [randomized controlled trials] was associated with an
increased risk of completed suicide among patients with MDD or various anxiety disorders."  (*See*
Undisputed Fact No. 93.)

held a public Advisory Committee hearing at which it discussed the results of its recent analyses

of adult data. Some attendees advocated for a warning of increased suicidality without reference

to age groups. (Undisputed Fact Nos. 98-99.) FDA presented its findings, which included that

the "net effect appears to be neutral on suicidal behavior but possibly protective for suicidality

for adults between the ages of 25 and 64 and to reduce the risk of both suicidality and suicidal

behavior in subjects aged 65 years and older."[5] (Undisputed Fact No. 100.)

On May 1, 2007, FDA notified GSK that it had completed its review of GSK's April 27,

2006 CBE labeling supplement, advising that "[b]efore these applications may be approved,

[GSK] will need to make revisions to [the Paxil] labeling, as outlined below, so as to ensure

standardized labeling pertaining to adult suicidality with all of the drugs to treat major depressive

disorder (MDD)." (*See* Undisputed Fact No. 102.) FDA's letter specifically referenced the

December 2006 hearing and required that GSK revise its labeling and Medication Guides to

include the specific language provided by FDA. FDA's letter instructed that "[c]hanges are also

needed to inform practitioners about an apparent favorable effect of antidepressants on

suicidality in older adults and to remind them that the disorders being treated with

antidepressants are themselves associated with an increased risk of suicidality." (Undisputed

Fact No. 102.) FDA advised that the labeling for antidepressants, including Paxil, should state

that "[s]hort-term studies did not show an increase in the risk of suicidality with antidepressants

compared to placebo in adults beyond age 24; there was a reduction in the risk with

antidepressants compared to placebo in adults aged 65 and older." (Undisputed Fact No. 103.)

The revised labeling was also to state that "[s]uicide is a known risk of depression and certain

---

5  In May 2009, FDA officials published the meta-analysis that had been discussed at the December 2006
hearing, which again reiterated "that the net effect seemed to be neutral in adults aged 25-65, and that the
effect on suicidality was favourable in adults older than 65". (*See* Undisputed Fact No. 124.)

other psychiatric disorders, and these disorders themselves are the strongest predictors of suicide," and that, while a few suicides occurred during the adult trials, "the number [of completed suicides] was not sufficient to reach any conclusion about drug effect on suicide". (Undisputed Fact No. 104.)

The very next day, FDA issued a press release announcing that the labeling for all SSRIs should be modified to reflect an increased risk of "suicidal thinking and behavior, known as suicidality, in young adults ages 18 to 24 during initial treatment." FDA further explained that the proposed labeling changes also included language stating that "***scientific data did not show [an] increased risk [of suicidality] in adults older than 24***" and a decreased risk in patients older than 64. (Undisputed Fact No. 105 (emphasis added).)

On May 7, 2007, GSK asked FDA for clarification of FDA's May 1, 2007 letter, asking whether it could keep the language in Paxil's labeling that had been the subject of GSK's April 2006 CBE labeling change or whether it should "replace the complete warning section on this topic [with] the new class labeling?" (Undisputed Fact No. 109.) GSK specifically asked whether it could keep and maintain the following language in Paxil's labeling:

> *Young adults, especially those with MDD, may be at increased risk for suicidal behavior during treatment with paroxetine. An analysis of placebo-controlled trials of adults with psychiatric disorder showed a higher frequency of suicidal behavior in young adults (prospectively defined as aged 18-24 years) treated with paroxetine compared with placebo (17/776 [2.19%] versus 5/542 [0.92%]), although this difference was not statistically significant. In the older age groups (aged 25-64 years and ≥65 years), no such increase was observed. In adults with MDD (all ages), there was a statistically significant increase in the frequency of suicidal behavior in patients treated with paroxetine compared with placebo (11/3,455 [0.32%] versus 1/1,978 [0.05%]); all of the events were suicide attempts. However, the majority of these attempts for paroxetine (8 of 11) were in younger adults aged 18-30 years. These MDD data suggest that the higher frequency observed in the younger adult population across psychiatric disorders may extend beyond the age of 24.*

(*Id.*)

Later that same day, FDA responded to GSK's inquiry, rejecting GSK's request to keep and maintain Paxil-specific language in the labeling about suicidality which had been added by way of GSK's April 2006 CBE labeling change. FDA directed GSK to "***replace the previous warning section with the new language [FDA] provided to [the Company] in the Class labeling letter***". (Undisputed Fact No. 110 (emphasis added).) This was consistent with FDA's May 2, 2007 email to GSK, advising that drug manufacturers were to "submit revised prescriber labeling and [Medication Guides], ***verbatim***, as outlined in" FDA's May 1, 2007 letter. (*See* Undisputed Fact No. 108 (emphasis added).)

On May 11, 2007, GSK responded to FDA's approvable letter of May 1, 2007, and again requested that it be allowed to retain Paxil-specific language that had been added in May 2006 to Paxil's labeling. (Undisputed Fact No. 111.) GSK specifically asked whether FDA agreed that the Paxil-specific language added by GSK's April 2006 CBE labeling supplement could remain in Paxil's labeling to "complement" the class labeling: "**Do you agree with complementing the class labeling with maintaining the Paxil specific paragraph?**" (Undisputed Fact No. 112 (emphasis in original).)

On May 15, 2007, FDA responded and advised GSK: "Please submit your CBE application with your requests. [FDA] will be discussing all the sponsor's proposals during the last week of May. After we discuss everyone's proposal [FDA] will have a response to your questions." (Undisputed Fact No. 113.) Following FDA's directive, on May 23, GSK formally submitted a CBE labeling supplement that again proposed to retain Paxil-specific language that GSK had added through its CBE supplement filed in April 2006. (Undisputed Fact No. 114.)

FDA contacted GSK on June 21, 2007, advising that it had reviewed responses from sponsors and determined that the class labeling needed some additional revision. Accordingly,

FDA provided new language that all SSRI-sponsors (including GSK) were required to include in their product labeling, and advised: "***Please be reminded that it is critical that the labeling is consistent for all of these products***." (Undisputed Fact No. 115 (emphasis added).)

The following day, June 22, 2007, GSK again contacted FDA to confirm whether FDA was directing GSK to remove the Paxil-specific language and analyses added to Paxil's labeling in April 2006. (Undisputed Fact No. 116.) FDA responded by e-mail:

> As for your first question, the Agency has reviewed your proposed changes, and we do not believe that your product specific analysis should be included in class labeling revisions since the labeling is targeted at the class of drugs. If you would like to discuss this matter further, please submit a formal meeting request.
>
> As for your second question, please respond by e-mail that you accept the changes and also send in a word version of the labeling via e-mail. We will then send an approval letter since you have accepted the changes.

(Undisputed Fact No. 117.) This response made clear that FDA had again considered and rejected the inclusion of the Paxil-specific analyses, data and/or warning information that had been proposed in GSK's CBE labeling supplements of April 27, 2006 and May 23, 2007, as well as other correspondence with FDA. GSK made all FDA-mandated changes that same day. (Undisputed Fact No. 118.)

Shortly thereafter, on August 2, 2007, FDA approved GSK's revised labeling, which included the verbatim language provided by FDA, including the statement that "[s]hort term studies did not show an increase in the risk of suicidality with antidepressants compared to placebo in adults beyond age 24; there was a reduction with antidepressants compared to placebo in adults aged 65 and older." (Undisputed Fact No. 121.) In its letter approving GSK's revised labeling, FDA instructed GSK that its "[f]ailure to make these changes within the specified period of time could make your product misbranded under 21 USC 321(n) and 352(a)." (*Id.*)

###### C. For Over A Decade, FDA Has Used Only Data From Randomized, Double-Blind Placebo-Controlled Controlled Trials (Not Open-Label or Uncontrolled Data) To Assess The Risk Of Suicidality from SSRI Medications.

When assessing the possible risk of suicidality from SSRIs, for more than a decade, FDA has relied exclusively on data from randomized, double-blind placebo-controlled trials. As FDA scientists stated before FDA conducted its meta-analysis in 2006: "Rates based on the pooling of data from both randomized controlled trials (RCTs) and open-label extension trials are subject to bias and could lead to misleading conclusions." (Undisputed Fact No. 80; *see also Mason*, 596 F.3d at 394 n.8 ("Having a control group is important when analyzing suicidal data because suicidal behavior is a symptom of depression and related diseases")．) For this reason, FDA requested antidepressant manufacturers, including GSK, to only submit data from randomized, double-blind placebo-controlled trials. "As noted, we are requesting information from placebo controlled trials only. Please do not submit data from active control only studies, uncontrolled extensions of placebo controlled studies, or combination drug studies." (Undisputed Fact No. 81.)

### III. THE FDA REGULATORY PROCESS FOR PRESCRIPTION DRUGS AND REQUIREMENTS FOR DRUG LABELING AND WARNINGS

An analysis of conflict preemption requires an understanding of the drug approval process, the manner in which FDA regulates prescription drugs and their labeling, and the scope of such regulation. Congress, through the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301 *et seq*., charged FDA with the authority and responsibility to regulate every aspect of the safety, effectiveness, labeling, marketing, and promotion of prescription drugs. *See* 21 U.S.C. § 393(b) (stating that FDA must "promote the public health by promptly and efficiently reviewing clinical research" and "protect the public health by ensuring that . . . drugs are safe and effective"). Congress also provided FDA with exclusive authority to enforce the FDCA, 21

U.S.C. § 337(a), and litigants cannot enforce the FDCA through private actions, *see Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349 n.4 (2001) (citing 21 U.S.C. § 337(a)).

### A.   FDA's New Drug Approval Process.

Most prescription drugs, like Paxil, are "new drugs" within the meaning of 21 U.S.C. § 321(p), and cannot be lawfully marketed in the United States without FDA review and approval. To obtain approval, a manufacturer must submit a New Drug Application ("NDA"), which includes, *inter alia*, evidence establishing "whether or not such drug is safe for use and whether such drug is effective in use," § 355(b)(1)(A), and proposed labeling, § 355(b)(1)(F).

FDA approves an NDA only after it concludes that a prescription medication is both "safe" and "effective" under the conditions of use specified in the proposed prescribing information. FDA *must* disapprove an NDA if it finds that: (a) investigations conducted to establish safety and effectiveness were not adequate; (b) the prescription drug is not safe for use under the conditions provided in the proposed labeling; or (c) the proposed labeling is false or misleading. 21 U.S.C. § 355(d); 21 C.F.R. § 314.125(b)(2), (3), (6).[6]

### B.   FDA's Regulation of the Content of Drug Labeling and Warnings.

By regulation, the prescribing information must be a compendium of *all the information physicians require to safely and effectively prescribe medications* to treat patients. *See* 21 C.F.R. § 201.80.[7] A prescription medication's labeling[8] "reflects thorough FDA review of the pertinent scientific evidence and communicates to health care practitioners the agency's formal,

---

[6] GSK cites to the federal regulations in place in 2010 because that is when the alleged injury occurred.

[7] Section 201.57 was amended in January 2006 and became effective on June 30, 2006. The standard for "older drugs," including paroxetine, is now located at 21 C.F.R. § 201.80.

[8] "Labeling," defined by 21 U.S.C. §321(m) and 21 C.F.R. § 202.1, includes not just the prescribing information, but also any written, textual, or graphic material "accompanying" the medication, such as advertisements in medical journals. *See Kordel v. United States*, 335 U.S. 345, 350 (1948). FDA requires the prescribing information (sometimes referred to as the "package insert") for prescription medications to follow a standard, detailed format to make the information easier for physicians to access and use. *See* 21 C.F.R. §§ 201.56, 201.80.

authoritative conclusions regarding the conditions under which the product can be used safely and effectively." 71 Fed. Reg. 3922, 3934 (Jan. 24, 2006).

Because all medications carry some risk, FDA's regulation of prescription drug labeling, including warnings, is extensive. *See generally* 21 C.F.R. §§ 201, 201.56, 201.80 (labeling for human prescription drugs). A critical objective of any NDA review by FDA is to ensure that the approved labeling accurately reflects the medication's risks and benefits so that physicians, in consultation with their patients, can make optimal treatment choices. FDA will not approve an NDA until the drug's labeling accurately describes, among other things, its indications, dosages, routes, methods, frequency and duration of administration, and relevant warnings, hazards, contraindications, side effects, or precautions. 21 C.F.R. §§ 201.56, 201.80, 201.100(c)(1), 314.125(b)(6), (8).

Based on the existing and reliable scientific evidence, FDA carefully develops warnings to express *known* risks through discussions with the manufacturer. *See* 21 C.F.R. § 201.80(e) (warnings must be based on "reasonable evidence of an association of a serious hazard with a drug"). At the same time, FDA avoids mention of unsubstantiated risks that may unnecessarily deter use of the medication, thereby depriving patients of beneficial treatment. 73 Fed. Reg. 49,603, 49605-06 (Aug. 22, 2008) (FDA's policies aim to prevent overwarning, "which may deter appropriate use of medical products, or overshadow [a] more important warning"); *see also* 71 Fed. Reg. at 3935.

FDA communicates its decision to approve the NDA through an approval letter that sets out FDA's terms for approving both the medication *and* its labeling. FDA approval of a NDA is *expressly conditioned* on the development and use of "final printed labeling" (prescribing information) that is identical – in every material respect – to the labeling that accompanies the

13

approval letter. *See* 21 C.F.R. § 314.105(b) (approval of drugs is "conditioned" on use of labeling and warnings "exactly as directed" by FDA); *Mason*, 596 F.3d at 391 ("FDA's approval is then conditioned on the manufacturer's use of the label [FDA] suggests."). Use of the FDA-approved prescribing information is mandatory, and failure to comply may lead to civil and criminal enforcement.

Following FDA approval, a drug is "misbranded" if its labeling is false or misleading, 21 U.S.C. § 352(a); lacks "adequate information for its use," *id.* § 352(f)(1), 21 C.F.R. § 201.100(c)(1); or omits material facts, 21 U.S.C. § 321(n). Therefore, departing from the FDA-approved prescribing information, failing to include a scientifically valid warning FDA believes is necessary, or including warning information of purported risks not based on reliable scientific evidence, causes the medication's labeling to be "false or misleading" and lacking "adequate directions for use," and renders the product misbranded – in violation of the FDCA. 21 U.S.C. § 352(a), (f)(1). The FDCA prohibits the distribution of misbranded drugs. (a), (d), (k). If FDA believes a medication is misbranded, FDA, through the Department of Justice, is authorized to seek an *in rem* forfeiture action, an injunction, and/or criminal prosecution of the drug's manufacturer and/or responsible persons. 21 U.S.C. §§ 332, 333, 334(a), 337(a). FDA may also seek to withdraw the approval of the NDA. 21 C.F.R. § 314.150.

After approval, FDA continues to exercise extensive control over the safety of prescription drugs and the content of labeling. *Id.* §§ 314.80-.81. If a manufacturer seeks NDA approval for additional indications or dosage forms, as was done for paroxetine more than ten times between 1992 and 2004, it must provide new supporting data to FDA. *Id.* § 314.50(d)(5)(vi)(a). If FDA believes that any information from a post-approval report merits a change in the drug's labeling, it will request that the company make the change. *See* 40 Fed.

14

Reg. 15,392, 15,394 (Apr. 7, 1975).  If the company refuses – a highly unlikely scenario – FDA

may pursue the enforcement actions described above.

### C.    <u>Changes to the FDA-Approved Prescribing Information and Warnings</u>.

NDA sponsors must notify FDA of every change to the approved prescribing

information.  21 C.F.R. § 314.70.  Minor editorial changes aside, a manufacturer must formally

file a "supplement" to the NDA to effect any change in a medication's labeling.

Two types of supplements are used for labeling changes.  The first, a "Prior Approval

Supplement," requires FDA's prior approval before implementation.  *Id.* § 314.70(b).  The

second, a CBE supplement, does not require prior approval but must nonetheless be submitted to

FDA for its review and final approval.  *Id.* § 314.70(c).  Among others, changes to add or

strengthen a contraindication, warning, precaution, or adverse reaction may be the subject of a

CBE.  *Id.* § 314.70(c)(2)(i).  Warnings may only be added through a CBE when there is

"reasonable evidence of an association of a serious hazard with a drug."  *Id.* § 201.80(e).

In 2008, FDA amended its regulations to codify its long-standing interpretation of the

CBE regulation by providing that a supplemental application submitted to FDA under the CBE

regulations is only appropriate to amend labeling "to reflect ***newly acquired information*** and to

add or strengthen a contraindication, warning, precaution, or adverse reaction if there is

sufficient evidence of a causal association...."  73 Fed. Reg. at 49,603 (emphasis added); *see* 21

C.F.R. § 314.70(c)(6)(iii); *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 779 F.3d 34,

37 (1st Cir. 2015).  "Newly acquired information means data, analyses, or other information not

previously submitted to the agency, which may include (but are not limited to) data derived from

new clinical studies, reports of adverse events, or new analyses of previously submitted data

(e.g., meta-analyses) if the studies, events or analyses reveal risks of a different type or greater

severity or frequency than previously included in submissions to FDA."  21 C.F.R. § 314.3(b).

Regardless of the supplement form, FDA retains exclusive authority over all prescription drug labeling changes. It is merely a question of when – not whether – FDA exercises its authority to approve or disapprove a change. *See* 73 Fed. Reg. at 49,608 (explaining that the changes to the CBE regulation in 2008 do "not alter the agency's current practices with respect to accepting or rejecting labeling changes proposed by a CBE supplement"); *see also Levine*, 555 U.S. at 570-71. "After the label change has been affected, the FDA has the opportunity to consider whether or not it will accept the change." *In re Fosamax (Alendronate Sodium) Prods. Liab. Litig.*, 951 F. Supp. 2d 695, 704 (D.N.J. 2013) (internal quotation marks omitted). "While it is important for a manufacturer to warn of potential side effects, it is equally important that it not overwarn because overwarning can deter potentially beneficial uses of the drug by making it seem riskier than warranted and can dilute the effectiveness of valid warnings." *Mason*, 596 F.3d at 392. In the event FDA disapproves a CBE change after it is in the marketplace, the company must immediately comply with FDA's judgment and revise the labeling accordingly. If the company refuses, its product is misbranded and distribution is prohibited under the FDCA. *See U.S. v. Lane Labs-USA Inc.*, 427 F.3d 219 (3d Cir. 2005) (affirming injunction against distribution of misbranded drugs); *In re Fosamax Prods. Liab. Litig.*, 951 F. Supp. 2d at 704.

## IV.    ARGUMENT

Because (a) there is "clear evidence" that FDA would not have approved Plaintiff's preferred warning, (b) Plaintiff's claims create an impossibility of compliance with both federal law and state law, and (c) Plaintiff's claims present an obstacle to the accomplishment of Congress's purposes and objectives, Plaintiff's claims are preempted by federal law. *See* U.S. Const. art. VI, cl. 2 ("The Constitution, and the laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land . . . ."); *Levine*, 555 U.S. at 571, 581; *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 873 (2000). Congress explicitly provided for

preemption under the FDCA where "there is a direct and positive conflict." *See* Pub. L. No. 87-781, § 202, 76 Stat. 780, 793 (1982). Thus, Plaintiff may not force GSK to choose between avoiding tort liability and complying with federal law. *See Geier*, 529 U.S. at 873; *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963). Nor may Plaintiff pursue claims that hinder the "full purposes and objectives of Congress," *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 699 (1984) (internal quotation marks omitted), or "frustrate[] the purposes" of "statutorily authorized regulations of an agency," *City of New York v. FCC*, 486 U.S. 57, 63-64 (1988). Plaintiff's claims here do both.

Paxil's regulatory history proves there can be absolutely no doubt about whether FDA reviewed, considered, and rejected the Paxil-specific labeling statement that GSK proposed in 2006. In the face of FDA's consistent and clear determinations regarding the risk of adult suicidality, Plaintiff nevertheless urges this Court to allow her claims to proceed to a jury because she disagrees with the informed scientific conclusions of FDA, the expert agency solely responsible for regulating prescription drugs, and determining the content of their labeling and warnings. A more direct conflict cannot be established. This direct conflict between Plaintiff's claims and FDA's scientific determinations is precisely why her claims are preempted: GSK cannot be held liable under state law for (1) removing warning language in Paxil's labeling that FDA rejected, or (2) not including a warning that violated FDA's labeling standards.

Plaintiff's state law claims undermine the federal regulation of prescription drug labeling and warnings, and would punish GSK for not including language in Paxil's labeling that FDA directed GSK to remove. The evidence is undisputed that FDA would not have approved GSK's request to include the language that FDA ***rejected***.

Moreover, Plaintiff's claims disregard the federal regulation that warnings in a medication's labeling be based on reasonable evidence of an association between a medication and a risk, and that they be based upon newly acquired information. Plaintiff's claims, therefore, are preempted because they also would pose an obstacle to FDA's prescription drug labeling requirements and restrictions because they violate the FDCA's requirement for "adequate directions for use" (21 U.S.C. § 352(f)(1)), and its prohibition against "false and misleading" labeling (21 U.S.C. § 352(a)).

### A.    Standard for Summary Judgment.

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The nonmoving party must "go beyond the pleadings" in order to prove "specific facts showing that there is a genuine issue for trial." *Id.* at 324. Thus, the nonmoving party must produce evidence that shows a genuine issue of material fact and "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The issue of whether federal preemption applies under the standard in *Levine* is a matter of law decided by the court. *Mason*, 596 F.3d at 390.

### B.    The Extensive Regulatory Record Establishes Clear Evidence that FDA "Would Not Have Approved" – and Instead Rejected – the Warning that Plaintiff Seeks.

Plaintiff's state law claims are preempted because the regulatory record is undisputed and provides "clear evidence" that FDA would not have approved Plaintiff's desired warning of an increased risk of suicidal behavior in adults using paroxetine. Indeed, FDA rejected GSK's many efforts to retain the very language that Plaintiff says should have been in Paxil's labeling.

In addressing the issue of whether FDA's approval of a medication preempts state law claims alleging that the FDA-approved labeling was inadequate, the Supreme Court

acknowledged that federal law preempts state law claims where, as here, there is clear evidence that FDA would not have approved a particular warning:

> *But absent clear evidence that the FDA would not have approved a change* to Phenergan's label, we will not conclude that it was impossible for Wyeth to comply with both federal and state requirements.

*Levine*, 555 U.S. at 571-72 (emphasis added); *see In re Fosamax Prods. Liab. Litig.*, 951 F. Supp. 2d at 703 (*Levine* "does not define 'clear evidence,' so application of the clear evidence standard is necessarily fact specific" (internal quotation marks omitted)). The warning Plaintiff seeks here was unsubstantiated and expressly rejected by FDA. Since 1990, FDA has repeatedly and thoroughly considered the central issue in this case – whether SSRIs, including Paxil, may play a role in suicidal acts and thinking in adults. In every analysis involving adult patients over the age of 24, FDA has repeatedly considered the available scientific evidence; failed to find a scientifically valid association between the risk of suicidality and the use of SSRIs, including Paxil, in that population; rejected GSK's warnings and labeling language prior to Mr. Dolin's death; and rejected requests to include a warning or language of an increased risk in adult patients over age 24. (*See generally* Undisputed Fact Nos. 24, 39, 42, 46, 53, 73, 105-107.) These events provide clear evidence that FDA would not have approved Plaintiff's warning or change. Moreover, Plaintiff simply cannot present any credible evidence to prove otherwise.

Based upon a far less established or robust regulatory history presented to it, the *Levine* Court found no irreconcilable conflict between state and federal requirements. In stark contrast, here, the regulatory record relating to Paxil and SSRIs demonstrates FDA's close attention to the identical risk at issue in the case for the past twenty-plus years. (*See generally supra* Section II.) Even *before* approving Paxil, FDA focused on the possibility that an increased risk of suicidality and/or suicide may exist in patients taking SSRIs. (*See* Undisputed Fact No. 9-11, 14-19, 24.)

19

Following Paxil's approval and in addition to the extensive data that GSK was already submitting to FDA each year pursuant to federal law, FDA requested that GSK provide additional data to the Agency. (*See* Undisputed Fact No. 35.) And FDA continued to monitor SSRIs closely, ultimately deciding in 2007 on the exact language that it wanted to include the labeling for Paxil and other SSRIs regarding adult suicidality. (*See supra* at Section II.B; Undisputed Fact Nos. 105-108.) This language that remains in place today. (Undisputed Fact Nos. 123, 125.) This extensive regulatory record shows that FDA actively monitored the claimed risk at issue here and repeatedly made decisions about what should (and should not) be in Paxil's labeling about that claimed risk.

This record further shows that after FDA told GSK to remove the Paxil-specific suicidality language from the Paxil labeling in favor of class labeling, GSK specifically requested on multiple occasions, including the submission of two CBE labeling supplements, if it could retain the Paxil-specific language and data. (Undisputed Fact Nos. 109-118.) On every occasion, FDA instructed GSK to remove that language. In doing so, FDA made clear that it had decided it wanted "to ensure standardized labeling pertaining to adult suicidality with all of the drugs to treat major depressive disorder (MDD)" because it was "***critical that the labeling is consistent for all of these products***". (Undisputed Fact Nos. 115.) In other words, following an extensive analysis of data in adult patients for all antidepressants, including Paxil; the use of outside experts to assess that data; and public hearings discussing the data and what the labeling should state, FDA exercised the authority granted to it by Congress to decide what should and should not be in Paxil's labeling concerning the risk of adult suicidality. Here, Plaintiff is simply unhappy with FDA's decision and seeks to hold GSK liable for complying with FDA's

determination that Paxil's labeling should not be different from any other SSRI's labeling when it came to the potential risk of adult suicidality.

FDA's actions, taken in the fuller context of GSK's extensive regulatory record for Paxil, are critical to understanding why federal law preempts Plaintiff's claims in this case. FDA **rejected**, and thus would **not** have approved, Plaintiff's warning and labeling change prior to Mr. Dolin's death. This renders moot any claim that GSK should have or could have proposed a warning reflecting an increased risk of adult suicidality in Mr. Dolin's age group as argued by Plaintiff. Such a proposal would have been an exercise in futility given FDA's repeated assessments of the data and its order to GSK to adopt the labeling "verbatim" that FDA had decided would apply to the entire class of medications. (*See* Undisputed Fact Nos. 108, 121.)

Unlike the record in *Levine*, the record relating to Paxil reflects that FDA would **not** have approved a warning relating to an increased risk of adult suicidality in patients over the age of 24 because FDA ordered that GSK remove such language in favor of labeling language that stated: "Short-term studies did not show an increase in the risk of suicidality with antidepressants compared to placebo in adults beyond age 24". (*See* Undisputed Fact Nos. 125.) This scientific determination is well within the expert purview of FDA. *See, e.g.*, *Henley v. FDA*, 77 F.3d 616, 621 (2d Cir. 1996) (noting that FDA "possesses the requisite know-how to conduct [an analysis of conflicting studies] by sifting through the scientific evidence to determine the most accurate and up-to-date information regarding a particular drug, and how those data affect human usage"); *Pub. Citizen Health Research Grp. v. Comm'r, FDA*, 740 F.2d 21, 29 (D.C. Cir. 1984) (acknowledging that whether a drug "is sufficiently dangerous to require a warning label is a factual question demanding the medical expertise that FDA possesses and . . . [courts] lack"). *Levine* itself readily acknowledges the final authority of FDA:

> Of course, the **FDA retains authority to reject labeling changes made pursuant to the CBE regulation** in its review of the manufacturer's supplemental application, just as it retains such authority in reviewing all supplemental applications.

555 U.S. at 571 (emphasis added). Plaintiff, therefore, may not resort to state law to impose liability on GSK for removing language from Paxil's labeling that FDA rejected and deemed to be without scientific support.

Another federal district court, addressing another SSRI medication, Effexor, rejected the plaintiff's assertions that Effexor's labeling "was inadequate to warn [53 year-old] Mr. Dobbs of the risk of suicide associated with Effexor." *Dobbs v. Wyeth Pharms.*, 797 F. Supp. 2d 1264, 1266 (W.D. Okla. 2011). After noting that "*Levine* did not [] hold that impossibility preemption based on FDA labeling regulations is precluded in *all* cases," *id.* at 1269, the *Dobbs* "court conclude[d] that, given the specific circumstances presented in this action, Wyeth has satisfied the *Levine* evidentiary standard required to support preemption," *id.* at 1280.

In reaching its conclusion, the *Dobbs* court evaluated the regulatory history of SSRIs, including Paxil, explaining that "FDA has consistently reviewed warning labels for SSRIs collectively, and its consideration of the proper content and scope of suicidality warnings has not been directed at specific brands of SSRIs, but at the entire classification." *Id.* at 1271-72. In so doing, "FDA has consistently expressed concern that an enhanced suicidality warning not supported by scientific evidence creates a risk of 'overall injury to the public health' resulting from the potential reduction in the use of antidepressants, thereby undermining the known benefit of such drugs in the treatment of depression." *Id.* at 1272. The court went on to explain:

> FDA has not considered individual manufacturers' reports of adverse events sufficiently persuasive to provide 'reasonable evidence of an association' between the drug and the reported adverse consequence. 21 C.F.R. § 201.57(e). With respect to SSRIs, the FDA has instead taken the position that the evidence

required to support a label warning must be based on randomized, double-blind,
controlled clinical trials.

*Id.* at 1273.  And FDA "has opined that the evidence [to date] suggests a neutral connection

between SSRIs and suicidality in [53 year-old Mr. Dobbs'] age group."  *Id.* at 1276.  The current

FDA-approved labeling for SSRIs reflects this neutral connection.

Nor does the Seventh Circuit's decision in *Mason* require a finding of no preemption for

several reasons.  First, *Mason* involved a 23 year-old patient – within the young adult age range,

unlike 57 year-old Mr. Dolin.  Second, Ms. Mason committed suicide in 2003, a time period

during which "the FDA was considering scientific evidence that Paxil might increase suicidality

in pediatric patients or young adults", and shortly afterwards FDA "enhanced warnings for

pediatric patients and young adults within a relatively short time after Ms. Mason's suicide."  *See*

*id.* at 1277 (distinguishing *Mason*).  Third, the regulatory record here shows that on multiple

occasions, FDA considered, reviewed, and rejected the very warnings and language about adult

suicidality that Plaintiff says should have been in Paxil's labeling.  In doing so, FDA expressly

stated that it wanted "standardized labeling pertaining to adult suicidality with all of the drugs to

treat major depressive disorder (MDD)" and it was "critical that the labeling is consistent for all

of these products".  (Undisputed Fact Nos. 102, 115.)

As determined by the Seventh Circuit in *Robinson*, "a court cannot order a drug company

to place on a label a warning if there is 'clear evidence' that the FDA would not approve it."  615

F.3d at 874.  In *Robinson* the plaintiff claimed that she contracted a rare disease known as

Stevens Johnson Syndrome/Toxic Epidermal Necrolysis ("SJS/TEN") from ingesting Children's

Motrin, culminating in the loss of 60 percent of her skin and the vision in one of her eyes.  *Id.* at

864-65.  Plaintiff alleged, among other things, that the drug manufacturer should have included a

warning about SJS/TEN in the drug's labeling.  The court ruled that the plaintiff's failure-to-

warn claim was preempted because the FDA had determined that the drug's labeling should ***not*** contain a warning about SJS/TEN. *Id.* at 873 ("The FDA decided not to require such a warning because it would confuse rather than inform ….").

The Supreme Court in *Levine* chose its words carefully and deliberately. The Court acknowledged that federal law preempts state law claims when FDA "would not have approved" a warning. Although the *Levine* Court did ***not*** require that a company either (1) propose a CBE supplement or (2) that FDA affirmatively reject that proposed CBE, ***both*** FDA actions occurred with respect to Paxil ***before*** Mr. Dolin's suicide. If there is not a finding of preemption on these regulatory facts and extensive analyses by FDA , then there is virtually no possibility of a finding of preemption in any case involving prescription medications. Surely, this is not what the *Levine* Court envisioned or else it would have said so.

GSK anticipates that, despite FDA's clear rejection of GSK's efforts to retain the Paxil-specific language, Plaintiff will argue that GSK should have requested a formal meeting because it would have caused FDA to change its mind and require the inclusion of the Paxil-specific warning. This e-mail from FDA, on the heels of FDA's directive to GSK to adopt the same labeling language on adult suicidality as other SSRIs, advised that "the Agency has reviewed your proposed changes, and we do not believe that your product specific analysis should be included in class labeling revisions since the labeling is targeted at the class of drugs. If you would like to discuss this matter further, please submit a formal meeting request". (Undisputed Fact No. 117.) This e-mail followed two years of careful study of the data, including expert review; development of a new methodology for analyzing the data; public Advisory Committee meetings to address the issue, in which Plaintiff's counsel, as well as her retained experts Dr. Joseph Glenmullen and Dr. David Healy, advocated to FDA for the inclusion of warnings of

increased suicidality without reference to age groups; extensive analyses by FDA scientists of data across all SSRIs and other antidepressants; and FDA press releases regarding FDA's deliberative analyses of the issue. (Undisputed Fact Nos. 82-84, 93, 95-107.) The undisputed facts show that another meeting would not cause FDA to change course. To argue that a meeting with FDA would make any difference is pure speculation and unsupported by the facts.

As explained by GSK's Dr. John Kraus about FDA's comment regarding a meeting request, GSK did not formally request a meeting because: (1) doing so would have been futile; (2) FDA had been clear, on several prior occasions, that (a) FDA was not accepting either Paxil-specific data for inclusion in Paxil's labeling or Paxil-specific data that had been included in GSK's prior CBE labeling supplements and other correspondence and (b) FDA wanted the labeling for medications in the class to be identical and consistent on the issue of adult suicidality; and (3) GSK would have been required to present new data, new analysis, or other newly-acquired information to FDA and no such new data or analyses existed. (Kraus Decl. ¶¶ 106-107.) As the *Dobbs* court explained, "*Levine* expressly recognized that the FDA retains the authority to reject label changes made pursuant to the CBE regulation; this court does not interpret *Levine* as imposing upon the drug manufacturer a duty to continually 'press' an enhanced warning which has been rejected by the FDA." 797 F. Supp. 2d at 1279. That is certainly true. Moreover, FDA rejected both of GSK's CBE labeling supplements as well as the several other efforts where GSK requested to include Paxil-specific data or language in the labeling about adult suicidality.

25

Should Plaintiff argue that GSK could have retained Paxil-specific language that conflicted with FDA-mandated class labeling[9] by placing them elsewhere in the Paxil labeling, that argument ignores that FDA stated it wanted standardized labeling for all the medications in the class. Such an argument is also nonsensical because that would create out-right conflicting statements and confusion within the labeling. The statement required by FDA would state "[s]hort-term studies did not show an increase in the risk of suicidality with antidepressants compared to placebo in adults beyond age 24; there was a reduction with antidepressants compared to placebo in adults aged 65 and older". (*See* Undisputed Fact No. 121.) But then Plaintiff's desired warning would state in some unnamed place in the labeling that "[i]n adults with MDD (all ages), there was a statistically significant increase in the frequency of suicidal behavior in patients treated with paroxetine compared with placebo (11/3,455 [0.32%] versus 1/1,978 [0.05%])" and "[t]hese MDD data suggest that the higher frequency observed in the younger adult population across psychiatric disorders may extend beyond the age of 24." (*See* Undisputed Fact No. 90.) These conflicting data and statements would create confusion and mislead patients and physicians, a result FDA clearly sought to avoid. *See Dobbs*, 797 F. Supp. 2d at 1271-72 ("FDA has consistently reviewed warning labels for SSRIs collectively, and its consideration of the proper content and scope of suicidality warnings has not been directed at specific brands of SSRIs, but at the entire classification."). Indeed, FDA's actions here repeatedly demonstrate that it wanted consistency in the labeling for antidepressants when discussing the possible risk of suicidality. These efforts included:

---

[9] Plaintiff's regulatory expert, Dr. Ross, confirmed that, although the current FDA-mandated labeling includes language that "short-term studies did not show an increase in the risk of suicidality with antidepressants compared to placebo in adults beyond age 24," the Paxil-specific language he believes GSK should have added would talk about an increased risk for Paxil beyond age 24. (*See* Dr. Ross Dep. at 405.)

- FDA's March 22, 2004 Public Health Advisory, in which FDA outlined that it "asked manufacturers of the following antidepressant drugs to include in their labeling a Warning statement that recommends close observation of adult and pediatric patients treated with these agents for worsening depression or the emergence of suicidality." (*See* Undisputed Fact No. 64.)

- FDA's Talk Paper on the same date, in which "[t]he agency is advising clinicians, patients, families and caregivers of adults and children that they should closely monitor all patients being placed on therapy with these drugs [antidepressants] for worsening depression and suicidal thinking, which can occur during the early period of treatment…. FDA is asking manufacturers to change the labels of ten drugs to include stronger cautions and warnings about the need to monitor patients for the worsening of depression and the emergence of suicidal ideation, regardless of the cause of such worsening." (*See* Undisputed Fact No. 63.)

- FDA's July 1, 2005 Talk Paper, "FDA Reviews Data for Antidepressant Use in Adults," in which FDA noted its "process of reviewing available data to determine whether there is an increased risk of suicidal behavior in adults taking antidepressants". FDA noted its recommendations, which "are consistent with warnings already present in approved labeling for antidepressants used by adults." (*See* Undisputed Fact No. 84.)

- Dr. Laughren's November 16, 2006 Memorandum to members of PDAC, in which he addressed PDAC's upcoming meeting "to consider new information on the occurrence of suicidality in the course of treatment of adult patients with various antidepressants." (*See* Undisputed Fact No. 97.) Dr. Laughren noted the meeting was intended to "discuss our plans for labeling modifications based on" findings from FDA's meta-analysis "involving 372 placebo-controlled antidepressant trials and almost 100,000 patients." (*Id.*)

And then, when it announced labeling changes on May 2, 2007, FDA explained that its

> proposed labeling changes apply to the entire category of antidepressants. Results of individual placebo-controlled scientific studies are reasonably consistent in showing a slight increase in suicidality for patients taking antidepressants in early treatment for most of the medications. Available data are not sufficient to exclude any single medication from the increased risk of suicidality.

(*See* Undisputed Fact No. 105 (further explaining that these proposed changes "include language

stating that scientific data did not show this increased risk in adults older than 24").)

Plaintiff's claims here undermine FDA's objective of ensuring that warnings and

information in a medication's labeling be based on sufficient scientific evidence. FDA has

repeatedly and consistently determined that the warning Plaintiff seeks through this lawsuit is

without scientific basis. Yet Plaintiff attempts to impose liability on GSK for removing language

27

from the Paxil labeling – in favor of language that FDA required – at FDA's instruction.  In

announcing the current labeling for Paxil and other SSRIs back on May 2, 2007, FDA plainly

stated:  "The labeling also will point out that *scientific data did not show this increased risk* in

adults older than 24 and that adults ages 65 and older taking antidepressants actually have a

decreased risk of suicidality." (*See* Undisputed Fact No. 107 (emphasis added).)  The evidence

relating specifically to SSRIs reflects FDA's concern that any warning be properly grounded and

premised on an adequate scientific basis; FDA advised that determining whether there is an

association between suicidality and a drug must be done in a "careful thoughtful manner.  Erring

in either direction would have adverse consequences."  (*See, e.g.*, Undisputed Fact No. 51.)

Had GSK retained or added back a warning regarding adult suicidality for Paxil despite

FDA's instruction to the contrary, Paxil's labeling would have been false and misleading (21

U.S.C. § 352(a)), lacking adequate direction for use (§ 352(f)(1)), thereby causing Paxil to be

deemed misbranded and its distribution a "prohibited act" (§ 331(a), (d), (k)).  This exposes the

company to potential civil and criminal enforcement (§§ 332-334).  As such, there is a "direct

and positive" conflict between Plaintiff's state law claims and the federal FDA-mandated

labeling for Paxil.  *See Geier*, 529 U.S. 861; 73 Fed. Reg. at 49,603-01, 49609; 71 Fed. Reg. at

3933-36, 3967-69.

Plaintiff should not be allowed to contravene the standards that FDA adopted to regulate

prescription medications.  *See Geier*, 529 U.S. at 881.  Otherwise, state law claims seeking to

impose liability on a pharmaceutical manufacturer for failing to include an unsubstantiated

warning would upset the system of federal regulation over prescription medications.  This is the

precise type of obstacle that the law on federal preemption seeks to avoid.

A finding of no preemption here would substantially burden FDA, the industry, and the public at large. A "no-preemption" decision may motivate potential applicants "to submit a deluge of information that the [Agency] neither wants nor needs, resulting in additional burdens on the FDA's evaluation of an application." *Buckman Co.*, 531 U.S. at 351. Manufacturers would be forced to comply with FDA's standards, as well as those enunciated by the fifty states. *See Nathan Kimmel, Inc. v. DowElanco*, 275 F.3d 1199, 1207 (9th Cir. 2002). This type of "unlimited liability for drug manufacturers would threaten the financial viability of many enterprises and could add substantially to the cost and unavailability of many drugs." *Garcia v. Wyeth-Ayerst Labs.*, 385 F.3d 961, 967 (6th Cir. 2004). Congress did not intend for claims such as Plaintiff's to interfere with FDA's exclusive authority to regulate prescription drug labeling. *See Geier*, 529 U.S. at 884-85 ("[O]ne can assume that Congress or an agency ordinarily would not intend to permit a significant conflict"). Plaintiff's claims, therefore, pose an obstacle to the federal regulation of drug labeling and are preempted.

Accordingly, Plaintiff's claims fail as a matter of law.

### C.    Plaintiff's Experts Point to No Basis For GSK to Submit a CBE Labeling Supplement to FDA.

The CBE regulations, discussed *supra* Section III, permit a manufacturer to submit a CBE supplement when there exists newly acquired information that reveals reasonable evidence of an association between a medication and a risk. *See* 21 C.F.R. § 201.80(e); 73 Fed. Reg. at 49,604 (stating that warnings submitted via CBE supplements must also be based on reasonable evidence of an association). Because such information does not exist here, Plaintiff's claims are preempted. *See Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 706 (1984) ("Since the [state] law . . . compels conduct that federal law forbids, the state [law] clearly 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives' of the federal regulatory

scheme."); *see also Levine*, 555 U.S. at 581 (recognizing that "some state-law claims might well frustrate the achievement of congressional objectives").

For over thirty years, FDA's regulations have required that warnings be based on "reasonable evidence … [of] an association between a drug and a serious hazard." 44 Fed. Reg. 37,434, 37,436 (June 26, 1979); 21 C.F.R. § 201.57; 21 C.F.R. § 201.80. FDA has consistently maintained that warnings must be based on sufficient scientific support to be included in the labeling. *See* 39 Fed. Reg. 33,229, 33,232 (Sept. 16, 1974) ("The presence of unsubstantiated medical opinion in drug labeling would be misleading within the meaning of sections 502(a) and 201(n) of the act."); *id.* ("[T]here is no justification for the presence of differences of medical opinion in any warning statements. . . ."); 40 Fed. Reg. 28,582, 28,583 (July 7, 1975) ("[S]tatements about the safety or effectiveness of a drug must be based upon adequate scientific evidence. . . ."). This rule is designed to "provide physicians with a clear and concise statement of the data and information necessary for the safe and effective use of the drug." 44 Fed. Reg. at 37,435.

FDA reiterated this federal standard when it promulgated a final rule codifying its longstanding interpretation of the CBE regulation. In its final rule, FDA explained that CBE supplements proposing a new warning for a product must be based on reasonable evidence of an association between the risk and a medication. *See* 73 Fed. Reg. at 49,606. FDA emphasized the importance of this requirement to "ensure that scientifically valid and appropriately worded warnings will be provided in the approved labeling for medical products, and to prevent overwarning, which may deter appropriate use of medical products, or overshadow more

important warnings." [10] *Id.* at 49,605-606; *see also* 71 Fed. Reg. at 3935 ("Exaggeration of risk could discourage appropriate use of a beneficial drug.").

A principal FDA objective is to ensure that all labeling, including warnings, is supported by credible scientific evidence. FDA has long recognized that speculative medication warnings included in a drug's labeling are not supported by scientific evidence can harm the public and, therefore, must be prohibited. First, FDA's regulations are designed to ensure each medication's optimal use through requiring scientifically substantiated warnings. Scientifically unsupported warnings in labeling may give physicians false impressions of the risks of a medication, thereby over-deterring its use. Thus, under-utilization can deprive patients of beneficial, possibly lifesaving treatment, and frustrate the purpose of FDA regulation. Second, unsupported warnings alarm patients who may discontinue use of the medication, ultimately harming themselves as they seek to avoid the alleged, but speculative risks. *See Am. Home Prods. Corp. v. Johnson & Johnson*, 672 F. Supp. 135, 146 (S.D.N.Y. 1987) (noting that FDA must consider not only possible hazards to public health, but also the interest of the public in freedom from groundless alarm). Finally, unsubstantiated warnings take attention away from more serious, scientifically confirmed risks. *See Brooks v. Howmedica*, 273 F.3d 785, 796 (8th Cir. 2001) (en banc) ("Warnings about dangers with less basis in science or fewer hazards could take attention away from those that present confirmed, higher risks."); *Thomas v. Hoffman-La Roche, Inc.*, 949 F.2d 806, 815 (5th Cir. 1992) ("To be reasonable, the warning should neither understate nor overstate the known risks associated with the use of a particular product.").

Plaintiff's experts here fail to identify any "newly acquired information" since FDA's 2007 rejection of GSK's two CBE labeling supplements (and other requests) that could form the

---

[10] FDA's interpretation of its regulations is entitled to substantial deference. *See Riegel v. Medtronic, Inc.*, 552 U.S. 312, 328 (2008) (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)).

basis of another CBE labeling supplement. In her Complaint, Plaintiff alleges that "[t]he paroxetine label in existence at the time of Stewart Dolin's death did not warn of the drug's association with an increased risk of suicidal behavior in adults despite GSK's knowledge of a statistically significant 6.7 times greater risk in adults of all ages." (Compl. ¶ 22.) But the FDA had explicitly reviewed and considered that very information before rejecting GSK's multiple requests to keep that information in the labeling. Likewise, FDA's finding of a 2.76 odds ratio for a secondary endpoint of suicidal behavior, preparation or worse, for paroxetine in FDA's own November 2006 analysis (*see id*. ¶¶ 107, 116) cannot be the basis of "newly acquired information" because FDA knew about that data before announcing the labeling it required GSK and other manufacturers to implement. *See In re Celexa*, 779 F.3d at 42-43 (rejecting effort to use CBE labeling supplement based on information and data known to FDA).

Moreover, Plaintiff's experts Dr. David Healy and Dr. Joseph Glenmullen fail to even address how any post-2007 studies or analyses of paroxetine somehow change FDA's decision-making as to what should (and should not) be in the labeling for Paxil about a risk of adult suicidality in patients Mr. Dolin's age, much less any other adult age group. Plaintiff's own purported regulatory expert, Dr. David Ross, readily concedes the lack of "newly acquired information" to support the labeling change Plaintiff seeks. Dr. Ross confirmed that (1) in 2008, FDA amended its regulations to affirm that a CBE supplement was appropriate to amend product labeling *only* to reflect newly-acquired information, and (2) this was consistent with FDA's long-standing practice *prior to* 2008 of focusing only on newly acquired information for CBE submissions. Deposition of Dr. David Ross at 392-93; *see id.* at 110 (agreeing that "newly acquired information" must reveal a risk of a different type or greater severity than previously included in submissions to FDA), transcript attached as Ex. 10 to Davis Decl. Dr. Ross agreed

32

that as of May 2007, when it announced its labeling changes for antidepressants, FDA was well aware of the 2.76 odds ratio finding for Paxil or paroxetine. *Id.* at 298-99; *see id.* at 344 (agreeing there was nothing new to submit to FDA regarding suicidality and Paxil as of that time).

Moreover, Dr. Ross agreed that, since at least 2004, FDA has focused on randomized double-blind placebo-controlled trials in assessing the issue of whether there was an increased risk of suicidality with Paxil or other SSRIs. *Id.* at 183; *see id.* at 187 (confirming that post-2004, he was not aware of an instance in which FDA approved an antidepressant CBE supplement addressing risk of suicidality that relied on data other than randomized double-blind, placebo-controlled trials). Dr. Ross admitted he could point to no data *not* already considered by FDA that showed an increased risk in adult patients above the age of 30:

> Q:     Do you know of any analysis of randomized placebo-controlled data conducted by anyone that shows a statistically significant increased risk of either suicidality, suicidal ideation or behavior, or suicidal behavior in adult patients over 30 using Paxil or paroxetine?
>
> A:     Well, all I can do is cite the analysis that GSK cited in which it said there was an increased risk in MDD patients [of] all ages.
>
> Q:     You're talking about the 2006 submission that GSK made to FDA?
>
> A:     Yes.
>
> Q:     Other than that, are you aware of any other?
>
> A:     No.
>
> Q:     And you don't know of any analysis of randomized placebo-controlled trials of Paxil or paroxetine that shows a statistically significant increased risk of completed suicides in adult patients over 30, [do] you?
>
> A:     No.

*Id.* at 412-13; *see id.* at 389-90 (agreeing that his own report pointed to no published study analyzing double-blind placebo-controlled data that identified a possibly risk for suicidality higher than the 6.7 odds ratio figure that GSK had submitted to FDA in 2006).

Because Plaintiff and her experts point to no newly-acquired information that could form the basis of a CBE labeling supplement concerning suicidality in Mr. Dolin's age group (or any other age group), Plaintiff's claims are preempted as a matter of law. *In re Celexa*, 779 F.3d at 41 (addressing a motion to dismiss). "So the question to which we now turn is whether the CBE regulation allows a brand name manufacturer to make the particular type of change that plaintiffs say [the manufacturer] needed to have made to avoid liability under [state] law." *Id.* In the *Celexa* litigation – involving another SSRI medication – the First Circuit Court of Appeals "scrutinized the complaint itself to see if it might plausibly be read as relying on 'newly acquired information' in contending that Forest could have changed its label through the CBE procedures." *Id.* at 42. Noting "only two fleeting references to academic articles published after the FDA's approval of the Lexapro labels" – which the plaintiffs did not contend were based on new data – the court dismissed plaintiffs' claims, "find[ing] no precedent … that would have allowed Forest to use the CBE procedure to alter the FDA label in the manner that plaintiffs allege is necessary so as to render it not 'misleading.'" *Id.* at 42-43. Similarly, as Dr. Ross recognized, Plaintiff's experts here fail to identify any "newly-acquired information" in randomized double-blind placebo-controlled trials that shows a different (or greater) risk of adult suicidality in patients Mr. Dolin's age group than what FDA already considered and evaluated.

## V.   CONCLUSION

For the foregoing reasons and the reasons set forth in GSK's Motion for Summary Judgment on the issue of federal preemption, GSK respectfully requests that this Court grant its

Motion for Summary Judgment, dismiss Plaintiff's claims with prejudice, and award GSK its

fees and costs as appropriate.


Dated: July 29, 2015                    Respectfully submitted,

                                        By:  /s/ Alan S. Gilbert
                                        Alan S. Gilbert (No. 953210)
                                        Anders C. Wick (No. 6274319)
                                        DENTONS US LLP
                                        233 S. Wacker Drive, Suite 5900
                                        Chicago, Illinois  60606-6404
                                        Telephone:  (312) 876-8000
                                        Facsimile:  (312) 876-7934

                                        Andrew T. Bayman (*pro hac vice*)
                                        Todd P. Davis (*pro hac vice*)
                                        Heather M. Howard (*pro hac vice*)
                                        KING & SPALDING LLP
                                        1180 Peachtree Street, N.E.
                                        Atlanta, GA 30309-3521
                                        Telephone:  (404) 572-4600
                                        Facsimile:  (404) 572-5100

                                        Robert E. Glanville (*pro hac vice*)
                                        Thomas S. Wiswall (*pro hac vice*)
                                        Tamar P. Halpern (*pro hac vice*)
                                        Eva Canaan  (*pro hac vice*)
                                        PHILLIPS LYTLE LLP
                                        One Canalside
                                        125 Main Street
                                        Buffalo, NY 14203-2887
                                        Telephone: (716) 847-8400
                                        Facsimile: (716) 852-6100

                                        *Attorneys for GlaxoSmithKline LLC*

## CERTIFICATE OF SERVICE

It is hereby certified that on July 29, 2015, I have served a copy of the foregoing

**DEFENDANT GLAXOSMITHKLINE LLC'S MEMORANDUM OF LAW IN SUPPORT**

**OF SUMMARY JUDGMENT (FEDERAL PREEMPTION)** on the following counsel via e-

mail:

Michael L. Baum
*sbeam@baumhedlundlaw.com*
Bijan Esfandiari
*besfandiari@baumhedlundlaw.com*
Frances M. Phares
*fphares@baumhedlundlaw.com*
R. Brent Wisner
*rbwisner@baumhedlundlaw.com*
Baum Hedlund Aristei & Goldman, P.c.
12100 Wilshire Blvd.
Suite 950
Los Angeles, CA 90025
(310) 207-3233

Joshua Lawrence Weisberg
*jweisberg@rapoportlaw.com*
Lindsey Alaine Epstein
*lepstein@rapoportlaw.com*
Rapoport Law Offices, PC
20 N. Clark Street
Suite 3500
Chicago, IL 60602
(312) 327-9880

*Attorneys for Plaintiff Wendy B. Dolin*

.

By:  /s/ Alan S. Gilbert
Alan S. Gilbert (No. 953210)
DENTONS US LLP

*Attorney for GlaxoSmithKline LLC*