IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

|  |  |  |
|---|---|---|
| WENDY B. DOLIN, Individually and as Independent Executor of the ESTATE OF STEWART DOLIN, Deceased, | ) ) ) ) | Case No. 1:12-cv-06403 |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| SMITHKLINE BEECHAM CORPORATION D/B/A GLAXOSMITHKLINE, a Pennsylvania Corporation, | ) ) ) ) | |
| Defendant. | ) ) ) ) | |

**DEFENDANT GLAXOSMITHKLINE LLC'S
MEMORANDUM OF LAW IN SUPPORT OF
SUMMARY JUDGMENT ON PLAINTIFF'S ILLINOIS LAW CLAIMS**

## TABLE OF CONTENTS

Page

I.     INTRODUCTION .................................................................1

II.    FACTUAL BACKGROUND .......................................................3

     A.     GSK's Paxil Labeling and Communications with the Medical Community...........3

     B.     Mr. Dolin's Paroxetine Prescriber, Dr. Sachman. ....................................6

     C.     Mr. Dolin's Longstanding Work-Related Anxiety Intensified in 2010..................9

     D.     Dr. Sachman's Interactions With the Dolins in July 2010 After Re-Starting Paroxetine......................................................................11

III.   ARGUMENT AND CITATION OF AUTHORITY .......................................11

     A.     Summary Judgment Standard. ...................................................11

     B.     Under the Learned Intermediary Doctrine, It Is The Prescribing Physician, Not the Patient, Who Must Be Warned, and Because Dr. Sachman Was Aware of Paroxetine's Alleged Risks, Plaintiff's Claims Fail as a Matter of Law. ....................................................................12

         1.    Dr. Sachman Agreed that the Paxil Labeling Warned of the Very Side Effects Plaintiff Alleges Mr. Dolin Experienced...........................14

         2.    Where a Doctor Has Knowledge Of the Alleged Risk From Any Source, There is No Duty To Warn. .........................................17

         3.    GSK Provided Dr. Sachman With the Very Information That He Claimed Would be Dispositive for Him to Make a Decision Not to Prescribe Paroxetine for Mr. Dolin.......................................20

         4.    Additional Testimony from Dr. Sachman Breaks the Chain of Causation...................................................................22

     C.     The Paroxetine Labeling Was Adequate as a Matter of Law. ...............23

     D.     Plaintiff's Remaining Claims Fail as a Matter of Law. .........................27

         1.    Plaintiff's Misrepresentation-Based Claims Fail Absent Evidence of Reliance on a False Statement of Material Fact. ...................27

         2.    Plaintiff's Claim for Consumer Fraud Cannot Survive Summary Judgment. ...................................................................29

i

E.     Plaintiff's Claims Should Be Dismissed Because GSK's Product Did Not Cause the Alleged Injury. .................................................................................31

IV.   CONCLUSION.................................................................................................36

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re Accutane Prods. Liab. (Greenshields)*,
   MDL 1626, Case. No. 8:04-MD-2523, 2014 WL 7896548 (M.D. Fla. Sept. 23,
   2014) ..................................................................................................................24, 25

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).......................................................................................................12

*Anthony v. Country Life Mfg. LLC*,
   70 F. App'x 379 (7th Cir. 2003) ....................................................................................29

*Ashman v. SK & F Lab Co.*,
   702 F. Supp. 1401 (N.D. Ill. 1988) .......................................................................... *passim*

*Canadian Pac. Ry. Co. v. Williams-Hayward Prot. Coatings, Inc.*,
   No. 02 C 8800, 2005 WL 782698 (N.D. Ill. Apr. 6, 2005).......................................28

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986).......................................................................................................11

*In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*,
   756 F.3d 917 (6th Cir. 2014) ....................................................................................32, 33

*Eckhardt v. Qualitest Pharm. Inc.*,
   751 F.3d 674 (5th Cir. 2014) ..........................................................................................32

*Forman v. Richmond Police Dep't*,
   104 F.3d 950 (7th Cir. 1997) ..........................................................................................12

*Foster v. Am. Home Prods. Corp.*,
   29 F.3d 165 (4th Cir. 1994) ............................................................................................33

*Fullington v. Pfizer, Inc.*,
   720 F.3d 739 (8th Cir. 2013) ..........................................................................................32

*Gillman v. Crown Equip. Corp.*,
   No. 95-1914, 1996 WL 464224 (N.D. Ill. Aug. 12, 1996) ............................................12

*Guarino v. Wyeth, LLC*,
   719 F.3d 1245 (11th Cir. 2013) ......................................................................................33

*Higgins v. Forest Labs.*,
   48 F. Supp. 3d 878 (W.D. Va. 2014) ....................................................................13, 16, 17

*Hoffman v. Hercules Chem. Co.*,
  No. 03-5222, 2004 WL 2496501 (N.D. Ill. Nov. 4, 2004) ...................................................23, 24

*Kelso v. Bayer Corp.*,
  398 F.3d 640 (7th Cir. 2005) ................................................................................23, 24, 27

*Koncz v. Burroughs Wellcome Co.*,
  No. 92-5797, 1994 WL 178320 (N.D. Ill. May 9, 1994)..............................................13, 17, 19

*McConnell v. Arrow Uniform Rental, Inc.*,
  No. 97-c-6551, 1999 WL 92908 (N.D. Ill. Feb. 17, 1999) ........................................................13

*Melton v. Ortho-McNeil Pharm., Inc.*,
  No. 3:11-40009, 2014 WL 2882916 (N.D. Ohio June 25, 2014) ........................................24, 25

*Melton v. Ortho-McNeil Pharm., Inc.*,
  No. 3:11-40009, 2014 WL 4930673 (N.D. Ohio Oct. 1, 2014).................................................28

*Moretti v. Wyeth, Inc.*,
  579 F. App'x 563 (9th Cir. 2014) ..........................................................................................32

*Schrock v. Wyeth, Inc.*,
  727 F.3d 1273 (10th Cir. 2013) .............................................................................................32

**State Cases**

*Bd. of Educ. of City of Chicago v. A C & S, Inc.*,
  546 N.E.2d 580 (Ill. 1989).............................................................................................27, 28

*Connick v. Suzuki Motor Co.*,
  675 N.E.2d 584 (Ill. 1996)....................................................................................................30

*De Bouse v. Bayer AG*,
  922 N.E.2d 309 (Ill. 2009)..............................................................................................30, 31

*Gillenwater v. Honeywell Int'l, Inc.*,
  996 N.E.2d 1179 (Ill. Ct. App. 2013) ...................................................................................32

*Gredell v. Wyeth Labs., Inc.*,
  854 N.E.2d 752 (Ill. App. Ct. 2006) ......................................................................................29

*Gredell v. Wyeth Labs.*,
  No. 04-5145, 2005 WL 4774219 (Ill. Cir. Ct. June 10, 2005).....................................12, 18, 30

*Hansen v. Baxter Healthcare Corp.*,
  723 N.E.2d 302 (Ill. App. Ct. 2000) ................................................................................18, 19

*Harris v. Solna Corp.*,
  307 N.E.2d 434 (Ill. App. Ct. 1974) .....................................................................................23

*Hernandez v. Schering Corp.,*
    958 N.E.2d 447 (Ill. App. Ct. 2011) ...................................................................23, 25

*Huck v. Wyeth, Inc.,*
    850 N.W.2d 353 (Iowa 2014) ...........................................................................32, 33

*Kirk v. Michael Reese Hosp. & Med. Ctr.,*
    513 N.E.2d 387 (Ill. 1987) ................................................................................12, 22

*Kokoyachuk v. Aeroquip Corp.,*
    526 N.E.2d 607 (Ill. App. Ct. 1988) ...........................................................13, 18, 20

*Leesley v. West,*
    518 N.E.2d 758 (Ill. App. Ct. 1988) .......................................................................12

*Lewis v. Lead Indus. Ass'n, Inc.,*
    793 N.E.2d 869 (Ill. Ct. App. 2003) .......................................................................32

*Martin v. Ortho Pharm. Corp.,*
    661 N.E.2d 352 (Ill. 1996) .......................................................................................12

*N. Trust Co. v. Upjohn Co.,*
    572 N.E.2d 1030 (Ill. App. Ct. 1991) ...............................................................13, 14

*Oliviera v. Amoco Oil Co.,*
    776 N.E.2d 151 (Ill. 2002) .......................................................................................30

*Shannon v. Boise Cascade Corp.,*
    805 N.E.2d 213 (Ill. 2004) .......................................................................................30

*Smith v. Eli Lilly & Co.,*
    560 N.E.2d 324 (Ill. 1990) .......................................................................................31

**State Statutes**

815 ILL. COMP. STAT. 505/1 *et seq.* (2015) ...................................................................30

**Rules**

Fed. R. Civ. P. 56 .......................................................................................................1, 11

**Other Authorities**

Victor E. Schwartz, *et al.*, *Warning: Shifting Liability to Manufacturers of Brand-
    Name Medicines When the Harm Was Allegedly Caused By Generic Drugs
    Has Severe Side Effects*, 81 FORDHAM L. REV. 1835, 1870 (2013).........................34

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, Defendant GlaxoSmithKline LLC ("GSK") submits this Memorandum of Law in Support of Summary Judgment on Plaintiff's Illinois Law Claims, respectfully showing the Court as follows:

## I.    <u>INTRODUCTION</u>

In this lawsuit, Plaintiff Wendy Dolin seeks damages from GSK arising from the death of her husband, Stewart Dolin ("Mr. Dolin"). Plaintiff's claims all arise out of Mr. Dolin's alleged ingestion of the prescription medication paroxetine hydrochloride ("paroxetine") manufactured by Mylan Pharmaceutical Inc. ("Mylan"). Plaintiff's Complaint includes claims against GSK sounding in negligence, misrepresentation, and consumer fraud[1] – all of which stem from an alleged failure to warn of purported risks of paroxetine.

In pursuing her claims against GSK, Plaintiff has maintained that Dr. Martin Sachman, the physician who prescribed paroxetine to Mr. Dolin before his death, was not made aware of an association between paroxetine and akathisia or an increased risk of suicidal behavior in adult patients. (*See* GSK's Statement of Undisputed Material Facts ("Undisputed Facts") at Nos. 5-7 (noting language in Plaintiff's Complaint, for example, that "since August 2007, GSK has allowed an affirmative misrepresentation to exist in the label that there is no risk beyond the age of 24" concerning Paxil® ("Paxil") and the alleged risk of adult suicidality and that GSK "defrauded" Dr. Sachman by failing to provide information showing "a 6.7 greater risk for patients of all ages" taking paroxetine).) But Dr. Sachman's testimony makes clear that he knew of these alleged risks. In fact, Dr. Sachman agreed that both the medical community and he knew of the reported association between paroxetine and akathisia and suicidality well before he

---

1 The Court previously dismissed Plaintiff's claims sounding in strict liability (Dkt. No. 110 at 23-24), and Plaintiff withdrew her express and implied warranty claims. (Dkt. No. 86 at 46 ("Plaintiff voluntarily withdraws her breach of warranty claims against GSK (Counts VII and VIII).").)

first prescribed paroxetine for Mr. Dolin; that GSK's May 2006 Dear Healthcare Provider ("DHCP") Letter and revised labeling told him of the critical information he needed to know to make a decision about whether to prescribe paroxetine to Mr. Dolin; that nothing in the Paxil labeling after 2004 stated that the risk of suicidal thoughts or behavior did not extend beyond age 24; that he never told Mr. Dolin or other patients that the risk of possible suicidality did not extend beyond the age of 24; and ███████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████ Critically, based on Dr. Sachman's testimony, there is no dispute that GSK disclosed to Dr. Sachman the very risk that he testified mattered to him in his analysis of whether to prescribe paroxetine for Mr. Dolin. Dr. Sachman's admissions break the chain of causation between GSK's alleged failure to warn and Mr. Dolin's alleged injury.[3]

Separate and independent, there can be no dispute that the United States Food and Drug Administration ("FDA")-approved paroxetine labeling in effect in 2010 was adequate as a matter of law, because the labeling warned explicitly and repeatedly of the possible risk of akathisia and its association with suicidality, *and* it encouraged doctors to closely monitor patients of *all* ages started on paroxetine therapy for emerging suicidality and akathisia. This same labeling language remains in effect today.

While Plaintiff's claims sounding in misrepresentation and consumer fraud are subsumed within her claims based upon an alleged failure to warn, these claims fail for other reasons as

---

[2] "Suicidality" refers to suicidal thinking and behavior.

[3] GSK preserves and does not waive its view that it had no duty in this case and should not be liable for Plaintiff's alleged injuries because it is undisputed that Mr. Dolin did not ingest GSK's Paxil; instead, Mr. Dolin allegedly ingested generic paroxetine manufactured by Mylan, a competitor of GSK. Thus, GSK owed no duty from an alleged injury stemming from use of a competitor's medicine and its product (Paxil) never injured Mr. Dolin. GSK includes within this Memorandum a renewed motion for summary judgment because Mr. Dolin's alleged harm was caused by Mylan's paroxetine, not GSK's Paxil. *See infra* Section III.E.

well. Plaintiff lacks any evidence of reliance by Mr. Dolin or Dr. Sachman on any alleged misrepresentation as needed to support these claims; Plaintiff cannot establish proximate causation for these claims; and Mr. Dolin was not a "consumer" of GSK's Paxil under Illinois' Consumer Fraud Act.

Finally, GSK renews its previous motion for summary judgment based on the undisputed fact that Mr. Dolin did not take GSK's Paxil, but instead Mylan's paroxetine. In its prior ruling, the Court invited GSK to present a fuller record on the far-reaching impacts of the Court's decision, and GSK's submission here does so.

For each of these reasons, Plaintiff's claims against GSK fail as a matter of law, and summary judgment should be granted on Plaintiff's remaining claims.

## II.  FACTUAL BACKGROUND[4]

### A.  GSK's Paxil Labeling and Communications with the Medical Community.

In the years before Mr. Dolin's death, GSK communicated extensively with FDA regarding Paxil's labeling. Starting in April 2004, the FDA-approved labeling for Paxil and other selective serotonin reuptake inhibitors ("SSRIs") advised that "patients being treated with antidepressants should be observed closely for clinical worsening and suicidality, especially at the beginning of a course of drug therapy...." (Undisputed Fact No. 10.) Since 2004, the Paxil prescribing information also warned of akathisia and informed prescribers to warn patients' families and caregivers to "be alerted about the need to monitor patients for the emergence of agitation, irritability, and the other symptoms described above, as well as the emergence of suicidality, and to report such symptoms immediately to health care providers." (*Id.*) GSK distributed a DHCP letter advising of the 2004 labeling changes, and sent it to healthcare

---

[4] GSK refers the Court to its Statement of Undisputed Material Facts for a fuller discussion of the facts supporting summary judgment for GSK.

providers throughout the United States, including Dr. Sachman. (Undisputed Fact Nos. 12-15, 50-51.)

The next year, in 2005, FDA approved additional changes to the labeling for Paxil and other SSRIs, which included a WARNING advising that adult patients "with MDD [major depressive disorder] or co-morbid depression in the setting of other psychiatric illness being treated with antidepressants should be observed similarly for clinical worsening and suicidality, especially during the initial few months of a course of drug therapy…." (Undisputed Fact No. 16.) Among the 2005 changes in Paxil's labeling was a specific PRECAUTION addressing akathisia that stated: "The use of paroxetine or other SSRIs has been associated with the development of akathisia, which is characterized by an inner sense of restlessness and psychomotor agitation such as an inability to sit or stand still usually associated with subjective distress. This is most likely to occur within the first few weeks of treatment". (Undisputed Fact No. 18.) Again, GSK sent a DHCP letter advising of the labeling changes to healthcare providers throughout the United States, again including Dr. Sachman. (Undisputed Fact Nos. 19-20, 50-51.)

Then, in 2006, GSK revised Paxil's labeling by way of a April 2006 Changes Being Effected labeling supplement (the "2006 April CBE labeling supplement"). This labeling change revised the WARNING section on "Clinical Worsening and Suicide Risk" to state that "[i]n adults with MDD (all ages), a statistically significant increase in the frequency of suicidal behavior in patients treated with paroxetine compared with placebo (11/3,455 [0.32%] versus 1/1,978 [0.05%]; all of the events were suicide attempts." (Undisputed Fact No. 21.) This warning further advised: "These MDD data suggest that the higher frequency observed in the younger adult population across psychiatric disorders may extend beyond the age of 24." (*Id.*)

4

In May 2006, GSK sent another DHCP letter and revised labeling to physicians throughout the United States, including Dr. Sachman, alerting them to the changes in Paxil's labeling. (Undisputed Fact Nos. 23-28, 50-51.) This letter informed prescribers that "in the analysis of adults with MDD (all ages), the frequency of suicidal behavior was higher in patients treated with paroxetine compared with placebo (11/3455 [0.32%] versus 1/1978 [0.05%])" and that "all" of these events were "non-fatal suicide attempts." (Undisputed Fact No. 25.) The May 2006 DHCP letter also stated in bolded text: "It is therefore important that all patients, especially young adults and those who are improving, receive careful monitoring during paroxetine therapy regardless of the condition being treated." (Undisputed Fact No. 26.)

In 2007, following its independent analysis of adult suicidality data for a variety of antidepressants, including paroxetine, and on the recommendation of its expert advisory committee, FDA directed GSK to revise the Paxil labeling, "so as to ensure standardized labeling pertaining to adult suicidality with all of the drugs to treat major depressive disorder (MDD)." (Undisputed Fact No. 29.) After requesting several times that it be allowed to retain the Paxil specific analyses in adult patients that had been added in April 2006, FDA denied GSK's requests and instructed GSK to remove the Paxil specific analyses and implement the language that FDA had prepared. (Undisputed Fact Nos. 30-31.) GSK complied with FDA's directive. (Undisputed Fact No. 32.)[5] GSK did *not* send another DHCP letter regarding the removal of the Paxil-specific language it had added in 2006. (*Id.*)

In 2010, ███████████████████████████████, the FDA-approved labeling for paroxetine and Paxil (as well as all other antidepressants) included a boxed warning advising that "[p]atients of all ages who are started on antidepressant therapy should be

---

[5] GSK refers the Court to its motion for summary judgment (federal preemption) which details each of GSK's requests and FDA's responses.

monitored appropriately and observed closely for clinical worsening, suicidality, or unusual

changes in behavior"; a WARNING entitled "Clinical Worsening and Suicide Risk", which

warned in part that "[a]ll patients being treated with antidepressants for any indication should be

monitored appropriately and observed closely for clinical worsening, suicidality, and unusual

changes in behavior, especially during the initial few months of a course of drug therapy"; and

another PRECAUTION regarding "Clinical Worsening and Suicide Risk," which advised

"[p]atients, their families, and their caregivers … to be alert to the emergence of anxiety,

agitation, panic attacks, insomnia, irritability, hostility, aggressiveness, impulsivity, akathisia

(psychomotor restlessness), hypomania, mania, other unusual changes in behavior, worsening of

depression, and suicidal ideation, especially early during antidepressant treatment".  (Undisputed

Fact Nos. 33-34, 36.)  The current paroxetine prescribing information contains this same

language.  (Undisputed Fact No. 37.)

     **B.**     **Mr. Dolin's Paroxetine Prescriber, Dr. Sachman.**



6

██████████████████████████████████

██████████████████████████████████

████████████████████████████████ Dr.

Sachman knew "that when you initiate the drug or change dose, there's an increased risk of []

depression, increase in anxiety." (Undisputed Fact No. 64.) To Dr. Sachman, the listing of

"clinical worsening, suicidality and unusual changes in behavior", "anxiety, agitation, panic

attacks, insomnia, irritability, hostility, aggressiveness, impulsivity, akathisia (psychomotor

restlessness), hypomania and mania" in Paxil's labeling meant "a statement of the most common

side effects seen with these drugs." (Undisputed Fact No. 69.)

Dr. Sachman admitted that Paxil's labeling before October 2005 alerted doctors to be on

the lookout for increasing suicidality in patients who take antidepressants such as Paxil or

paroxetine; advised doctors such as him to be on the lookout for the symptoms described in the

warnings, including anxiety, agitation, insomnia, akathisia and emerging suicidality; and to have

discussions with the patient, family member or care providers to report such symptoms

immediately to healthcare providers. (Undisputed Fact No. 52.) The labeling for Paxil before

October 2005 also disclosed to Dr. Sachman that there was a risk of suicidal thinking and

behavior and that this could occur after starting a patient on Paxil or paroxetine. (Undisputed

Fact No. 57.) Dr. Sachman looked out for akathisia in his patients because it was described as

one of the possible or potential side effects of taking Paxil or paroxetine and that could be

reflective of suicidal thoughts or behavior. (Undisputed Fact No. 63.)

Dr. Sachman also knew that the increased risk of suicidal thoughts or behavior referenced

in the labeling was not limited to patients aged 24 or younger. (*See* Undisputed Fact No. 72.)

Dr. Sachman confirmed that well before October 2005 he was familiar with akathisia, and that he

was aware of a reported association between SSRIs such as paroxetine and akathisia.  (*See* Undisputed Fact Nos. 60-63.)



  Dr. Sachman also confirmed that when he gets a DHCP letter, he reads it and incorporates it into his practice.  (Undisputed Fact No. 49.)  Dr. Sachman does not dispute that he received GSK's DHCP letters in May 2004, February 2005, and May 2006, and that he familiarized himself with their content.  (Undisputed Fact No. 51.)  Dr. Sachman confirmed that the May 2006 DHCP Letter and attached labeling provided him with the same information

contained in a highlighted version of a 2006 GSK Briefing Document shown to him by

Plaintiff's counsel at his deposition, and that the May 2006 DHCP Letter and labeling gave him

the necessary information to make a decision whether to prescribe paroxetine to Mr. Dolin.

(Undisputed Fact Nos. 80-81.) Dr. Sachman agreed that, if GSK sent the May 2006 DHCP

Letter and revised labeling to other doctors – which it did – then GSK disclosed to and alerted

the medical community to the information contained in the revised labeling. (Undisputed Fact

No. 28, 84.) ███████████████████████████████████████

███████████████████████████████ Dr. Sachman

continued to prescribe paroxetine to his patients above age 24 (including Mr. Dolin) after

receiving the May 2006 DHCP Letter. (*See* Undisputed Fact No. 85.) In November 2010 – four

months after Mr. Dolin's death – Dr. Sachman first learned that the Paxil labeling no longer

contained the Paxil-specific data that he had seen introduced in 2006 (but had been removed at

FDA's direction in 2007). (*See* Undisputed Fact No. 88.)

**C.**     **Mr. Dolin's Longstanding Work-Related Anxiety Intensified in 2010.**

According to Plaintiff, Mr. Dolin experienced "anxiety and depression over the years,

primarily work related." (Undisputed Fact No. 90.) ███████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

████████████████████████████

███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████



**D.    Dr. Sachman's Interactions With the
Dolins in July 2010 After Re-Starting Paroxetine.**

The Dolins were (and Plaintiff remains) close personal friends with Dr. Sachman and his
wife; Dr. Sachman described Mr. Dolin as a "good" friend, a "close" friend, and "like family."
(Undisputed Fact Nos. 105, 111.)  Dr. Sachman met with the Dolins on the evening of July 13,
2010 – less than 48 hours before Mr. Dolin's suicide – for a Shiva at a friend's home and then
dinner.  (Undisputed Fact No. 106.)  Nothing about Mr. Dolin's behavior that evening suggested
to Dr. Sachman that he had akathisia.  Rather, Dr. Sachman described Mr. Dolin as "calmer than
I was" and noted that he appeared "fine."  (Undisputed Fact No. 107.)  Neither Plaintiff nor Mr.
Dolin expressed any concerns to Dr. Sachman that evening regarding Mr. Dolin experiencing
any problems with paroxetine.  (Undisputed Fact No. 108.)  Nor has Plaintiff – at any time since
Mr. Dolin's suicide – told Dr. Sachman that Mr. Dolin acted out of the ordinary or exhibited any
unusual behavior before his death.  (Undisputed Fact No. 109.)  Shortly after Mr. Dolin's
suicide, Plaintiff reported to Mrs. Sachman that there was nothing unusual in Mr. Dolin's
behavior until he was observed pacing on the train platform moments before his death.
(Undisputed Fact No. 110.)

## III.    ARGUMENT AND CITATION OF AUTHORITY

**A.    Summary Judgment Standard.**

Summary judgment is appropriate when the movant "shows that there is no genuine
dispute as to any material fact and that the movant is entitled to a judgment as a matter of law."
FED. R. CIV. P. 56(a).  When, as here, the non-moving party bears the burden of proof at trial,
summary judgment is warranted if the nonmovant fails to "make a showing sufficient to establish
the existence of an element essential to [its] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322
(1986); *see Ashman v. SK & F Lab Co.*, 702 F. Supp. 1401, 1402 (N.D. Ill. 1988) (same).  The

party opposing the motion may not rest on the mere allegations or denials of its pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[N]either 'the mere existence of some alleged factual dispute between the parties' nor the demonstration of 'some metaphysical doubt as to the material facts,' will sufficiently demonstrate a genuine issue of material fact." *Forman v. Richmond Police Dep't*, 104 F.3d 950, 957 (7th Cir. 1997) (citations omitted).)

### B. Under the Learned Intermediary Doctrine, It Is The Prescribing Physician, Not the Patient, Who Must Be Warned, and Because Dr. Sachman Was Aware of Paroxetine's Alleged Risks, Plaintiff's Claims Fail as a Matter of Law.

Under the learned intermediary doctrine, "manufacturers of prescription drugs have a duty to warn prescribing physicians [the "learned intermediaries"] of the drugs' known dangerous propensities, and the physicians, in turn, using their medical judgment, have a duty to convey the warnings to their patients." *Kirk v. Michael Reese Hosp. & Med. Ctr.*, 513 N.E.2d 387, 392 (Ill. 1987). Then, the prescribing doctor, "functioning as a learned intermediary…, decides which available drug best fits the patient's needs and chooses which facts from the various warnings should be conveyed to the patient, and the extent of disclosure is a matter of medical judgment." *Id.* at 393. Accordingly, "there is no duty on the part of manufacturers of prescription drugs to directly warn patients."[6] *Id.*; *Martin v. Ortho Pharm. Corp.*, 661 N.E.2d 352, 354 (Ill. 1996) (same); *Leesley v. West*, 518 N.E.2d 758, 763 (Ill. App. Ct. 1988) ("Manufacturers of prescription drugs [] are not required to provide cautionary information directly to the consumers of the drugs."). Simply put, the "learned intermediary doctrine [] can

---

[6] The learned intermediary doctrine applies to bar all of Plaintiff's claims because they are all based upon an alleged failure to warn. *Leesley*, 518 N.E.2d at 760-61 (concluding, "under either theory," that the manufacturer had no duty "to directly warn consumers of the side effects" of its medication); *Gillman v. Crown Equip. Corp.*, No. 95-1914, 1996 WL 464224, at *2 (N.D. Ill. Aug. 12, 1996) ("The analysis of the duty owed to a plaintiff, and alleged breach of that duty, is the same for both negligence and strict products liability claims."); *Gredell v. Wyeth Labs.*, No. 04-5145, 2005 WL 4774219, at *45 (Ill. Cir. Ct. June 10, 2005)(applying learned intermediary doctrine in case brought under Illinois Consumer Fraud Act). In addition, Plaintiff's misrepresentation and consumer fraud claims fail for other reasons as well. *See infra* Section III.D.

12

relieve a drug manufacturer of liability for adverse effects of its drugs." *Ashman*, 702 F. Supp. at 1404.

"The gist of the learned intermediary doctrine is that when informed physicians make decisions to prescribe drugs to their patients, they break the chain of liability." *Koncz v. Burroughs Wellcome Co.*, No. 92-5797, 1994 WL 178320, at *3 (N.D. Ill. May 9, 1994); *Ashman*, 702 F. Supp. at 1404 ("An adequately informed physician acts as a learned intermediary between the patient and the drug manufacturer, thus breaking the chain of liability."); *Higgins v. Forest Labs.*, 48 F. Supp. 3d 878, 887 (W.D. Va. 2014) (explaining, in granting summary judgment for SSRI manufacturer under Virginia law, that "there is no basis to impose liability on the drug manufacturer for allegedly failing to warn a treating physician of risks associated with a medication as to which the physician is already aware"). Indeed, even where a duty is found to exist and the plaintiff "shows a breach of duty, he must [still] show that the breach proximately caused his injury. A defendant is not liable for breaches that cause no injury." *McConnell v. Arrow Uniform Rental, Inc.*, No. 97-c-6551, 1999 WL 92908, at *6 (N.D. Ill. Feb. 17, 1999).

Whether a duty exists "is a question of law properly decided on summary judgment because absent a legal duty, there can be no recovery in negligence as a matter of law."[7] *Kokoyachuk v. Aeroquip Corp.*, 526 N.E.2d 607, 609 (Ill. App. Ct. 1988); *see id.* at 611 ("The determination of whether a duty to warn exists is normally a question of law."). "When a plaintiff attempts to prove that a drug manufacturer failed to adequately warn, he must first demonstrate that there was a duty to warn." *N. Trust Co. v. Upjohn Co.*, 572 N.E.2d 1030, 1037

---

[7] *See McConnell*, 1999 WL 92908, at *6 (outlining the elements of a negligence claim and articulating "several factors" to which Illinois courts look "to determine whether a duty exists"); *Koncz*, 1994 WL 178320, at *2 (explaining that under the doctrine, "drug manufacturers have a duty to warn prescribing physicians of the dangers associated with the drug").

(Ill. App. Ct. 1991).[8] Then, plaintiff must plead and prove that the manufacturer "knew or should have known [of the] possible reaction [], but failed to warn of that fact." *Id*. And "[f]inally, plaintiff was required to show that the omission of such information made the warning inadequate and the drug 'defective' and that this defect was the proximate cause of plaintiff's injuries." *Id*.

Following the principles of the learned intermediary doctrine, Plaintiff's claims fail as a matter of law for at least four separate reasons: (1) Dr. Sachman agreed that the Paxil labeling warned explicitly of the very "side effects" that Plaintiff claimed Mr. Dolin experienced, thus discharging any duty *and* breaking the chain of liability; (2) Dr. Sachman agreed that he and other members of the medical community possessed the pertinent information about the alleged risks at issue; (3) GSK disclosed to Dr. Sachman the very information that he deemed critical in evaluating whether he would have prescribed paroxetine for Mr. Dolin in 2010; and (4) Dr. Sachman's actions break any chain of causation because he testified that if he had known that the Paxil-specific language included in the May 2006 labeling had been subsequently removed from the labeling before last prescribing paroxetine to Mr. Dolin (which it had been in 2007 at FDA's direction), he would not have prescribed paroxetine to Mr. Dolin.

### 1. Dr. Sachman Agreed that the Paxil Labeling Warned of the Very Side Effects Plaintiff Alleges Mr. Dolin Experienced.

Dr. Sachman testified that the Paxil labeling warned explicitly of the very side effects that Plaintiff claimed Mr. Dolin experienced. Dr. Sachman agreed that the warnings in Paxil's labeling since 2007, like the generic paroxetine labeling, warned of what he called "a statement of the most common side effects seen with these drugs", which included the risk of clinical

---

[8] As an initial matter, of course, Plaintiff must establish that the medication used by the patient actually caused the alleged injury. *N. Trust Co.*, 572 N.E.2d at 1037 (explaining that "it was plaintiff's initial burden to show that cardiac arrest was, in fact, a reaction caused by the use of the drug").

worsening, suicidality, unusual changes in behavior, anxiety, agitation, insomnia, irritability,

and akathisia. (Undisputed Fact No. 69.)[9] Importantly, Dr. Sachman agreed that he looked out

for akathisia in his patients "because it was described as one of the possible or potential side

effects of taking Paxil or paroxetine and that could be reflective of suicidal thoughts or

behavior." (Undisputed Fact No. 63 ("Q: … the reason you would look out for akathisia is

because it was described as one of the possible or potential side effects of taking Paxil or

paroxetine and that could be reflective of suicidal thoughts or behavior? A: I would agree with

that." ).)



---

[9] Similar language had been present in Paxil's labeling since April 2004. (*See* Ex. 37 to Kraus Preemption Declaration, April 2004 labeling, PXL31, at 10-11.)

[10] Notably, Plaintiff testified that "no," she would not have allowed Mr. Dolin to take paroxetine had she known about akathisia and related references in the paroxetine prescribing information, but in her errata sheet she then changed her response to "I don't know," claiming that "I did not understand the question." (Undisputed Fact No. 71 at n. 4.)



Finally, and contrary to Plaintiff's assertion that "GSK has allowed an affirmative misrepresentation to exist in the label that there is no risk beyond the age of 24" (Undisputed Fact No. 5), Dr. Sachman confirmed that, before prescribing paroxetine to Mr. Dolin, he was aware that the increased risk of suicidal thoughts or behavior referenced in the Paxil labeling was *not* limited to patients age 24 or younger. (Undisputed Fact No. 72.) Consistent with the statement in the labeling that "all patients" need to be appropriately monitored for the emergence of such symptoms, ████████████████████████████████████████████

Similar to the prescribing doctors in *Higgins*, Dr. Sachman was well aware of a reported increased risk of suicidality in adult patients prior to treating Mr. Dolin in 2010, and "there is no basis to impose liability on the drug manufacturer for allegedly failing to warn a treating physician of risks associated with a medication as to which the physician is already aware." 48 F. Supp. 3d at 887. As the *Higgins* court held:

> Both [doctors] testified that they were aware, prior to treating [the 60 year-old decedent in 2004], that SSRIs, while generally effective in treating anxiety and

16

depression, could cause an increased risk of suicidality in certain patients, and that, as such, patients should be closely monitored. Both doctors testified that it was their standard practice to instruct the patient to be on the lookout for increased anxiety or depression. As the testimony of [decedent's] treating psychiatrists clearly establishes that *they were independently aware of the risks [plaintiff] claims Forest Labs should have warned, there is no basis upon which any reasonably jury could impose failure to warn liability on Forest Labs....*

*Id.* at 893 (emphasis added). Because "[a]n adequately informed physician" like Dr. Sachman – who knew of, ████████████████████, potential risks of paroxetine including those alleged by Plaintiff – "acts as a learned intermediary between the patient and the drug manufacturer, thus breaking the chain of liability," *see Ashman*, 702 F. Supp. at 1404, Plaintiff's claims fail as a matter of law.

### 2. Where a Doctor Has Knowledge Of the Alleged Risk From Any Source, There is No Duty To Warn.

GSK had no duty to warn Dr. Sachman of paroxetine's risks because he testified unequivocally that he had knowledge of paroxetine's association with both akathisia and suicidality. "The learned intermediary doctrine applies where a physician is alert to the dangerous propensities of a particular drug and nonetheless decides to prescribe it." *Ashman*, 702 F. Supp. at 1405. "[T]he manner in which the physician becomes informed is irrelevant." *Koncz*, 1994 WL 178320, at *3. "Therefore, the true inquiry is whether the physician was informed from any source whatsoever, and not whether the physician was informed directly by the drug manufacturer." *Id.* (granting summary judgment where, although the prescribing doctor could not recall whether he had reviewed the medication's prescribing information, he testified that he was aware the side effect at issue was one of the "possible" adverse reactions of the drug through "lectures and other sources," and still prescribed the drug to the plaintiff).

Moreover, a manufacturer has no duty to warn where a doctor is already aware of the information that would be conveyed in a warning. "In Illinois, there is no duty to warn of a risk

that is already known by those to be warned." *Hansen v. Baxter Healthcare Corp.*, 723 N.E.2d 302, 312 (Ill. App. Ct. 2000) (citation omitted)), *judgment aff'd by* 764 N.E.2d 35 (Ill. 2002). "In the context of the learned intermediary doctrine, [] a medical device manufacturer has no duty to warn physicians of a device's dangers which the medical community generally appreciates." *Hansen*, 723 N.E.2d at 312 (citation omitted)). *Kokoyachuk*, 526 N.E.2d at 610 ("The purpose of a warning is to apprise the party of a danger of which he has no knowledge and thereby enable him to take appropriate measures to protect himself."); *cf. Gredell v. Wyeth Labs.*, No. 04-5145, 2005 WL 4774219, at *45 (Ill. Cir. Ct. June 10, 2005) (noting that, "to the extent that the information was publically available, [] the chain of causation was broken").

"Courts have consistently held that a drug manufacturer is entitled to summary judgment where the prescribing physician is aware of the risks associated with a drug." *Ashman*, 702 F. Supp. at 1405 (citing *Wooten v. Johnson & Johnson Prods., Inc.*, 635 F. Supp. 799, 803 (N.D. Ill. 1986)). In *Ashman*, plaintiff sued the manufacturer of Tagamet because the drug did not warn of its interactive properties with another drug, Halcion. But Halcion did contain this warning, and the prescriber had reviewed it but still prescribed this combination of medications. On these facts, the *Ashman* court held that the learned intermediary doctrine applied where the prescribing physician was alerted – from any source – "to the dangerous propensities of a particular drug and nonetheless decides to prescribe it." *Id.*

Here, Dr. Sachman testified unequivocally that he was aware of paroxetine's reported association with akathisia and suicidality. More specifically, Dr. Sachman testified that he had long been aware of a reported association between SSRIs such as paroxetine and akathisia, deeming this "a class effect of SSRIs." (Undisputed Fact No. 62.) Dr. Sachman was also aware "that when you initiate the drug or change dose, there's an increased risk of [] depression,

18

increase in anxiety." (Undisputed Fact No. 64.) Dr. Sachman confirmed that the Paxil labeling told him to be on the lookout for "increased risk in all patients for emerging suicidality or worsening depression after initiation of Paxil or paroxetine." (Undisputed Fact No. 52.) As in *Koncz*, Dr. Sachman knew at least since May 2004 that possible side effects of paroxetine included akathisia and agitation, and he agreed that he looked out for akathisia in his patients "because it was described as one of the possible or potential side effects of taking Paxil or paroxetine and that could be reflective of suicidal thoughts or behavior." (Undisputed Fact Nos. 63.) *See* 1994 WL 178320, at *1. Accordingly, Dr. Sachman "was fully aware of the facts which were the subject of the warning." *See Ashman*, 702 F. Supp. at 1405.

It is entirely immaterial that the Paxil-specific data from 2006 was not in the labeling in 2010 since GSK had *already* warned Dr. Sachman about that data through its May 2006 DHCP letter and revised labeling. (Undisputed Fact No. 81.) Thus, GSK informed Dr. Sachman of the very information that he deemed critical in his prescribing decision. (*See infra* Section III.B.3.)

██████████████████████████████████████████████████

████████████████████████████████████████ Dr. Sachman agreed that, by distributing the May 2006 DHCP letter to doctors across the country, including himself, that GSK disclosed the information in its revised labeling to the medical community. (Undisputed Fact No. 84.) Dr. Sachman also testified he does not remember GSK ever telling him to ignore what was in the revised labeling attached to the May 2006 DHCP letter, and he would have remembered had GSK subsequently refuted or otherwise told him to ignore that information. (Undisputed Fact No. 86.) Thus, there exists "no duty to warn [Mr. Dolin's] doctor[, Dr. Sachman] about risks [that he] and the medical community already were aware of," and Plaintiff's claims fail as a matter of law. *See Hansen*, 723 N.E.2d at 312.

### 3. GSK Provided Dr. Sachman With the Very Information That He Claimed Would be Dispositive for Him to Make a Decision Not to Prescribe Paroxetine for Mr. Dolin.

It is undisputed that GSK provided Dr. Sachman with the very information that he deems critical in evaluating his prescribing decision for Mr. Dolin. Plaintiff bears "the burden of proving the existence of a defective condition in the product at the time it left the manufacturer's control." *Kokoyachuk*, 526 N.E.2d at 610. She does not dispute that she bears that burden as her counsel insisted on questioning Dr. Sachman first at his deposition because of her burden. (*See* Ex. 29 to the Declaration of Todd P. Davis in Support of Defendant's Submission on Plaintiff's Illinois Law Claims ("Davis Decl.").) Because Dr. Sachman does not dispute that GSK provided him a DHCP letter and labeling that contained the very information that he considered to be critical in prescribing paroxetine to Mr. Dolin, Plaintiff cannot meet her admitted burden of proving that the "information, if any, Dr. Sachman was given regarding the risks of Paxil and suicidality" was not "accurate or complete." (*See id.*)

During his deposition, Plaintiff's counsel showed Dr. Sachman an April 5, 2006 GSK Updated Briefing Document (the "Briefing Document") that was highlighted in yellow on page 6.[11] This document provided data indicating "an increase in suicide attempts in adults with MDD treated with paroxetine compared to placebo." (Undisputed Fact No. 75.) The Briefing Document stated that, for patients with MDD, there were 11 incidents on paroxetine ["11/3455 (0.32%)"], and one on placebo ["1/1978 (0.05%)"]. (Undisputed Fact No. 76.) Dr. Sachman testified that, had he been aware of the highlighted information on page 6 of the Briefing Document, he would not have prescribed paroxetine for Mr. Dolin:

---

[11] The highlighting was on the third bullet under the heading Clinical Summary. Plaintiff's counsel questioned Dr. Sachman about the highlighted part of the Briefing Document at issue on pages 73-74 of Dr. Sachman's deposition where he refers to "page 275" and a "yellow highlighted section".

> Q: Okay. So what you're referring to is Exhibit 6, the updated briefing document, and the yellow highlighted information that – that's on page 6 Dolin 0025 [sic] that says, "The results provide evidence of an increase in suicide attempts in adults with MDD treated with paroxetine compared to placebo. However, as the absolute number in incidence of events are very small, 11 out of 3,455 for paroxetine versus 1 out of 1,978 for placebo," that's the information you're referring to?
>
> A: Right.
>
> Q So, is it your testimony that if that information [from the Briefing Document] was publicly disclosed –
>
> A: Right
>
> Q: -- you would have never had prescribed Paxil or paroxetine to Mr. Dolin?
>
> A: That's correct.
>
> Q: And if this information was – if you were informed of this information, would you have prescribed Paxil or paroxetine to Stewart Dolin?
>
> A: I would not have. I was not informed, neither was the medical community informed.

(Undisputed Fact No. 77.) Yet Dr. Sachman then confirmed that he had, in fact, received, reviewed, and familiarized himself with GSK's May 2006 DHCP letter and attached labeling containing this very same information regarding MDD patients. (Undisputed Fact Nos. 78-80.)

Dr. Sachman reviews DHCP letters because "[t]here might be something important in them." (Undisputed Fact No. 49.) Like the Briefing Document, the May 2006 DHCP letter advised Dr. Sachman of GSK's recent meta-analysis and stated that "in the analysis of adults with MDD (all ages), the frequency of suicidal behavior was higher in patients treated with paroxetine compared with placebo (11/3455 [0.32%] versus 1/1978 [0.05%])."[12] (Undisputed Fact No. 25.) Similarly, the attached labeling disclosed to Dr. Sachman stated that "[i]n adults with MDD (all ages), there was a statistically significant increase in the frequency of suicidal behavior in patients treated with paroxetine compared with placebo (11/3,455 [0.32%] versus 1/1,978 [0.05%]); all of the events were suicide attempts." (Undisputed Fact No. 21.) Dr.

---

[12] This information was also added to the Paxil labeling in 2006. The following year, however, FDA required that GSK remove that language and instead replace it with the class labeling language that FDA required for all antidepressants, including Paxil. (Undisputed Fact Nos. 29-32.) GSK did not send a DHCP letter advising of the Paxil-specific language's removal from the prescribing information. (Undisputed Fact No. 32.)

Sachman agreed that the May 2006 DHCP letter provided the same data set and figures, and communicated the same information, as the Briefing Document:

> Q:   Okay.  And then if you look over at the highlighted language of the briefing document that's marked as Exhibit 6, you see the exact same figures that are in the briefing document as are in the Dear Healthcare Provider letter we read, right?
> A:   Yes.
> Q:   Okay.  So, it's talking about the same type of – this is the same data set, right?
> A:   Yes.

(Undisputed Fact No. 80.)  Dr. Sachman further agreed that, through the May 2006 DHCP letter and corresponding revised labeling, GSK disclosed to him the same data as in the Briefing Document addressing a statistically significant increase in the frequency of paroxetine MDD patients compared with placebo.  (*See* Undisputed Fact No. 81.)

In sum, GSK provided Dr. Sachman with the very information that he testified was essential to his prescribing decision.  *See Kirk*, 513 N.E.2d at 392-93.  Dr. Sachman's receipt of the May 2006 DHCP letter and revised labeling again breaks the chain of liability.  *See Ashman*, 702 F. Supp. at 1404.  Plaintiff's claims fail on this basis as well.

### 4.    *Additional Testimony from Dr. Sachman Breaks the Chain of Causation.*

Additional actions by Dr. Sachman also break the chain of causation.  Dr. Sachman testified that if he had known that the Paxil-specific language added by GSK to Paxil's labeling in 2006 had later been removed, he would not have prescribed paroxetine for Mr. Dolin. (Undisputed Fact No. 89.)  After providing this testimony, Dr. Sachman then testified that he did not know that the Paxil specific data included in 2006 had been removed from the labeling for Paxil and paroxetine until November 2010, four months after Mr. Dolin's death.  (Answering "No" when asked: "Before this November 17, 2010 e-mail [from Plaintiff's counsel to Sheryl

Sachman, Dr. Sachman's wife], did you know that the labeling for Paxil or paroxetine had excluded the Paxil-specific 2006 data as reflected in this email?" (Undisputed Fact Nos. 88.)

It is undisputed that the paroxetine-specific information concerning GSK's 2006 analysis was removed from the Paxil labeling in 2007 at FDA's direction. Dr. Sachman's failure, until late 2010, to recognize that the paroxetine-specific language was removed from the prescribing information in 2007 presents an additional, separate ground that breaks any chain of causation.

### C.     The Paroxetine Labeling Was Adequate as a Matter of Law.

Independently, the warnings in the 2010 paroxetine labeling were adequate as a matter of law. Product warnings are deemed adequate as a matter of law where they provide a "warning with a degree of intensity that would cause a reasonable man to exercise a caution commensurate with the potential dangers." *Harris v. Solna Corp.*, 307 N.E.2d 434, 437 (Ill. App. Ct. 1974) (adding, "Where there is no dispute upon the facts, summary judgment is proper as to both products liability and negligence cases."). "[A] product is not required to list every possible risk associated with" it in order to be held adequate as a matter of law. *Hoffman v. Hercules Chem. Co.*, No. 03-5222, 2004 WL 2496501, at *6 (N.D. Ill. Nov. 4, 2004) (finding product warnings adequate as a matter of law where a product label warned of the danger of accidental inhalation but did not cite brain damage as a possible effect). "The sufficiency of the warning can become a question of law where the warning is clear, accurate and unambiguous." *Hernandez v. Schering Corp.*, 958 N.E.2d 447, 455 (Ill. App. Ct. 2011) (adding that "the adequacy of the warning must be judged by whether it sufficiently apprises physicians of the risks associated with the use of the drug").

The Seventh Circuit held a product warning for a non-prescription nasal spray was adequate as a matter of law where it advised consumers not to use the nasal spray for more than three days. *Kelso v. Bayer Corp.*, 398 F.3d 640 (7th Cir. 2005) (applying Illinois law). The

*Kelso* court noted that a warning's adequacy is determined using an objective standard; applying that standard, the Seventh Circuit deemed the language of the warning at issue "plain, clear and unambiguous." *Id.* at 642. The court rejected the plaintiff's argument that the warning was inadequate for failing to warn of consequences of use of the product in excess of the permitted duration, holding that "under Illinois law, a manufacturer need not warn of all possible consequences of failing to follow a primary warning." *Id.* Further, the *Kelso* court found the product warning adequate as a matter of law for the "added reason" that it "complied with the FDA-required warning" – and accordingly, plaintiff "cannot challenge the adequacy of the warning." *Id.* at 643; *see Hoffman*, 2004 WL 2496501, at *7 (noting that compliance with federal governmental safety standards "is particularly relevant to the adequacy of warnings question"). Following *Kelso*, another court deemed a prescription drug's warnings "adequate as a matter of law because they warned of the specific adverse effects suffered by Plaintiff and because they were part of an FDA-approved package insert." *Melton v. Ortho-McNeil Pharm., Inc.*, No. 3:11-40009, 2014 WL 2882916, at *4 (N.D. Ohio June 25, 2014) (citation omitted) (applying Illinois law).

Illinois courts are not alone in deeming product warnings adequate as a matter of law. In a case pending in a federal Multidistrict Litigation, the district judge recently found the pharmaceutical product warnings adequate as a matter of law because the "Physician Package Insert plainly and prominent identified inflammatory bowel disease by name as a *possible consequence of taking isotretinoin* [Accutane]." *In re Accutane Prods. Liab. (Greenshields)*, MDL 1626, Case. No. 8:04-MD-2523, 2014 WL 7896548, at *4 (M.D. Fla. Sept. 23, 2014) (applying California law). "A court may hold a prescription drug warning to be adequate as a matter of law 'if it directly warns in plain and explicit terms of the specific risk that has caused

24

injury to plaintiff.'" *Id.* (citing *Dash v. Roche Labs.*, 74 F.3d 1245 (9th Cir. 1996)). Because the Accutane labeling warned of irritable bowel disease in a Warning and in the Adverse Reaction sections of the labeling, the court found this adequate as a matter of law and granted summary judgment on all of the plaintiff's claims. *Id.*

Here, the FDA-approved labeling in effect at the time Dr. Sachman prescribed paroxetine to Mr. Dolin in June of 2010 was "adequate as a matter of law because [it] warned of the specific adverse effects [alleged] by Plaintiff['s decedent, akathisia and suicidality in patients of all ages] and because [it was] part of an FDA-approved package insert." *See Melton*, 2014 WL 2882916, at *4. Indeed, following *Kelso*, Plaintiff "cannot challenge the adequacy of the [FDA-approved paroxetine] warning." *See* 398 F.3d at 643.

Moreover, the Paxil labeling was "clear, accurate and unambiguous" in alerting healthcare providers to the possibility of treatment-emergent symptoms, including akathisia and its possible association with suicidal thinking and behavior. *See Hernandez*, 958 N.E.2d at 455; *In re Accutane*, 2014 WL 7896548, at *4. GSK's 2010 Paxil prescribing information plainly warned of akathisia – the specific side effect Plaintiff claims Mr. Dolin experienced – in *four* separate places: (1) WARNINGS: Clinical Worsening and Suicide Risk; (2) a specific PRECAUTION addressing Akathisia; (3) in the PRECAUTION addressing Information for Patients: Clinical Worsening and Suicide Risk; and (4) among the Postmarketing Reports in the Adverse Reactions section (discussing akathisia). (*See* Undisputed Fact Nos. 34-37 & Ex. 4 to Davis Decl.) The Akathisia PRECAUTION advised that use of paroxetine "has been associated with the development of akathisia, which is characterized by an inner sense of restlessness and psychomotor agitation such as an inability to sit or stand still usually associated with subjective

25

distress.  This is most likely to occur within the first few weeks of treatment." (Undisputed Fact No. 35.)

Further, the discussion in the WARNINGS section stated, after listing symptoms including akathisia, that "[a]lthough a causal link between the emergence of such symptoms and either the worsening of depression and/or the emergence of suicidal impulses has not been established, there is concern that *such symptoms may represent precursors to emerging suicidality*." (Undisputed Fact No. 34 (emphasis added).)  The prescribing information further cautioned, in the Information for Patients PRECAUTION pertaining to Clinical Worsening and Suicide Risk:

> *Patients, their families, and their caregivers should be encouraged to be alert to the emergence of* anxiety, agitation, panic attacks, insomnia, irritability, hostility, aggressiveness, impulsivity, *akathisia (psychomotor restlessness)*, hypomania, mania, *other unusual changes in behavior*, worsening of depression, and *suicidal ideation, especially early during antidepressant treatment* and when the dose is adjusted up or down. Families and caregivers of patients should be advised to *look for the emergence of such symptoms on a day-to-day basi*s, since changes may be abrupt. *Such symptoms should be reported to the patient's prescriber or health professional, especially if they are severe, abrupt in onset, or were not part of the patient's presenting symptoms*. Symptoms such as these *may be associated with an increased risk for suicidal thinking and behavior* and indicate a need for very close monitoring and possibly changes in the medication.

(Undisputed Fact No. 36 (emphasis added).)[13]

Elsewhere, beyond the akathisia-specific Warnings and Precautions, the prescribing information warned in bold-face text that "**All patients being treated with antidepressants for any indication should be monitored appropriately and observed closely for clinical worsening, suicidality, and unusual changes in behavior, especially during the initial few months of a course of drug therapy, or at times of dose changes, either increases or decreases**." (Undisputed Fact No. 34.)  The boxed warning on the first page of the labeling

---

[13] The labeling had contained this language for over five years before Dr. Sachman re-started Mr. Dolin on paroxetine in 2010.  (*See* Undisputed Fact No. 17.)

advised, in part, that "*Patients of all ages* who are started on antidepressant therapy should be monitored appropriately and observed closely for clinical worsening, suicidality, or *unusual changes in behavior*. Families and caregivers should be advised of the need for close observation and communication with the prescriber." (Undisputed Fact No. 33 (emphasis added).)

Although "a manufacturer need not warn of all possible consequences of failing to follow a primary warning," *Kelso*, 398 F.3d at 642, the Paxil prescribing information *did warn* – contrary to Plaintiff's assertion that "GSK did not warn of akathisia's association with suicidal behavior and impulses" (Undisputed Fact No. 5) – that symptoms such as akathisia "may represent precursors to emerging suicidality." (Undisputed Fact No. 34) Accordingly, Plaintiff's claims against GSK fail because the Paxil labeling was adequate as a matter of law.

**D.**     **Plaintiff's Remaining Claims Fail as a Matter of Law.**

Additional reasons exist for why Plaintiff's claims sounding in misrepresentation and consumer fraud (which are claims based on an alleged failure to warn) fail and summary judgment should be granted for GSK.

**1.**     ***Plaintiff's Misrepresentation-Based Claims Fail Absent Evidence of Reliance on a False Statement of Material Fact.***

Plaintiff's claims based upon an alleged misrepresentation or concealment fail because Plaintiff has not met her burden of establishing that either Mr. Dolin or Dr. Sachman acted in reliance upon anything from GSK in deciding to take or prescribe paroxetine in 2010. The elements of a fraudulent misrepresentation claim are: "(1) a false statement of material fact, (2) knowledge or belief of the falsity by the party making it, (3) intention to induce the other party to act, (4) action by the other party in reliance on the truth of the statements, and (5) damage to the other party resulting from such reliance." *Bd. of Educ. of City of Chicago v. A C & S, Inc.*, 546

N.E.2d 580, 591 (Ill. 1989). A claim for fraudulent concealment, "in addition to the elements of fraudulent misrepresentation," requires a plaintiff to prove "that the defendant concealed a material fact when it was under the duty to disclose that fact to the plaintiff." *Canadian Pac. Ry. Co. v. Williams-Hayward Prot. Coatings, Inc.*, No. 02 C 8800, 2005 WL 782698, at *25 (N.D. Ill. Apr. 6, 2005).

"Negligent misrepresentation has essentially the same elements, except that the defendant's mental state is different. The defendant need not know that the statement is false." *Id.* In addition, a plaintiff claiming negligent misrepresentation "must also allege that the defendant owes a duty to the plaintiff to communicate accurate information." *A C & S, Inc.*, 546 N.E.2d at 591. Faced with summary judgment, making claims is not enough; plaintiff "must establish the elements of fraudulent misrepresentation and concealment by clear and convincing evidence because [she] must carry this burden of proof at trial." *Canadian Pac. Ry. Co.*, 2005 WL 782698, at *22.

GSK will not repeat its prior arguments addressing these claims,[14] but focuses now on the case-specific record that has developed since the parties last presented these issues to the Court. To be sure, there is no evidence that Mr. Dolin acted in reliance on any statement (or purported omission) by GSK. *See Melton v. Ortho-McNeil Pharm., Inc.*, No. 3:11-40009, 2014 WL 4930673, at *3 (N.D. Ohio Oct. 1, 2014) (granting summary judgment on misrepresentation-based claims where plaintiff admitted having no communication with the pharmaceutical company before her doctor recommended a birth control patch, and because plaintiff saw but did not read an advertisement for the patch, she "could not have relied on any statement made therein").

---

[14] In connection with its earlier summary judgment motion, GSK explained that Plaintiff could not meet the elements of her misrepresentation/concealment claims, and she still cannot. GSK will not repeat that discussion here but instead incorporates it by reference. (*See, e.g.*, Dkt. No. 89 at 19-27.)

28

Nor can Plaintiff invoke reliance by Dr. Sachman. There exists no evidence that Dr. Sachman acted in reliance on any of the laundry-listed "representations and/or omissions" in Plaintiff's Complaint. The only item Plaintiff could plausibly assert as the basis for this claim is the 2010 Paxil labeling. But Dr. Sachman's own testimony, discussed in detail in Section II.B, *supra*, undercuts any assertion that Dr. Sachman acted in reliance of the 2010 Paxil labeling. To the contrary, Dr. Sachman's testimony makes clear that he was *not* aware that the Paxil or paroxetine labeling no longer contained the Paxil-specific data that he had seen introduced in 2006. Regardless, there is a break in the chain of causation for any alleged "representations and/or omissions" since GSK disclosed to Dr. Sachman the information in the May 2006 DHCP letter and revised labeling, and Dr. Sachman admitted that GSK never told him to ignore that data. (*See* Undisputed Fact No. 86; *supra* at Section III.B.2.)

Finally, to the extent Plaintiff attempts to establish misrepresentation or concealment through Dr. Sachman, this merely illustrates why Plaintiff's misrepresentation claims should be subsumed within her claims sounding in failure to warn. But even if they are not, these claims fail on their own.

### 2. *Plaintiff's Claim for Consumer Fraud Cannot Survive Summary Judgment.*

Under the Illinois Consumer Fraud Act, a plaintiff must plead and prove, by a preponderance of the evidence: "(1) a deceptive act or unfair practice by the defendant; (2) intent by the defendant that the plaintiff rely on that act or practice; (3) that the deception or unfair practice occur in the course of conduct involving trade and commerce; and (4) that the deceptive act or unfair practice proximately caused the plaintiff's injury." *Anthony v. Country Life Mfg. LLC*, 70 F. App'x 379, 382 (7th Cir. 2003); *Gredell v. Wyeth Labs., Inc.*, 854 N.E.2d 752, 756 (Ill. App. Ct. 2006). "[T]o maintain an action under the Act, the plaintiff must actually be deceived by a statement or omission that is made by the defendant. If a consumer has neither

seen nor heard any such statement, then she cannot have relied on the statement and, consequently, cannot prove proximate cause." *De Bouse v. Bayer AG*, 922 N.E.2d 309, 316 (Ill. 2009). *Shannon v. Boise Cascade Corp.*, 805 N.E.2d 213, 217 (Ill. 2004) ("[D]eceptive advertising cannot be the proximate cause of damages under the Act unless it actually deceives the plaintiff.").

Plaintiff cannot sustain a claim under the Illinois Consumer Fraud Act because Mr. Dolin was not a consumer of GSK's Paxil, but instead filled his prescription with Mylan's paroxetine. Thus, GSK never received any of Mr. Dolin's money because it went to one of GSK's competitors. The language of the Consumer Fraud Act does not address these circumstances, because its focus is on the "sale" of "merchandise" to "consumers", 815 ILL. COMP. STAT. 505/1 *et seq.* (2015). Plaintiff points to no case law expanding liability in the manner she wishes.[15] Case law speaks of buyers, products, purchases, and sales. *See, e.g.*, *De Bouse*, 922 N.E.2d at 318 ("[T]he mere *sale* of a prescription medication cannot be a representation which serves as the basis for a consumer fraud claim." (emphasis added)); *Gredell*, 2005 WL 4774219, at *9 ("A material fact exists where a *buyer* would have acted differently knowing the information that was omitted." (emphasis added)); *id.* at *10 ("It is not enough to believe that a product was defective. A claimant must plead and prove that the *product* was actually *defective*...." (emphasis added)); *Oliviera v. Amoco Oil Co.*, 776 N.E.2d 151, 163 (Ill. 2002) (affirming dismissal because "plaintiff could not allege that defendant's advertisements deceived him or misled him as to what he was receiving when he made his *purchase*" (emphasis added)).

---

[15] In her Opposition to GSK's earlier Motion for Summary Judgment, Plaintiff asserted that "there is no requirement under the CFDBPA that an individual purchase the product manufactured by the defendant." (Dkt. No. 86 at 47.) Yet in support, she cited to *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584 (Ill. 1996) – a case involving a group of "Plaintiffs, each of whom purchased" the vehicle at issue. *Id.* at 587; *see id.* at 595 ("A material fact exists where a *buyer* would have acted differently knowing the information, or if it concerned the type of information upon which a *buyer* would be expected to rely in making a decision whether to *purchase*." (emphasis added)).

But even if the scope of Consumer Fraud Act claims were to be expanded in this manner, Plaintiff still could not recover because she can point to no evidence that Mr. Dolin heard or saw – much less that he was deceived by or relied upon – a statement or omission made by GSK. *See De Bouse*, 922 N.E.2d at 316. There is no evidence in the record that Mr. Dolin saw or heard *anything* directly from GSK prior to taking paroxetine due to his doctor's prescription.

Moreover, the "affirmative misrepresentation" that Plaintiff alleges in connection with this claim – "that there is no risk [of suicidal behavior] beyond the age of 24" (Compl. ¶ 147) – is belied by Dr. Sachman's testimony that he recognized that an increased risk of suicidal thoughts or behavior was not limited to patients age 24 or younger and ████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ █████████████████████████████████████ Nor is there any dispute that Dr. Sachman received the May 2006 DHCP letter and revised labeling which conveyed the very information that Plaintiff argues should have been disclosed to Dr. Sachman. (Undisputed Fact No. 81.) There can be no "actual deception" where Dr. Sachman knew of the very information that forms the basis of the alleged misrepresentation or omission, and Plaintiff's consumer fraud claim fails for a lack of proximate causation.

### E. Plaintiff's Claims Should Be Dismissed Because GSK's Product Did Not Cause the Alleged Injury.

Since this Court issued its ruling in February 2014, no decisions have issued that would change the state of Illinois law: a plaintiff must establish that it was the defendant's product that actually caused the alleged harm. *See, e.g., Smith v. Eli Lilly & Co.*, 560 N.E.2d 324, 340-41 (Ill. 1990) (refuting the theory that a manufacturer can be held "responsible for the injuries caused by

others' products even under the unique facts surrounding the approval of the manufacturing of DES"); *Gillenwater v. Honeywell Int'l, Inc.*, 996 N.E.2d 1179, 1200 (Ill. Ct. App. 2013) (rejecting claim that a manufacturer can be held liable for a product that it did not manufacture because that "would violate a fundamental tenet of products-liability law: a manufacturer is responsible only for the defects in the products it manufactured" and holding that "[a] manufacturer owes a duty to plaintiffs who will use its product or be injured by it, but the manufacturer does not owe a duty to anyone who uses a product similar to, but not manufactured by, the manufacturer"); *Lewis v. Lead Indus. Ass'n, Inc.*, 793 N.E.2d 869, 874-75 (Ill. Ct. App. 2003) (holding that "without proof that the particular [manufacturer]'s specific product caused the injury for which recovery is sought" that manufacturer could not be held liable in tort, and rejecting the notion that a manufacturer's duty is "so broad as to extend to anyone who uses or might be injured by a like kind product supplied by another").[16]

Nor have any other courts, in the intervening year and a half, agreed that a branded drug manufacturer owes a duty to the consumers of its competitor's generic medication and thus can be held liable for resulting alleged injuries. Instead, yet another state supreme court has rejected this theory, *Huck v. Wyeth, Inc.*, 850 N.W.2d 353 (Iowa 2014), and each United States Court of Appeals to consider the issue – the Fourth, Fifth, Sixth, Eighth, Ninth, Tenth, and Eleventh – has also rejected it.[17] In so doing, one of these federal appellate courts specifically addressed this Court's holding. As the Sixth Circuit Court of Appeals explained:

---

[16] Rather than repeating them here, GSK incorporates herein by reference each of the arguments made in its prior briefing on this issue, including: Dkt Nos. 77-79, GSK's Motion for Summary Judgment, Statement of Undisputed Material Facts, and Memorandum of Law in Support; Dkt. No. 89, GSK's Reply in Support of Summary Judgment; Dkt. No. 90, GSK's Response to Plaintiff's Statement of Additional Facts; Dkt. No. 99, GSK's Supplemental Briefing in Support of Summary Judgment; and Dkt. No. 102, GSK's Response to Plaintiff's Supplemental Brief in Opposition to Motion for Summary Judgment.

[17] *See, e.g., In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917, 945 (6th Cir. 2014); *Eckhardt v. Qualitest Pharm. Inc.*, 751 F.3d 674, 680-682 (5th Cir. 2014); *Moretti v. Wyeth, Inc.*, 579 F. App'x 563 (9th Cir. 2014); *Schrock v. Wyeth, Inc.*, 727 F.3d 1273 (10th Cir. 2013); *Fullington v. Pfizer, Inc.*, 720 F.3d 739, 744

32

We disagree with the *Dolin* court's holding. While Illinois does not have a product liability statute, its case law indicates that Plaintiffs' misrepresentation claims would be construed as product liability claims and fail for lack of product identification. Under Illinois law, a plaintiff must "identify the supplier of the product and establish a causal connection between the injury and the product." *York v. Lunkes*, 189 Ill. App. 3d 689, 136 Ill. Dec. 954, 545 N.E.2d 478, 480 (1989) (citation omitted); *see also Smith v. Eli Lilly & Co.*, 137 Ill.2d 222, 148 Ill.Dec.22, 560 N.E.2d 324, 328 (1990) ("[I]t is obvious that to hold a producer, manufacturer, or seller liable for injury caused by a particular product, there must first be proof that the defendant produced, manufactured, sold, or was in some way responsible for the product.") (citation omitted). But, even if Plaintiffs' misrepresentation claims were not construed as product liability claims, applying the same factors, we predict that the Illinois Supreme Court would not recognize brand manufacturers owed generic consumers a duty that can give rise to liability.

*In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917, 944 (6th Cir. 2014); *see also Huck*, 850 N.W.2d at 380, 369 (Iowa Supreme Court adhering to "these bedrock [product liability] principles [] and join[ing] the multitude of courts that have concluded brand defendants owe no duty to consumers of generic drugs" and "declin[ing] to change Iowa law to impose a new duty on manufacturers to those who never used their products and were instead harmed by use of a competitor's product").

Among the reasons that other courts have rejected liability for branded manufacturers is the "grave health policy consequences associated with recognizing brand manufacturer liability in these situations including higher priced brand name drugs and fewer innovative drugs." *In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*, 756 F.3d at 944; *see Huck*, 850 N.W.2d at 377 ("extending liability to brand manufacturers for harm caused by generic competitors would discourage investments necessary to develop new, beneficial drugs by increasing the downside risks"). The Sixth Circuit concluded in *In re Darvocet* that "[t]he potential for wide-ranging ramifications on Illinoisans' health and welfare should we recognize a duty in this case renders the narrower path the proper choice." 756 F.3d at 944-45; *see id.* at 937 (cautioning that

---

(8th Cir. 2013); *Guarino v. Wyeth, LLC*, 719 F.3d 1245 (11th Cir. 2013); *Foster v. Am. Home Prods. Corp.*, 29 F.3d 165 (4th Cir. 1994).

"federal courts must be cautious when making pronouncements about state law" and encouraging interpretations of state law which restrict liability as opposed to those which greatly expand liability).  Likewise, one commentator stated: "the economics of the pharmaceutical industry do not support competitor liability.  Saddling 10 percent of a market with 100 percent of its liability is certain to create new and significant financial pressures on brand-name drugs, the effects of which would harm health care consumers."  Victor E. Schwartz, *et al.*, *Warning: Shifting Liability to Manufacturers of Brand-Name Medicines When the Harm Was Allegedly Caused By Generic Drugs Has Severe Side Effects*, 81 FORDHAM L. REV. 1835, 1870 (2013).

In denying GSK's Motion for Summary Judgment on this issue, this Court invited GSK to supplement the record to establish the negative impact its ruling would have on GSK and the pharmaceutical industry more generally.  (*See* Dkt. No. 110 at 11 ("But there is nothing yet in the record here to suggest that this problem [GSK's burden] is so grave as to warrant finding that GSK owed no duty of care to Plaintiff.  And GSK does not make the argument.").)  Accordingly, during discovery, GSK retained Ernst Berndt, Ph.D., a professor in applied economics at Massachusetts Institute of Technology's Sloan School of Management, as an expert "to analyze the economic impacts and effects of brand name pharmaceutical companies being liable for injuries allegedly caused by medicines manufactured and distributed by generic pharmaceutical companies".  (Berndt Report at 2, attached as Ex. 30 to the Davis Decl.)  Dr. Berndt outlined significant harm that would result if branded manufacturers faced potential liability for injuries allegedly caused by generic competitors' products.  These include:

- "If the brand manufacturer became subject to extended liability from a competitor's product, the basic economics of R&D would be substantially and negatively altered and incentives to proceed with investment in innovation would significantly diminish.  The shift associated with this burden would be applied across the entire industry – for large and small companies in connection with large and small products across varied

therapeutic areas. ***Branded manufacturers would, in effect, become the insurers for the industry.***" (*Id.* at 3 (emphasis added).)

- "[I]f the branded manufacturer became subject to extended liability from a competitor's product, the economic impact of this liability would vary for drugs currently on the market (with and without market exclusivity) and for drugs in development. Any range of these market exclusivity scenarios affect the branded manufacturer's cost of capital, ability to secure funds for future R&D and innovation, and the willingness of stakeholders to invest in the branded manufacturer since potential on-going or perpetual liability makes the company less attractive as an investment." (*Id.*)

- "For novel drugs, extended liability would further reduce the NPV [net present value] calculation at the onset of the project and therefore more likely deter investment where prospective liability is uncertain. ***Accordingly, investment would likely be shifted towards development of 'me too' drugs rather than new innovation to further advance the field of medicine or to address unmet medical needs. This would result in a stifling of innovation and the ability to bring new and beneficial therapeutic drugs to the market.*** In an industry that is increasingly returning thinner margins to investors, capital sources for new investment (if not in novel therapeutic areas that are in market demand) will shift away to other projects." (*Id.* (emphasis added).)

- "[E]conomic reasoning predicts that not only would consumers be denied access to innovative novel drugs whose development would no longer be economically justified due to increased exposure to competitor's product liability, but for those R&D projects that still proceeded and were successful (consisting primarily of 'me too' and 'knockoff' drugs), the brand's price during the exclusivity period would be greater than if it were not exposed to competitors' product liability." (*Id.* at 34.)

- ***"Consumer access would suffer a 'double whammy' from branded companies' exposure to competitors' product liability: access to fewer novel drugs, and for those drugs that were developed, access only to less affordable drugs."*** (*Id.* (emphasis added).)

- "[P]roduct exit and reduced innovation are not just theoretical possibilities, but have actually occurred in the U.S. biopharmaceutical industry in response to unexpected liability exposure." (*Id.* at 53.)

- "The economic impacts and effects of brand pharmaceutical companies becoming exposed to product liability from injuries allegedly caused by medicines manufactured and distributed by generic competitors ***would be very substantial, not only inflicting devastating damages to shareholders and employees of brand pharmaceutical companies, but also harming consumers and payers.***" (*Id.* at 57 (emphasis added).)

- "[T]o the extent future competitors' liability reduces the net present value of R&D projects, a substantial number of R&D projects would no longer have a positive expected net present value (NPV), leading biopharmaceutical investors to abandon them, and

ultimately resulting in less biopharmaceutical innovation of highly novel products than are under development today." (*Id.*)

- "[T]he economic effects and impacts I would expect from brands being liable to product liability from their generic competitors are *an increase in the brand's price, an increased probability of product withdrawal, and a reduced amount of R&D on expanding the list of indications for which the product would be an approved treatment.*" (*Id.* at 58 (emphasis added).)

As Dr. Berndt's analysis illustrates, allowing branded manufacturers to be held responsible for injuries allegedly caused by their competitors' generic products would substantially and detrimentally affect innovation, product pricing, and product availability. These effects are "so grave as to warrant finding that GSK owed no duty of care to Plaintiff." (*See* Dkt. No. 110 at 11.) Accordingly, GSK renews its previously filed motion for summary judgment and respectfully requests that the Court dismiss Plaintiff's remaining claims because it remains undisputed that Mr. Dolin never ingested GSK's product Paxil.

## IV.     CONCLUSION

For the foregoing reasons, GSK respectfully requests that this Court grant summary judgment for GSK on each of Plaintiff's remaining claims against it and grant GSK such other and further relief as it deems just and proper.

Dated:  July 29, 2015          Respectfully submitted,

By: /s/  Alan S. Gilbert
Alan S. Gilbert (No. 953210)
Anders C. Wick (No. 6274319)
DENTONS LLP
233 S. Wacker Drive, Suite 7800
Chicago, Illinois  60606-6404
Telephone:  (312) 876-8000
Facsimile:  (312) 876-7934

Andrew T. Bayman (*pro hac vice*)
Todd P. Davis (*pro hac vice*)
Heather M. Howard (*pro hac vice*)

36

KING & SPALDING LLP
1180 Peachtree Street, N.E.
Atlanta, GA 30309-3521
Telephone:  (404) 572-4600
Facsimile:  (404) 572-5100

Robert E. Glanville (*pro hac vice*)
Thomas S. Wiswall (*pro hac vice*)
Tamar P. Halpern (*pro hac vice*)
Eva Canaan (*pro hac vice*)
PHILLIPS LYTLE LLP
One Canalside
125 Main Street
Buffalo, NY 14203-2887
Telephone: (716) 847-8400
Facsimile: (716) 852-6100

*Attorneys for GlaxoSmithKline LLC*

<u>**CERTIFICATE OF SERVICE**</u>

It is hereby certified that on July 29, 2015, I have served a copy of the foregoing

**DEFENDANT GLAXOSMITHKLINE LLC'S MEMORANDUM OF LAW IN SUPPORT**

**OF SUMMARY JUDGMENT ON PLAINTIFF'S ILLINOIS LAW CLAIMS** on the

following counsel via e-mail:

Michael L. Baum
*sbeam@baumhedlundlaw.com*
Bijan Esfandiari
*besfandiari@baumhedlundlaw.com*
Frances M. Phares
*fphares@baumhedlundlaw.com*
R. Brent Wisner
*rbwisner@baumhedlundlaw.com*
Baum Hedlund Aristei & Goldman, P.c.
12100 Wilshire Blvd.
Suite 950
Los Angeles, CA 90025
(310) 207-3233

Joshua Lawrence Weisberg
*jweisberg@rapoportlaw.com*
Lindsey Alaine Epstein
*lepstein@rapoportlaw.com*
Rapoport Law Offices, PC
20 N. Clark Street
Suite 3500
Chicago, IL 60602
(312) 327-9880

*Attorneys for Plaintiff Wendy B. Dolin*

.

By: /s/ Alan S. Gilbert
Alan S. Gilbert (No. 953210)
DENTONS US LLP

*Attorney for GlaxoSmithKline LLC*