**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| WENDY DOLIN, Individually and as | ) | Case No.: 1:12-cv-06403 |
| Independent Executor of the ESTATE OF | ) | Judge James B. Zagel |
| STEWART DOLIN, deceased, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SMITHKLINE BEECHAM CORPORATION | ) | |
| D/B/A GLAXOSMITHKLINE, a Pennsylvania | ) | |
| Corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S OPPOSITION TO GSK'S MOTION FOR SUMMARY JUDGMENT
(FEDERAL PREEMPTION)**

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... i

INTRODUCTION ................................................................................................................... 1

SUMMARY OF THE FACTS AND LEGAL ARGUMENTS ................................................ 1

STATEMENT OF FACTS ..................................................................................................... 3

    I.      GSK HAS KNOWN ABOUT PAXIL'S ASSOCIATION WITH
           SUICIDALITY FOR OVER 20 YEARS ............................................................ 3

    II.     FDA OFFICIALS HAVE CONFIRMED THAT GSK'S MANIPULATION
           OF THE DATA VIOLATED GENERAL SCIENTIFIC PROCEDURES, AS
           HAVE GSK'S OWN EMPLOYEES ..................................................................... 4

    III.    GSK FALSELY MARKETED PAXIL AS SAFE AND AS REDUCING
           SUICIDAL BEHAVIOR .................................................................................... 6

    IV.    THE FDA DISCOVERS THAT GSK HAD BEEN CONCEALING
           SUICIDE EVENTS UNDER THE TERM "EMOTIONAL LABILITY" ............. 6

    V.      PRELIMINARY ANALYSIS OF THE PAXIL PEDIATRIC CLINICAL
           TRIALS PROMPTS FDA TO ISSUE A WARNING TO THE MEDICAL
           COMMUNITY REGARDING THE POTENTIAL SUICIDE RISKS
           ASSOCIATED WITH PEDIATRIC USE OF PAXIL ........................................... 6

    VI.    THE FDA RECOMMENDS THE IMPLEMENTATION OF A
           PRECAUTION REGARDING CLINICAL WORSENING OF
           SUICIDALITY FOR BOTH ADULT AND PEDIATRIC PATIENTS ................ 7

    VII.   FDA ORDERS GSK TO RE-ANALYZE ITS ADULT DATA TO
           DETERMINE IF A SIMILAR RISK EXISTS IN ADULT PATIENTS .............. 8

    VIII.  IN 2006, GSK FINALLY WARNED THAT ADULTS TAKING PAXIL
           WERE MORE THAN SIX TIMES AS LIKELY TO EXPERIENCE
           SUICIDAL BEHAVIOR THAN THOSE TAKING PLACEBO .......................... 9

    IX.    FDA'S 2007 CLASS WIDE LABELING CHANGE WAS BASED ON A
           POOLED ANALYSIS OF A NUMBER OF ANTIDEPRESSANTS, NOT
           AN ANALYSIS OF PAXIL BY ITSELF .............................................................. 9

    X.      GSK REFUSED FDA'S INVITATION TO DISCUSS THE
           IMPLEMENTATION OF A PAXIL SPECIFIC LABEL TO WARN OF
           THE PAXIL SPECIFIC SUICIDE RISKS ........................................................ 10

ARGUMENT ........................................................................................................................ 11

    I.      STANDARD FOR SUMMARY JUDGEMENT ................................................ 13

    II.     THE FDCA AND FDA REGULATIONS ALLOW AND REQUIRE
           PRESCRIPTION DRUG MANUFACTURERS TO ISSUE WARNINGS
           REGARDING KNOWN RISKS ........................................................................ 14

    III.    ILLINOIS LAW LIKEWISE REQUIRES DRUG MANUFACTURERS TO

       WARN OF KNOWN RISKS.................................................................. 15

IV.     PLAINTIFFS' FAILURE TO WARN CLAIMS ARE NOT PREEMPTED
       BY FEDERAL LAW ....................................................................... 16

      A.    There Is a Strong Presumption Against Preemption.................................. 16

      B.    The Supreme Court Has Concluded That Prescription Drug Failure to
          Warn Claims Are Not Preempted .............................................................. 16

      C.    The Evolution of Paxil's Label Demonstrates that the FDA Has
          Never Rejected a Request by GSK to add a Suicidality Warning ........... 20

      D.    GSK Has Failed to Present Clear Evidence That The FDA Would
          Have Rejected A Paxil Specific Adult Suicide Warning......................... 21

          1.    The Duty to Warn Rested With GSK, Not the FDA and FDA
                Has Admitted That Its Ability to Analyze the Suicide Risk
                Was Hampered Because of the Misleading Way In Which
                Manufacturers' Such As GSK Had Coded the Suicide
                Adverse Events ............................................................................ 22

          2.    The FDA Would Not Have Rejected A Warning As
                Evidenced By The Fact That The FDA Began To Issue
                Prophylactic Warnings in 2003.................................................... 26

          3.    Even After The Implementation of The FDA's 2007
                Class-Wide Labeling Change, the FDA Offered To Meet
                With GSK To Discuss A Paxil-Specific Suicide Warning ........... 28

      E.    Plaintiffs' Claims Would Not Interfere With the FDA's and
          Congress' Objectives of Providing Safe and Effective Drugs to
          American Consumers ............................................................................... 31

V.     PLAINTIFF'S CLAIMS ARE NOT PREEMPTED BY *BUCKMAN* SINCE
       SHE HAS NOT ALLEGED A CAUSE OF ACTION FOR FRAUD ON THE
       FDA................................................................................................................. 35

CONCLUSION...................................................................................................................... 37

*Cases*

*Abbot v. American Cyanamid Co.*,
844 F.2d 1108 (4th Cir. 1988) ................................................................. 19

*American Home Prods. Corp. v. Johnson & Johnson*,
672 F.Supp. 135 (S.D.N.Y 1987) ............................................................ 32

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................................. 12

*Bates v. Dow Agrosciences, LLC*,
544 U.S 431 (2005) ................................................................................. 16

*Bausch v. Stryker Corp.*,
630 F.3d 546 (7th Cir. 2010) ................................................................... 36

*Brooks v. Howmedica*,
273 F.3d 785 (Cir. 2001) .......................................................................... 32

*Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001) ............................................. 35

*Caraker v. Sandoz*,
172 F. Supp. 2d 1018 (S.D. Ill. 2001) ..................................................... 24

*Chambers v. Baltimore   & Ohio Railroad Co.*, 207 U.S. 142 (1907) ........................................ 37

*Desiano v. Warner-Lambert & Co.*,
467 F.3d 85 (2nd Cir. 2007) ..................................................................... 36

*English v. Gen. Elec. Co.*,
496 U.S. 72 (1990) ................................................................................... 29

*English v. General Electric Co.*,
496 U.S. 72 (1990) ................................................................................... 12

*Fellner v. Tri-Union Seafoods, L.L.C.*,
539 F.3d 237 (3d Cir. 2008) ..................................................................... 25

*Forst v. Smithkline Beecham Corp.*,
639 F. Supp. 2d 948 (E.D. Wis. 2009) ................................................. 1, 32

*Geier v. American Honda Motor Co., Inc.*,
529 U.S. 861 (2000) ................................................................................. 33

*Graham v. Wyeth*,
906 F.2d 1399 (10th Cir. 1990) ............................................................... 19

*Halloran v. Parke, Davis & Co.,*
   280 N.Y.S. 58 (App.Div. 1935) ........................................................ 11

*Hill v. Searle Labs.,*
   884 F.2d 1064 (8th Cir.1989) .......................................................... 19

*Hurley v. Lederle Laboratories Div. of Am. Cyanamid Co.,*
   863 F.2d 1173 (5th Cir.1989) .......................................................... 19

*In Re Celexa & Lexapro Mktg & Sales Practices Litig.,*
   779 F.3d 34 (1st Cir. 2015) ........................................................ 30, 31

*James v. Sheahan,*
   137 F.3d 1003 (7th Cir.1998) .......................................................... 36

*Kirk v. Michael Reese Hospital & Medical Center,*
   117 Ill.2d 507 (1987) .................................................................. 15

*Knipe v. SmithKline Beecham,*
   583 F.Supp.2d 602 (E.D.Pa. 2008) ........................................... 9, 26, 36

*Knipe v. SmithKline Beecham, 583 F.Supp.2d 602 (E.D.Pa. 2008)* ........................... 9

*Kurer v. Parke, Davis & Co.,*
   679 N.W.2d 867 (Wis. App. 2004) ..................................................... 19

*Kurer v. Parke, Davis & Co.,*
   679 N.W.2d 867 (Wis. App. 2004) ..................................................... 19

*Mason v. SmithKline Beecham Corp.,*
   596 F.3d 387 (7th Cir. 2010) ....................................................... 1, 19

*McDarby v. Merck & Co., Inc,*
   949 A.2d 223 (N.J. 2008) .............................................................. 19

*Motus v. Pfizer, Inc.,*
   127 F.Supp.2d 1085 (C.D. Cal. 2000) ................................................. 24

*Proctor v. Davis,*
   291 Ill. App. 3d 265 (1997) ........................................................... 15

*Riegel v. Medtronic, Inc.,*
   128 S.Ct. 999 (2008) .................................................................. 33

*Robinson v. McNeil Consumer Healthcare,*
   615 F.3d 861 (7th Cir. 2010) .......................................................... 33

*Scroggin v. Wyeth,*
   4:04CV01169-WRW (E.D.Ark., April 16, 2008) ..................................... 38

*Sprietsma v. Mercury Marine,*
    537 U.S. 51 (2002) ............................................................................................. 25

*Thomas v. Hoffman-La Roche, Inc.,*
    949 F.2d 806 (5th Cir. 1992) ........................................................................... 32

*Tobin v. Astra Pharm. Prods., Inc.,*
    993 F.2d 528 (6th Cir. 1993) ............................................................................ 19

*Tobin v. SmithKline Beecham Corp.,*
    164 F.Supp.2d 1278 (D.Wyo. 2001) ................................................................ 24

*Tucker v. SmithKline Beecham Corp.,*
    596 F. Supp. 2d 1225 (S.D. Ind. 2008) ....................................................... 1, 32

*Washington Legal Foundation v. Friedman,*
    13 F.Supp.2d 51, (D.D.C. 1998). ..................................................................... 15

*Wells v. Ortho Pharm. Corp.,*
    788 F.2d 741 (11th Cir. 1986) .......................................................................... 19

*Wyeth v. Levine,*
    555 U.S. 555 (2009) ................................................................................... passim


### Other Authorities

21 C.F.R. § 201.80(e) ................................................................................... 14, 15

21 C.F.R. § 314.50(c)(2)(I) ................................................................................ 14

21 C.F.R. § 314.70(c)(6)(iii)(A) ...................................................................... 8, 14

21 C.F.R.§201.80(e) ........................................................................................... 14

21 U.S.C. § 355(a)(b) .......................................................................................... 13

## INTRODUCTION

Relying on outdated, out-of-context and even withdrawn statements uttered by the FDA, and interlaced with a distorted presentation of the applicable case law, GSK invites this Court to dismiss Plaintiff's meritorious claims on preemption grounds. The barrenness of GSK's arguments are exemplified by the fact that they (GSK's arguments) have uniformly been rejected by every single court within the Seventh Circuit to address the defense, including: *Mason v. SmithKline Beecham Corp.*, 596 F.3d 387 (7th Cir. 2010) (failure to warn claims involving Paxil-induced suicide of a 23-year-old woman not preempted by federal law); *Forst v. Smithkline Beecham Corp.*, 639 F. Supp. 2d 948, 953 (E.D. Wis. 2009) (failure to warn claims involving the Paxil-induced suicide attempt of a 61-year-old man are not preempted by federal law) and *Tucker v. SmithKline Beecham Corp.*, 596 F. Supp. 2d 1225, 1227 (S.D. Ind. 2008) (failure to warn claims involving the Paxil-induced suicide attempt of a 55-year-old Catholic priest not preempted by federal law).

## SUMMARY OF THE FACTS AND LEGAL ARGUMENTS

During the lunch hour of an otherwise uneventful Thursday in the summer of 2010, Stewart Dolin, a successful attorney/partner at Reed Smith, left his downtown office, headed to the Blue Line train station, paced back and forth along the platform several times and then jumped in front of an oncoming train. A subsequent autopsy toxicology test confirmed the presence of paroxetine (generic Paxil) in Mr. Dolin's blood system. Mr. Dolin is survived by his two adult children and his wife, Plaintiff, Wendy Dolin. Mr. Dolin committed suicide six days after he started taking the powerful psychotropic agent, paroxetine (generic Paxil).[1] Unbeknownst to Mr. Dolin, his family or his treating physician, Paxil was (and is) causally associated with suicidal behavior in patients

---

[1] For ease of reference, throughout this brief, Plaintiff will refer to paroxetine by its brand name, Paxil (although there is, of course, no dispute that at the time of his suicide, Mr. Dolin was taking generic paroxetine.

of all ages—something GSK has known since at least the 1990s—yet the label in effect at the time of Mr. Dolin's suicide falsely stated that the suicidality risk seen with children, adolescents and young adults did not extend beyond age 24.   As outlined in the expert reports of Plaintiff's experts, Joseph Glenmullen, M.D., David Healy, M.D., David Ross, M.D., Ph.D., and Roger Grimson, Ph.D., when properly analyzed, the initial Paxil clinical trials reveal a statistically significant 8.5-fold increased risk of suicidal behavior when compared to patients taking placebo. Likewise, an analysis of a second dataset performed by GSK in the spring of 2006 confirmed that adult patients on Paxil had a statistically significant 6.7-fold increased risk of experiencing suicidal behavior when compared to patients on placebo.   Finally, an analysis performed by the FDA in late 2006 revealed that adults treated with Paxil had a statistically significant 2.76-fold increased risk of experiencing suicidal behavior when compared to adult patients taking placebo. Unfortunately, the label in effect at the time Mr. Dolin was prescribed Paxil, in 2010, did not contain any of this data nor did it inform patients and physicians that the risk seen in children, adolescents and young adults actually extended to and was applicable to adults of all ages, including Mr. Dolin's age.   Rather, the Paxil label in effect at the time of Mr. Dolin's prescription gave the misleading impression that the suicide risk was limited to adolescents and young-adults when this was not the case.

Despite these facts, GSK seeks complete immunity from liability by asserting the "conflict preemption defense" and claims that, under the Food, Drug, and Cosmetic Act (FDCA), it was *prohibited* from warning or disclosing to the public *truthful information* about the suicidality risks associated with Paxil.   In so arguing, GSK attempts to improperly abrogate its duties as a drug manufacturer to the FDA.   In essence, GSK argues that, because the FDA did not "make" GSK warn about the suicidality risk, it could not have warned or disclosed these risks any sooner.   GSK is wrong.   The Supreme Court's landmark decision in *Wyeth v. Levine,* 555 U.S. 555, 561, 129 S.

Ct. 1187, 1192, 173 L. Ed. 2d 51 (2009) makes it abundantly clear that, "through many amendments to the FDCA and to FDA regulations, it has remained a central premise of federal drug regulation that the manufacturer bears responsibility for the content of its label at all times**."** *Levine,* 555 U.S. at 570-571.

GSK's conflict preemption defense is meritless because no actual conflict exists, nor does any state law asserted by Plaintiff stand as an obstacle to the achievements of federal objectives. As the Supreme Court has recognized, the FDCA and accompanying FDA regulations do not prohibit a manufacturer from issuing enhanced warnings. This Court should, thus, reject GSK's attempt to eliminate the historical right of the States to regulate health and safety matters for its citizens and provide tort remedies for injured consumers.

## STATEMENT OF FACTS

## I.     GSK HAS KNOWN ABOUT PAXIL'S ASSOCIATION WITH SUICIDALITY FOR OVER 20 YEARS

GSK has known about Paxil's association with suicidality for more than 20 years. The Paxil Integrated Summary of Safety submitted to the FDA in 1989 contained clinical trial data, which, when properly presented, demonstrate a statistically significant, greater-than-eight-fold increased risk of suicidal behavior compared to placebo. But, GSK misleadingly presented this data, thus concealing the risk. See Plaintiffs' Additional Proposed Findings of Fact ("PFF") 1-9. GSK's manipulation of the data consisted of, *inter alia*, improperly counting suicide attempts that took place during the "run-in" period (sometimes also called "wash-out") (i.e., prior to the start of the official study) as though they occurred in the placebo group during the official study.[2] PFF

---

[2]     During the "run-in" (also called "wash-out") period, patients participating in a clinical trial are taken off any medications they may be taking and given a placebo instead. In this way, a person's system is "washed-out"of other drugs and all patients start the trial on a drug-free basis. Because people who are stopping medication during this wash-out period may be experiencing adverse events associated with withdrawal from the medications they were previously on, adverse

1-23.   By manipulating and increasing the number of attempted suicides that occurred with the placebo group, GSK gave the impression that there was no increased rate of suicidal events.   The non-manipulated data show an eight times greater likelihood that a patient on Paxil versus placebo would attempt suicide.   PFF 9.

Prior to 2006, GSK *never* proposed nor voluntarily implemented a Paxil-specific suicide warning.   PFF 91-102.   Rather, to stay competitive with other antidepressant manufacturers, GSK proposed a "precaution" in the label for "suicide" *identical* to the precaution contained in the label for Prozac, a competing SSRI antidepressant, which had been on the market since 1988.   PFF 91-92.   That language stated:

> The possibility of a suicide attempt is inherent in depression and may persist until significant remission occurs.   Close supervision of high-risk patients should accompany initial drug therapy.   Prescriptions for [Paxil] should be written for the smallest quantity of tablets consistent with good patient management, in order to reduce the risk of overdose.

PFF 92.   This "precaution" only linked the risk of suicide to the underlying disease (depression) and did not warn that Paxil (the drug) can increase the risk of suicidal behavior.   On December 29, 1992, the FDA approved Paxil and its proposed label.   PFF 93.

## II. FDA OFFICIALS HAVE CONFIRMED THAT GSK'S MANIPULATION OF THE DATA VIOLATED GENERAL SCIENTIFIC PROCEDURES, AS HAVE GSK'S OWN EMPLOYEES

Since Paxil's approval, senior officials and safety officers within the FDA have testified that the way GSK analyzed the Paxil clinical trial data concerning suicide-related events was inappropriate and "scientifically illegitimate."   See PFF 4, deposition of Dr. Robert Temple; and PFF 5, deposition of Dr. Martin Brecher.   In a 1999 telephone conference, the FDA specifically informed GSK that it is not permissible to count adverse events that occurred during the "run-in"

---

events experienced during the "run-in" or "wash out" period should not be counted as occurring during the clinical trial.

period.   PFF 6.   ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████ ██████████████ ██████████

███████████████████████████████████████

███████████████████████████████████ ██████████████

██████████████████████████████████████████████████

███████████████.   GSK did nothing to correct these erroneous figures even though it was

aware the false figures were contained in submissions to the FDA, in a heavily touted medical

journal article (Montgomery article) published in 1995, which was used by GSK to alleviate any

concerns [doctors] may have regarding suicidal ideation" (PFF No.33), and, in its promotional

materials to physicians disseminated at medical conferences and during sales visits to individual

doctors.   It was not until May 2006, the year Paxil's lucrative exclusivity patent was set to expire,

and after pressure from FDA and other governmental agencies, that GSK finally disclosed some of

the data concerning the true risks associated with Paxil.   PFF 66-78.   In a May 2006 "Dear

Healthcare Professional" letter, GSK disclosed that Paxil increases the risk of suicidal behavior in

adults of all ages.   PFF 74-75.

---

[3]   *See* Montgomery S.A., Dunner D.L. & Dunbar G.C., *Reduction of Suicidal Thoughts With Paroxetine In Comparison with Reference Antidepressants and Placebo*, 5 J. EUROPEAN NEUROPSYCHOPHARMACOLOGY 5-13 (1995) (PFF 31-32, Exh. 17).   The 1995 Montgomery article improperly included the same run-in events that had been improperly included in GSK's 1989 and 1991 submissions to the FDA. As evidenced by the title of the article, the article boasted that Paxil *reduced* suicidal behavior.

III.    **GSK FALSELY MARKETED PAXIL AS SAFE AND AS REDUCING SUICIDAL BEHAVIOR**

Both prior to and following Paxil's approval, GSK conducted a substantial marketing campaign to promote the benefits and safety of Paxil and promulgated to the medical community the same manipulated "run-in" data.   PFF 31-33.    For example, in 1991, *a year prior to* Paxil receiving FDA approval, GSK employees falsely asserted that "Suicides and suicide attempts occurred *less frequently* with paroxetine than with either placebo or active controls."   PFF 25-26.   GSK's false promotion and concealment paid off.   Paxil went on to become the most profitable drug in GSK's inventory, generating *$3.1 billion in annual sales*.   See PFF 34.

IV.    **THE FDA DISCOVERS THAT GSK HAD BEEN CONCEALING SUICIDE EVENTS UNDER THE TERM "EMOTIONAL LABILITY"**

On April 11, 2002, GSK filed an application with the FDA seeking approval for the use of Paxil in treating children and adolescents.   In reviewing GSK's application, an FDA safety reviewer noticed GSK's use of the term "emotional lability."   After further investigation, the reviewer realized that GSK was improperly concealing suicide events under the category of "emotional lability."   The FDA reviewer asked GSK to explain its "rationale for coding suicide attempts and other forms of self-injurious behavior under the [] term 'emotional lability,'" and discovered that "almost all of these events related to suicidality."   PFF 35-44.   The FDA complained, in internal emails, that Paxil suicide events were "**being hidden by various inappropriate coding maneuvers**…." and were being "obscured by inappropriate terminology." PFF 43.

V.    **PRELIMINARY ANALYSIS OF THE PAXIL PEDIATRIC CLINICAL TRIALS PROMPTS FDA TO ISSUE A WARNING TO THE MEDICAL COMMUNITY REGARDING THE POTENTIAL SUICIDE RISKS ASSOCIATED WITH PEDIATRIC USE OF PAXIL**

6

In light of the FDA's discovery of GSK's miscoding of pediatric data, on June 19, 2003, the FDA issued a public statement explaining that it was "reviewing reports of a possible increased risk of suicidal thinking and suicide attempts in children and adolescents under the age of 18 treated with the drug Paxil for major depressive disorder."   PFF 44.   The FDA advisory went on to state: "[a]lthough the FDA has not completed its evaluation ... FDA is recommending that Paxil not be used in children and adolescents for the treatment of MDD [major depressive disorder]." *Id.*

The FDA also expanded the scope of its investigation and requested a reanalysis of pediatric data from other antidepressant manufacturers.   PFF 45.   On October 27, 2003, the FDA issued a Public Health Advisory and corresponding Talk Paper, stating that it was looking into the pediatric suicide data and "it is not possible at this point to rule out an increased risk of [suicidal thoughts or actions] for any of these drugs including Paxil."   PFF 47.

## VI.   THE FDA RECOMMENDS THE IMPLEMENTATION OF A PRECAUTION REGARDING CLINICAL WORSENING OF SUICIDALITY FOR BOTH ADULT AND PEDIATRIC PATIENTS

The alarming Paxil data prompted the FDA to analyze the pediatric data of other antidepressant manufacturers.   On February 2, 2004, the FDA convened an advisory committee meeting to consider the association between antidepressants and suicidality in pediatric patients. During that advisory committee meeting, the FDA's Dr. Russell Katz noted:

> It is the controlled trial data that we believe is best able to help us provide an adequate answer to this question, but as you have heard, and you will hear throughout today's presentations, **we do not believe that this data until now has been provided to us in a way that would permit us to interpret it fully**.

PFF 50, emphasis added.   Even though it had not analyzed the adult data, the FDA asked for an added precautionary warning as to **both adult** and pediatric patients.   On March 22, 2004, the FDA issued a Public Health Advisory, in which it asked antidepressant manufacturers to warn

7

about a risk for both children **and adults**.  PFF 52.  In light of the FDA's directive, in May 2004, GSK revised its warning.  The May 2004 GSK warning provided:

> Patients with major depressive disorder, *both adult* and pediatric, may experience worsening of their depression and/or emergence of suicidal ideation and behavior (suicidality)...**patients being treated with antidepressants should be observed closely for clinical worsening and suicidality especially at the beginning of a course of drug therapy**...
> ***
> **Families and caregivers of patients being treated with antidepressants for major depressive disorder or other indications...should be altered about the need to monitor patients for the emergence of agitation...as well as the emergence of suicidality**...

See PFF 53 (italics added; bolding in original label).  The FDA held another advisory committee meeting in September 2004 to examine more closely suicidality data submitted by numerous antidepressant manufacturers.  PFF 58.  Following this advisory committee meeting, and based on the committee's review of data confirming a risk, the FDA mandated that each manufacturer issue a "black box" warning regarding the increased risk of suicidal thoughts and behavior in children and adolescents.  PFF 59-60.[4]

## VII.    FDA ORDERS GSK TO RE-ANALYZE ITS ADULT DATA TO DETERMINE IF A SIMILAR RISK EXISTS IN ADULT PATIENTS

In light of the risks uncovered in the pediatric clinical trial data, the FDA asked GSK and the other antidepressant manufacturers to re-examine their adult suicide data.  PFF 63.  On July 1, 2005, the FDA stated that it had begun reviewing the adult suicide data and "asked manufacturers to provide information from their trials..."  PFF 61.  The FDA recommended that, while the adult data was being analyzed, adult patients "should be watched closely for worsening of depression and increased suicidal thinking or behavior" and close monitoring is "especially important when antidepressant medications are started for the first time..."  *Id.*

---

[4]    A "black box" warning is the strongest warning FDA regulations provide for, short of contraindicating the use altogether.  *See* 21 C.F.R. §201.80.

VIII.  **IN 2006, GSK FINALLY WARNED THAT ADULTS TAKING PAXIL WERE MORE THAN SIX TIMES AS LIKELY TO EXPERIENCE SUICIDAL BEHAVIOR THAN THOSE TAKING PLACEBO**

In April/May 2006, while the FDA's reanalysis of the adult data was ongoing, GSK *sua sponte* issued its own adult suicide warning based on its re-analysis of Paxil specific suicide data. PFF 67.   Using the Changes Being Effected ("CBE") process (21 C.F.R. § 314.70(c)(6)(iii)(A)), GSK changed its label to warn that Paxil was associated with an increased risk of suicidality in adults.   *Id.*   Further, in May 2006, GSK sent a "Dear Doctor" letter to alert physicians of its label change and to warn that "**in the analysis of adults with [major depressive disorder] (all ages), the frequency of suicidal behavior was higher in patients treated with [Paxil] compared with placebo**," and that the difference was "statistically significant."   PFF 75.   In a companion Briefing Document, GSK admitted that a depressed adult patient taking Paxil is six times more likely to attempt suicide than a patient taking placebo.   PFF 70 (GSK's analysis "provide evidence of an increase in suicide attempts in adults with MDD treated with paroxetine compared to placebo" with an "odds ratio [of] 6.7 ...").[5]   PFF 70.   GSK's 2006 adult suicide warning was accepted by the FDA and remained unchanged until August 2007.   PFF 72 & 106-112.

IX.  **FDA'S 2007 CLASS WIDE LABELING CHANGE WAS BASED ON A POOLED ANALYSIS OF A NUMBER OF ANTIDEPRESSANTS, NOT AN ANALYSIS OF PAXIL BY ITSELF**

In 2007, the FDA finalized its review of the "pooled data" from the various different antidepressant manufacturers and concluded that the *pooled* data did not show a significantly

---

[5]   Again, this adult analysis was triggered by the 2002 discovery by an FDA safety reviewer that Paxil's child/adolescent data showed an increased risk of suicidality in children and adolescents, which eventually resulted in black box warnings for all antidepressants.   PFF 37, 45-46.   A Court in the Eastern District of Pennsylvania found the evidence convincing that GSK had known about the pediatric suicide risks since as early as 1998 "**yet failed to warn solely to increase the commercial profitability of Paxil**." *Knipe v. SmithKline Beecham*, 583 F.Supp.2d 602, 640-641 (E.D.Pa. 2008) ("*Knipe II*").

increased risk of suicidality for patients over the age of 24 in the combined studies.   The FDA

thereafter asked all manufacturers to expand the existing pediatric black box warning to add

class-wide language stating that the suicidality risk extended beyond children and adolescents, to

young adults up to age 24, but that the risk of suicidality did not extend beyond the age of 24.   PFF

107-108.   However, out of all of the antidepressants analyzed by the FDA, only Paxil was

significantly associated with an excess risk of suicidal behavior.   The FDA's analysis showed that

Paxil increased the risk of suicidal behavior in patients of all ages.   PFF 79-90.   The FDA

specifically found, based on a selection of clinical trials, that patients taking Paxil were nearly

three times (2.76) as likely to engage in suicidal behavior compared to placebo and the difference

was statistically significant.   PFF 85.   A study published in the Journal of the Canadian Medical

Association confirms this:

> The present analysis, which suggests that paroxetine is associated with a
> statistically significant increase in the risk of suicidal tendencies, expands the
> results of previous re-analyses of GlaxoSmithKline's data [citing GSK's 2006
> analysis finding a 6.7 times increased risk] ...   **The recently released re-analysis
> by the US food and Drug Administration ... confirmed these figures by
> showing that, among the selective serotonin reuptake inhibitors and newer
> antidepressants, only paroxetine was significantly associated with an excess
> risk of suicidal behavior...**

Barbui et al., *Effectiveness of paroxetine in the treatment of acute major depression in adults: a*

*systematic re-examination of published and unpublished data from randomized trials*, 178

Can.Med. Assn.J., 296 (2008); PFF 90, Exh. 42.

X.   **GSK REFUSED FDA'S INVITATION TO DISCUSS THE IMPLEMENTATION
OF A PAXIL SPECIFIC LABEL TO WARN OF THE PAXIL SPECIFIC SUICIDE
RISKS**

While the FDA was in the process of implementing class-wide labeling in 2007, GSK

suggested in its exchanges with the FDA that it believed the 2006 Paxil-specific adult language

cited above, should become part of the class label.   PFF 109-110.   On June 22, 2007, the FDA

extended an invitation to GSK to discuss the option of keeping the 2006 Paxil-specific adult language in its current label by simply requesting a formal meeting.   PFF 110.   Specifically, the FDA told GSK: "If you would like to discuss this matter further [keeping the 2006 Paxil-specific adult warning in the Paxil label], please submit a formal meeting request." See Exh. 56; see also PFF 111.   However, GSK never asked for a formal meeting, nor did it seek additional labeling regarding Paxil-specific data.[6]   PFF 112.

GSK never sent a separate supplement and declined the FDA's invitation for a meeting to discuss the inclusion of the 2006 Paxil-specific adult warnings even though it knew the Paxil-specific data justified additional warnings.   Dr. Ronald Krall, GSK's Senior Vice President and Chief Medical Officer and the Co-Chairman of GSK's Global Safety Board, testified that it was his decision not to request the meeting because he *speculated* it would take a long time to get a meeting date and would not lead to a different result.   PFF 113-114; see also Exh. 37, Krall Depo at 126:16-127:15.[7]

## ARGUMENT

For over a century, people injured by a drug manufacturer's unsafe products have been able to pursue compensation for their injuries under state law.[8]   The civil justice system's chief

---

[6]   Likewise, the June 21, 2007 FDA correspondence GSK relies upon in support of its preemption motion actually supports Plaintiffs' argument that such claims are not preempted. Notably, in that communication, the FDA states: "We also have noted that some sponsors [drug manufacturers] have taken this opportunity to include other revisions to their labeling which are not applicable to the class labeling revision requested in our 5-1-07 letter.   *We are requesting that these changes be submitted as a separate supplement.*" *See* PFF 110 (emphasis added).

[7]   Dr. Krall's decision not to push the issue was made notwithstanding his testimony that GSK's 2006 analysis resulting in revised labeling for Paxil and its dissemination of a "Dear Doctor" letter alerting doctors to the statistically significant 6.7 times increased risk of suicidality in depressed adults of all ages was so important to communicate to doctors. (PFF 113; see also Exh.  37, Krall Depo at 32-33 and 107-113).

[8]   *See, e.g., Halloran v. Parke, Davis & Co.*, 280 N.Y.S. 58, 59 (App.Div. 1935) (per

purpose—to compensate people who are injured—has never been a role assumed by the FDA. Cognizant of the important, complementary functions served by FDA regulations and state law remedies, Congress did not include an express preemption provision in the FDCA. Nor has it ever added a preemption clause for prescription drugs (such as Paxil) in any of the numerous statutory amendments to the FDCA. Nevertheless, GSK asserts that FDA's regulation of prescription drugs preempts Plaintiffs' state law claims.

GSK's baseline argument is that "implied conflict preemption" bars Plaintiffs' state law claims. However, the Supreme Court has recognized a general presumption that Congress does not intend to preempt state law causes of action. GSK can only overcome this presumption and prevail on its preemption argument by demonstrating that Illinois law "actually conflicts" with federal law such that the conflict makes it either "*impossible* for a private party to comply with both state and federal requirements" or "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *English v. General Electric Co.*, 496 U.S. 72, 79 (1990). GSK cannot make that showing, as detailed below, because state law tort claims complement applicable FDA regulations, and do not conflict with them.

The most compelling evidence illustrating the baseless nature of GSK's preemption defense is established by the fact that, in March 2004, the FDA took prophylactic measures and actually ordered manufacturers to issue warnings regarding children *and adults* and, in May 2006, GSK voluntarily enhanced its label to warn (and quantify) the increased risk of suicidal behavior in adults, and the FDA never initiated a misbranding action against GSK. As demonstrated below, GSK's attempt at deliverance through preemption fails and, thus, should be rejected.

---

curiam) (drug manufacturer held liable for failing to give a proper warning); *Thomas v. Winchester*, 6 N.Y. 397, 407-10 (N.Y. 1852) (drug manufacturer liable for a patient's injury).

## I.       STANDARD FOR SUMMARY JUDGEMENT

The rules for granting summary judgment are well settled.   In determining the appropriateness of summary judgment, the relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). "[S]ummary judgment will not lie ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   *Anderson*, 477 U.S. at 248.   In applying this standard, the Court should not weigh the evidence.   *Id.* at 249.   Rather, the Court is obligated to view the record in a light most favorable to the party opposing summary judgment and must construe all evidence and reasonable inferences in favor of the non-moving party.   *Id.* at 255.   With respect to the defense of federal preemption, which is the sole defense raised in GSK's present summary judgment motion, the Supreme Court has held that preemption is a demanding defense which will not succeed absent defendant establishing "clear evidence" that the FDA would not have approved an enhanced warning to the drug's label.   *Wyeth v. Levine*, 555 U.S. 555, 571 (2009).

GSK has failed to meet its demanding burden of establishing, with "*clear evidence*," that, had it added a Paxil-specific adult suicidality warning in 2010 (consistent with the Paxil-specific dataset from its own analysis of the data), that change would have been rejected by the FDA or deemed a misbranding of the drug.   *Levine,*555 U.S at 571 (requiring that defendant present "clear evidence" that a warning would have been rejected); *see also Mason*, 596 F.3d at 396 (holding that GSK failed to meet its burden of demonstrating by clear evidence that the FDA would have rejected a young adult suicide warning); *Tucker*, 596 F. Supp. 2d at 1227 (denying GSK's preemption motion in a case involving the suicide of a 55-year-old priest); *Forst,* 639 F. Supp. 2d

at 952 (denying GSK's preemption motion and holding GSK failed to present clear evidence that the FDA would have rejected a Paxil specific adult suicide warning).

## II.    THE FDCA AND FDA REGULATIONS ALLOW AND REQUIRE PRESCRIPTION DRUG MANUFACTURERS TO ISSUE WARNINGS REGARDING KNOWN RISKS

All prescription drugs marketed in this country must first be approved by the FDA.   To obtain permission to market a new product, a drug company must first submit a "new drug application" ("NDA") for the FDA's review and approval.   21 U.S.C. § 355(a)(b).   The FDA does not conduct clinical trials, rather, clinical trials are conducted by drug manufacturers. *Tucker*, 596 F.Supp.2d at 1234 ("FDA does not conduct its own drug trials...").   Furthermore, as part of the NDA process, the drug manufacturer drafts and submits the proposed label to the FDA for approval.   21 C.F.R. § 314.50(c)(2)(I); 314.50(d)(5)(viii).

Because the FDA has limited knowledge of a new drug's safety at the time of approval, the FDA has acknowledged that the label is not a static document, but a fluid one that evolves over time.   The FDA Commissioner has stated that "drug labeling does not always contain the most current information and opinion available to physicians about a drug because advances in medical knowledge and practice inevitably precede formal submission of proposed new labeling by the manufacturer and approval by the FDA."   44 Fed. Reg 37434, 37435 (1979).   Because a manufacturer has the resources and most-thorough and up-to-date knowledge about its drug products, federal regulations place an affirmative duty on a manufacturer to continuously assess the safety of its drugs and to warn of safety hazards as these harms come to light: "*[T]he labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug: a causal relationship need not have been proved*."   21 C.F.R. §

201.80(e).[9]   The FDA thought it so important to put safety first that it dispensed with the normal procedure requiring FDA approval prior to a label change.   50 Fed. Reg. at 7452-01, 7470. Instead, a company can "add or strengthen a contraindication, warning, precaution, or adverse reaction" for its drug at any time, without the agency's prior approval.   21 C.F.R. § 314.70(c)(6)(iii)(A) (this is often referred to as the "Changes Being Effected" (CBE) regulation). Thus, despite any assertion by GSK to the contrary, it cannot avoid its duties to ensure that the labeling contains adequate warnings, and GSK was required to revise the labeling to include a warning "as soon as there is reasonable evidence of an association of a serious hazard with a drug." 21 C.F.R. § 201.80(e); *see also Levine*, 555 U.S. at 571.

Further, GSK has a First Amendment right to issue truthful warnings through medical journal articles.   *Washington Legal Foundation v. Friedman*, 13 F.Supp.2d 51, 67 (D.D.C. 1998). Prior to Mr. Dolin's suicide, GSK could have used numerous means (e.g., its label, medical journal articles) to warn his doctor.   Unfortunately, instead of issuing warnings, GSK chose to conceal those risks and, instead, falsely promoted Paxil as being safe and *lowering* suicidal behavior in adults.   PFF Nos. 24-34.

## III.    ILLINOIS LAW LIKEWISE REQUIRES DRUG MANUFACTURERS TO WARN OF KNOWN RISKS

Illinois law, like the FDA regulations discussed *supra*, require drug manufacturers such as GSK to warn about any known risks and side effects associated with their products. *See Proctor v. Davis,* 291 Ill. App. 3d 265, 280, 682 N.E.2d 1203, 1213 (1997); *Kirk v. Michael Reese Hospital & Medical Center,* 117 Ill.2d 507, 517, 111 Ill.Dec. 944, 513 N.E.2d 387 (1987); *see also* 21 C.F.R. §

---

[9]   In 2006, the regulations were revised but the old version of the regulations continue to apply to "older drugs" such as Paxil, and the older versions of the labeling regulation was relocated (without any significant change) to 21 C.F.R.§201.80(e) and it continues to govern manufacturers of older drugs such as Paxil.

201.80(e) (2008) (under federal law manufacturer has affirmative duty to warn). As outlined above, years prior to Mr. Dolin's July 2010 suicide, GSK was aware of a substantiated suicide risk associated with Paxil, however, GSK's label in effect at the time failed to adequately warn regarding the suicide risks associated with adult patients, nor can GSK show that the FDA would have rejected any attempt on the part of GSK to issue such warnings.

## IV. PLAINTIFFS' FAILURE TO WARN CLAIMS ARE NOT PREEMPTED BY FEDERAL LAW

### A. There Is a Strong Presumption Against Preemption

The Supreme Court has repeatedly recognized that there is a "basic presumption against preemption" because preemption upsets the balance of power between the federal government and the states as independent sovereigns. *Bates v. Dow Agrosciences, LLC,* 544 U.S 431, 449 (2005). The presumption applies in this case because, historically, the several States have possessed broad powers to protect the "lives, limbs, health, comfort and quiet of all persons." *Slaughter House Cases*, 16 Wall 36, 62 (1873). In *Levine*, the Supreme Court confirmed that the presumption is particularly applicable to prescription drug cases. *Levine,* 555 U.S. at 565, n.3. GSK has failed to overcome this strong presumption against preemption.

### B. The Supreme Court Has Concluded That Prescription Drug Failure to Warn Claims Are Not Preempted

In 2009, the Supreme Court issued its landmark decision denying preemption in a prescription drug case. *Levine,* 555 U.S. 555. In *Levine*, the plaintiff was injured when a clinician improperly injected an anti-nausea drug Phenergan into her artery. The plaintiff sued Wyeth, the manufacturer of the drug, claiming Wyeth had failed to provide an adequate warning regarding the risks involved with the various administering methods of the drug. The case was presented to a jury and the jury concluded that Wyeth had failed to properly warn. The issue

16

before the Supreme Court was, like the present case, whether plaintiff's claims were preempted by the FDCA and applicable FDA regulations.   Wyeth, like GSK in this case, argued it would have been impossible for it to comply with both the state law duty and federal law, and state tort action created an unacceptable obstacle to the accomplishment and execution of the full purposes and objectives of Congress.   The Supreme Court rejected both arguments.

In *Levine*, the Court established the appropriate framework for assessing a drug manufacturer's contention that federal drug laws and the FDA's approval of a drug's label preempt a state law failure to warn claim.   The Court rejected the drug industry's and Government's broad claims of conflict preemption, including claims that, when the FDA approves a drug label, the agency strikes a balance that establishes both a "floor" and a "ceiling" with respect to the appropriate warnings for that drug.   The Court found that Congress and the FDA had long recognized that "state law offers an additional, and important, layer of consumer protection that complements FDA regulation."   *Levine*, 555 U.S. at 579.   The Court concluded that a drug manufacturer's claim of implied conflict preemption will fail where it cannot present "clear evidence" that the FDA would "have prohibited [the manufacturer] from adding a stronger warning pursuant to the CBE regulation."   *Id.* at 572-573 & n.6; *accord id.* at 581, n.14.

In reaching these conclusions, the Court began its analysis with the two cornerstones of its preemption jurisprudence:   the "purpose of Congress" and the presumption against preemption. *Id.* at 564-67.   The Court then applied those principles to reject arguments by Wyeth and the FDA that are identical to GSK's arguments in this case.   *First*, the Court rejected Wyeth's claim that FDA rules gave it no right to change its drug label without prior FDA approval, making it impossible to comply with the Vermont jury verdict.   The Court found that the FDA's CBE regulation permits precisely such manufacturer-initiated changes.   *See id.* at 568-69.   The Court

concluded that FDA rules properly "account[] for the fact that risk information accumulates over time and that the same data may take on a different meaning in light of subsequent developments." *Id.* at 569. Because Wyeth "could have analyzed the accumulating data" about the risks associated with its drug, Phenergan, the FDA's rules allowed it to "add[] a stronger warning" without prior FDA approval. *Id.* at 569-70.

*Second*, the Court rejected Wyeth's claim that modifying its label without FDA approval would have rendered its drug misbranded under federal law. The Court determined that "strengthening the warning" on the label "would not have" "rendered [the drug] misbranded," because federal law "does not provide that a drug is misbranded simply because the manufacturer has altered an FDA-approved label." *Id.* at 570. The Court dismissed the notion that FDA "would bring a[] [misbranding] enforcement action against a manufacturer for strengthening a warning." *Id.* at 570 ("And the very idea that the FDA would bring an enforcement action against a manufacturer for strengthening a warning pursuant to the CBE regulation is difficult to accept—neither Wyeth nor the United States has identified a case in which the FDA has done so.")

*Third*, the Court explained that the impossibility and misbranding arguments were premised on a "fundamental misunderstanding" of federal drug regulation: namely, that "the FDA, rather than the manufacturer, bears primary responsibility for drug labeling." *Id.* The Court emphasized that "it has remained a central premise of federal drug regulation *that the manufacturer bears responsibility for the content of its label at all times*." *Id.* at 570-71 (emphasis added). In particular, the manufacturer" is charged . . . with ensuring that its warnings remain adequate as long as the drug is on the market." *Id.* Therefore, under federal law, a manufacturer has a "duty to provide a warning that adequately describe[s] [a] risk" once the risk "became apparent" to the manufacturer. *Id.*

18

*Fourth*, the Supreme Court rejected the FDA's position, set out in a 2006 regulatory preamble and a series of amicus briefs, that all state law failure to warn claims are preempted because federal approval of a label "establishes both a floor and a ceiling for drug regulation." *Id.* at 1199. As the Court explained, the "most glaring problem with this argument is that all evidence of Congress' purposes is to the contrary." *Id.* at 573-74. The Court therefore held that the plaintiff's claims were not preempted by federal law. *Id.* at 581.

Although the Court did not find that state law failure to warn claims could never be preempted, *see id.* at 581, the Court made clear that the bar for a manufacturer claiming preemption has been set extremely high. In particular, the manufacturer bears the burden of showing, based on "clear evidence" in the record, that the FDA "would have prohibited" the manufacturer from strengthening its warning using the CBE regulation. *Id.* at 571 & n.6. Absent such evidence of an "affirmative decision . . . to prohibit [the manufacturer] from strengthening its warning," a state law failure to warn claim is not preempted. *Id.* at 572. Applying that standard to the facts in *Levine* [which included a 34-year regulatory history wherein the FDA had focused specifically on the issues/warnings in question], the Court found that the record — **which was established following a jury trial** — contained no evidence that FDA would have prohibited Wyeth from strengthening its warning based on the risk information revealed at trial[10]. *Levine*, 555 U.S. at 572*; see also Mason,* 596 F.3d at 393 ("Taking *Levine* as a

---

[10]  In addition to the Supreme Court's *Levine* decision, nearly every appellate court – federal and state – to address the issue has refused to find preemption. *See, e.g.*, *Abbot v. American Cyanamid Co*., 844 F.2d 1108, 1110-14 (4th Cir. 1988), *cert. denied*, 488 U.S. 908 (1988); *Hurley v. Lederle Laboratories Div. of Am. Cyanamid Co.*, 863 F.2d 1173, 1176-77 (5th Cir.1989); *Tobin v. Astra Pharm. Prods., Inc.*, 993 F.2d 528, 537 (6th Cir. 1993), *cert. denied*, 510 U.S. 914 (1993); *Hill v. Searle Labs*., 884 F.2d 1064, 1068 (8th Cir.1989); *Graham v. Wyeth*, 906 F.2d 1399, 1405 (10th Cir. 1990); *Wells v. Ortho Pharm. Corp*., 788 F.2d 741, 746 (11th Cir. 1986), *cert. denied*, 479 U.S. 950 (1986); *Kurer v. Parke, Davis & Co.*, 679 N.W.2d 867, 875 (Wis. App. 2004) ("As numerous courts have concluded, FDA regulations do not preempt the imposition of state common law liability for failure to warn claims.")

19

whole, it is clear from the ample administrative record that the FDA strongly considered a similar warning to the one the plaintiff proposed and the Court still did not find preemption.")

### C. The Evolution of Paxil's Label Demonstrates that the FDA Has Never Rejected a Request by GSK to add a Suicidality Warning

Applying *Levine* to the facts of this case confirms that GSK has not met its heavy burden of establishing preemption. GSK's entire preemption argument rests on the *false* premise that the FDA has considered and rejected an adult suicide warning during the relevant time period. GSK, however, fails to cite a single document that establishes that the FDA ever considered or rejected a *GSK-proposed* suicide warning for Paxil. When GSK submitted the initial proposed label for Paxil to the FDA in the late 1980s, GSK proposed a "precaution" in the label for "suicide" identical to the precaution contained in the label for Prozac, another SSRI antidepressant that had been approved before Paxil. PFF 91-92. That "precaution" only linked the risk of suicide to the underlying disease (depression) and did not warn that Paxil (the drug) can increase the risk of suicidal behavior. PFF 92.

Between 1992 (the approval date of Paxil's New Drug Application) and 2001, GSK never sought, and by extension the FDA never rejected, any different suicide or suicidality language for Paxil's label. PFF 94. In 2001, GSK made a minor modification to the precaution section regarding suicide. PFF 98.[11] Thereafter, the suicide language in Paxil's label did not change until May 2004. In May 2004, at the behest of the FDA, Paxil's label was changed *for the first time* to include a precaution regarding the association between Paxil and suicidality in children and adolescents. PFF 101. The May 2004 precaution also cautioned that *adult* patients "may

---

[11] GSK added the following text: "Because of well-established comorbidity between major depressive disorder and other psychiatric disorders, the same precautions observed when treating patients with major depressive disorder should be observed when treating patients with other psychiatric disorders." PFF 98.

experience worsening of their depression and/or emergence of suicidal ideation and behavior

(suicidality)." *Id*; see also Exh. 30. Thereafter, in May 2006, GSK voluntarily issued a warning

which, for the first time, warned, "In adults with MDD (all ages), there was a statistically

significant increase in the frequency of suicidal behavior in patients treated with [Paxil] compared

with placebo." PFF 103. The FDA did not object to GSK's May 2006 label change, which was

based on a re-analysis of clinical trial data dating back to the 1990s. PFF 106.[12]

Although GSK asserts that the FDA specifically considered and rejected the warnings at

issue in this case, the actual facts demonstrate otherwise. GSK has proposed three different

suicide or suicidality warnings in the past 14 years (2001, May 2004 and May 2006) and all three

were accepted by the FDA.

### D. GSK Has Failed to Present Clear Evidence That The FDA Would Have Rejected A Paxil Specific Adult Suicide Warning

GSK's sole excuse for failing to provide a more timely warning is its self-serving argument

that it was prohibited from releasing the truthful data or issuing a truthful warning. Weaving

together out-of-context snippets of statements uttered by the FDA, GSK argues it was prohibited

from issuing or maintaining a suicide warning prior to Mr. Dolin's 2010 death. GSK's argument

is disingenuous given the FDA has never rejected a suicide warning and had been actively

*prophylactically* ordering manufacturers to issue warnings.

Significantly, GSK has failed to produce *any* evidence regarding the FDA rejecting a

suicide warning for Paxil prior to Mr. Dolin's suicide. Instead, GSK generally relies on its

contention that the FDA has paid "close attention" to the suicide risks; that the 2007 *pooled*

analysis does not show an increased risk of suicidal behavior in older adults; and its speculation

---

[12] Dr. Arning, GSK's former FDA liaison for Paxil, testified that the FDA neither requested the reanalysis nor did it request the label change. PFF 105.

that the FDA would not have allowed it to add warnings beyond the class labeling.    Each of GSK's contentions is baseless and, in fact, they have been judicially rejected by multiple courts.

> **1.    The Duty to Warn Rested With GSK, Not the FDA and FDA Has Admitted That Its Ability to Analyze the Suicide Risk Was Hampered Because of the Misleading Way In Which   Manufacturers' Such As GSK Had Coded the Suicide Adverse Events**

GSK's first attempt to distinguish *Levine* is to argue that the FDA only paid passing attention to Phenergan (the drug at issue) and that it has paid more attention to the risks associated with antidepressants.   See e.g, Brief at 19.   GSK misses the point.   *Levine's* rejection of preemption was not based on the FDA paying less attention to the risk at issue, rather, the Supreme Court rejected preemption because it believed "the FDA would not have prevented [the drug manufacturer] from adding a stronger warning."   *Levine*, 129 S.Ct. at 1199; see also 1197-98 ("it has remained a central premise of federal drug regulation *that the manufacturer bears responsibility for the content of its label at all times*.")   Likewise, in this case, GSK has failed to present any clear evidence that the FDA would have prevented a stronger warning for Paxil.

Even if the level of FDA attention were relevant (which it should not be), the drug at issue in *Levine* had been on the market for over 50 years, while Paxil had been on the market for about 20 years.   Thus, the FDA has had far more time to examine the risks at issue in *Levine*.[13] Tellingly, in *Mason*, the Seventh Circuit (relying on the regulatory history outlined by the dissent in *Levine*, which was not contradicted by the majority) confirmed that the record in *Levine* contained "ample evidence that the FDA specifically considered and reconsidered" the warnings of the drugs/risks at issue in *Levine*, and "[t]aking *Levine* as a whole, it is clear from the ample administrative record that the FDA strongly considered a similar warning to the one the plaintiff

---

[13]    The dissent chronicled the detailed history of FDA's "strict regulatory oversight" of the drug and risk at issue in *Levine*.   *Levine*, 129 S.Ct. at 1222-25 (Alito, J., dissenting).

proposed and the Court still did not find preemption." *Mason*, 596 F.3d at 393. Further, contrary to GSK's arguments, the evidence in this case indicates that, during the 1990s, the FDA did not actually give serious attention to the suicide risk. For example, in a 1990 telephone conversation, the FDA told GSK that it did not view the suicide risk as a "real issue" but rather a "public relations problem." PFF 134.

Moreover, the FDA has admitted that it did not do a good job examining the suicide risk. In 2004, the FDA acknowledged that its cursory review of the potential relationship between antidepressants and an increased risk of suicidality over the past decade and a half had been inadequate. During Congressional hearings, an FDA official testified that the FDA's analyses could have been far "better, more structured, [and] more careful." PFF 144. Likewise, at the February 2004 FDA advisory committee meeting, the FDA admitted that the methods the FDA had previously utilized in analyzing the adult data "**was not particularly productive**." PFF 148. Most tellingly, in 2004, the FDA acknowledged it did not have the expertise to conduct a proper suicide analysis. PFF 147 ("We [the FDA] briefly considered doing this internally, but quickly rejected the idea, since ...**we clearly did not have the expertise in suicidality** to conduct such a reclassification..."). And finally, the FDA noted that its ability to properly analyze the suicide data was hampered by the manufacturer's entangled presentation of the data. PFF 146 ("we [FDA] do not believe that this [suicidality] data until now has been provided to us in a way that would permit us to interpret it fully"); see also PFF 50. Accordingly, GSK's contention that the FDA had paid "close attention to the identical risk at issue in the case for the past twenty years" (see GSK Br. at 19) is not supported by the facts.

Likewise, GSK's reliance upon the FDA's rejection of citizen petitions dealing with Prozac (another antidepressant) in the 1990s is misplaced. GSK's Br. at 3. It is difficult to see

how the denials of the Prozac citizens' petitions have any relevance to this case. Aside from the fact that none of the petitions involved the specific drug at issue here, such older decisions cannot provide "clear evidence" that the FDA would have rejected a warning in 2010. As the Supreme Court found, "risk information accumulates over time" and "the same data may take on a different meaning in light of subsequent developments." *Levine,* 555 U.S. at 569.

      The denial of the citizen petitions all occurred prior to 1997, ███████████████

███████████████████████████████████████████████████████████████

███████. This should have triggered GSK's duty to issue a warning or at least to request a warning. *Caraker v. Sandoz,* 172 F. Supp. 2d 1018, 1034-35 (S.D. Ill. 2001). The fact that earlier citizen petitions concerning *another* drug were denied does not alleviate GSK's ongoing duty to ensure the adequacy of *Paxil's* warning. *Levine,* 129 555 U.S. at 570. Furthermore, the FDA's statements in connection with the Prozac citizen petitions actually support Plaintiffs' contention that, had GSK proposed a suicide warning, it would not have been rejected by the FDA. For example, in connection with one of the Prozac (fluoxetine) citizen petitions, the FDA stated:

> [N]obody in the agency dismisses the possibility that antidepressants in general and fluoxetine in particular may – and I emphasize may – the capacity to cause untoward injurious behaviors, acts, and/or intensify them.

PFF 140; *see also* Exh. 73. Thereafter, in a June 1992 letter, the FDA commented that more research was needed to explore the relationship between Prozac and suicidality. See Exh. 75. Significantly, the FDA also noted:

> [A]n actual court finding of a causal relationship between Prozac and violent behavior would be relevant. In that event, the agency would be able to evaluate the scientific basis for the court's conclusion and consider whether [the] court's conclusion warranted a modification of its own position.

*See* PFF 143. In the case of Paxil, that actual court finding would come ten years later when, in June 2001, a Wyoming jury held (and the court confirmed) that Paxil caused an *adult* patient to

engage in homicidal and suicidal acts. *Tobin v. SmithKline Beecham Corp.*, 164 F.Supp.2d 1278 (D.Wyo. 2001). GSK did not even argue preemption in *Tobin*.

Accordingly, the denial of the Prozac citizen petitions in the early 1990s does not establish "clear evidence" that, prior to July 2010, a Paxil specific suicide warning would have been rejected by the FDA. *Motus v. Pfizer, Inc.,* 127 F.Supp.2d 1085, 1089-90, 1096 (C.D. Cal. 2000) (denying defendant's preemption motion based upon these same citizen petitions and holding "the FDA never stated that it would be impermissible to include additional warnings"); *Fellner v. Tri-Union Seafoods, L.L.C.*, 539 F.3d 237, 254 (3d Cir. 2008) ("[s]tate law is not preempted whenever an agency has merely 'studied' or 'considered' an issue"); *Sprietsma v. Mercury Marine,* 537 U.S. 51, 65 (2002) (Coast Guard's decision not to impose propeller guards did not preempt plaintiffs' tort claims arising out of failure to install propeller guards on a boat).

Most importantly, GSK raised these same Citizen Petition arguments to the Seventh Circuit in another Paxil suicide case. The Seventh Circuit properly refused to give any weight to the FDA's response to the citizen petitions concerning Prozac and held:

> Additionally, in the very letter that rejected a citizen petition to change the label on Prozac, the FDA noted that more research needs to occur to explore the relationship between antidepressants and suicidality. Overall, we do not find the FDA's rejection of the citizen petitions or its call to do more research very compelling for either side. Even the latest of these findings was made several years before Tricia's suicide. This temporal gap is especially important in the analysis of prescription drugs because it constantly evolves as new data emerges. Furthermore, even though Prozac and Paxil are both SSRIs, they are different drugs made by different manufacturers. Therefore, we give little weight to the administrative history of Prozac when we are concerned with whether there is clear evidence that the FDA would have rejected a labeling change in Paxil.

*Mason*, 596 F.3d at 395. In sum, GSK's reliance upon the Prozac Citizen Petitions is misplaced and the relevance of these documents vis-à-vis GSK's preemption arguments has been examined and squarely rejected by the Seventh Circuit.

25

### 2. The FDA Would Not Have Rejected A Warning As Evidenced By The Fact That The FDA Began To Issue Prophylactic Warnings in 2003

As outlined *supra*, during a review of Paxil's pediatric data, the FDA noticed that GSK was inappropriately coding suicide events under the term "emotional lability." PFF 36-44. After the FDA became aware that GSK had inappropriately coded the suicide data, in June 2003, the FDA took *prophylactic* measures and recommended "**that Paxil not be used"** in the treatment of patients under the age of 18. PFF 44 (emphasis added). GSK relies upon this same June 2003 FDA press release and focuses instead on the FDA's statement concerning its knowledge and belief that Paxil did not pose an increased risk of adult suicidality. However, the FDA's statement that it lacked such evidence as to adults does not answer the question—which *Levine* makes clear is central—of what the *manufacturer* knew about Paxil at that time and whether the company had "accumulating data" it "could have analyzed" that would have supported "a stronger warning." *Levine*, 555 U.S. at 570. Plaintiff has shown through documents and expert testimony that GSK knew of the risks prior to 2003. PFFs 1-35; see also Glenmullen Adult Report; and Expert Report of Roger Grimson, Ph.D. Furthermore, the FDA's statement must be placed into context.

In October 2002, during a review of Paxil's pediatric data, the FDA for the first time noticed that GSK was inappropriately coding suicide events under the term "emotional lability."[14] PFF 36; *see also Knipe*, 583 F.Supp.2d at 580. Once the FDA became aware that GSK had miscoded the suicide data (and even though the FDA had not finished its evaluation), in June 2003, the FDA took *prophylactic* measures and recommended "**that Paxil not be used"** in the treatment of patients under the age of 18. *See* PFF 44 (emphasis added). Given that GSK knew it had also

---

[14] GSK had also coded the *adult* suicide events under the term "emotional lability".

similarly coded the adult suicide data under "emotional lability," it would defy common sense for GSK to argue that the FDA would have rejected an adult suicide warning.

In light of the dismal Paxil pediatric data and the revelation regarding GSK's miscoding of suicide events, the FDA also expanded the scope of its investigation and requested a reanalysis of pediatric data from other antidepressant manufacturers and, on October 27, 2003, the FDA stated "it is not possible at this point to rule out an increased risk of [suicidal thoughts or actions] for any of these drugs including Paxil." PFF 47; Exh. 102 at 2-4. Shortly thereafter, the FDA convened an advisory committee to look at the pediatric data results and, even though it had not looked at the adult results, the FDA ordered antidepressant manufacturers to issue a precaution about suicide risks for both children **and adults**. PFF 52; Exh. 29. The FDA noted the need for further investigation but stated that physicians and family members should "closely monitor both *adults* and children with depression, especially at the beginning of [antidepressant] treatment..." *Id.* (emphasis added). In light of the FDA's directive, in May 2004, GSK revised its label to warn that "both adult and pediatric [patients] may experience worsening of their depression and/or emergence of suicidal ideation and behavior (suicidality)." PFF 53.

Despite the FDA's prophylactic *sua sponte* action of requesting the issuance of enhanced warnings for both adult and pediatric patients, GSK boldly contends that, had it acted as a prudent manufacturer and voluntarily issued and maintained an adult suicide warning, the FDA would have deemed it misbranded. The idea that an added adult warning would misbrand Paxil, particularly when GSK's own data shows a significant increased risk of suicidal behavior in adults taking Paxil, is not only speculative, but simply incorrect. As another court stated in denying another antidepressant manufacturers' preemption motion in a case involving the suicide of an *adult* woman in May 2002:

27

> Given the hearings by both Congress and the FDA regarding suicidality, the FDA's PDAC's recent decision to recommend black box warnings regarding suicidality in children and adolescents, and the numerous experts who have concluded that there is a link between SSRIs, like Zoloft, and suicidality, it would be *inconceivable* to this Court to argue that an additional warning regarding suicidality would be false or misleading.

*Cartwright*, 369 F.Supp.2d at 885-886 (emphasis added). GSK has failed to demonstrate (and cannot demonstrate) "clear evidence" that the FDA would have rejected an adult suicide warning. *Levine*, 555 U.S. at 571; *Tucker*, 596 F.Supp.2d at 1237 (finding GSK's preemption claims in an adult suicide case to be speculative and not supported by the facts); *Knipe*, 583 F.Supp.2d at 581-82 ("the mere fact that the FDA had not ordered GSK to include a warning prior to 2002, does not mean that it could not have legally done so").

### 3. Even After The Implementation of The FDA's 2007 Class-Wide Labeling Change, the FDA Offered To Meet With GSK To Discuss A Paxil-Specific Suicide Warning

In its motion, GSK relies extensively upon the 2007 FDA class-wide label to argue that Paxil does not pose an increased risk of suicidality in adults and that, if it had added (or maintained) a suicide warning for adults over the age of 24, the FDA would have deemed the drug misbranded. See GSK Br. at 28. First, GSK's reliance upon the *pooled* data is false and misleading. The FDA nowhere has stated that *Paxil* does not increase the risk of suicidality in patients over 24. In fact, according to the FDA's analysis, Paxil *does* increase the risk of suicidal behavior in patients of all ages. PFF 84-90. A district court within this Circuit has already found GSK's argument on this point to be misleading:

> ... GSK's argument that it has no duty to warn because no link exists between Paxil and increased suicidality as a matter of law is misleading. [¶] The FDA's analysis does not definitively state that Paxil poses no risk of suicide attempts ... Dr. Russell Katz of the FDA stated that clinical trial data showed 'causality'... therefore the court cannot conclude that Paxil does not increase suicidality as a matter of law.

*Forst*, 602 F.Supp.2d at 967 (Stadtmueller, J.) (adult patients taking Paxil are "three times as likely to experience suicidality as compared to placebo, which was deemed statistically significant."); *see also Forst*, 639 F. Supp. 2d at 955.   Thus, GSK's reliance upon the "pooled" data and the "class label" as the basis for preemption is disingenuous and irresponsible.

Furthermore, as previously discussed, even after the implementation of the 2007 class label, the FDA provided GSK with an opportunity to schedule a meeting to discuss a Paxil-specific warning, however, GSK never followed up on the FDA's invitation.   PFF 110-112.   GSK's excuse for refusing to follow up with the FDA is that (a) it would have taken too long; and (b) GSK "speculated" that the FDA would not have allowed the company to add the Paxil specific warning.15   GSK's speculation is not sufficient to warrant a finding of preemption, nor do they come anywhere close to the Supreme Court's requirement of showing "*clear evidence*" that the FDA would have rejected a truthful warning.   *Levine,*129 S.Ct. at 1198; see also *English v. Gen. Elec. Co.*, 496 U.S. 72, 89-90 (1990) ("speculative" conflicts insufficient for conflict preemption); *Tucker* 596 F.Supp.2d at 1236 (refusing to find preemption since GSK had the opportunity to meet with the FDA and issue a Paxil specific warning); *Forst*, 2009 WL 2256232 at *4 ("The agency's action did not preclude Paxil-specific language changes to other areas of the labeling or prevent GSK from pursuing a label change through submission of a separate supplement.")

---

15  Plaintiff's regulatory expert, David Ross, M.D., Ph.D., M.B.I., who has had several managerial and directorial positions at the FDA and other government health agencies, and whose former responsibilities at the FDA included reviewing new drug applications and making recommendations regarding approval of drugs and labeling of drugs explains that, even in the context of class-labeling/warnings, the FDA permits drug manufacturers to issue tailored warnings regarding specific drugs within a class, and he provides various examples wherein individual drugs carry drug-specific warnings in addition to FDA-imposed class labeling.   *See* Ross Decl., Report at 22-23.   GSK was nonetheless free to provide enhanced warnings under federal law and had a corresponding duty under state law to provide enhanced warnings regarding Paxil specific risks.

Every single court that has heard and analyzed GSK's argument on this exact point has soundly rejected GSK's preemption defense.    In rejecting this identical argument, the Honorable David Hamilton, the former Chief Judge of the Southern District of Indiana held:

> the court finds this position flawed in one key respect: in spite    of the FDA's direction regarding Paxil's label in May 2007, GSK still had (and has) the obligation to revise its label to strengthen a warning upon reasonable evidence of an association of a serious hazard, particularly with respect to this individual drug. If GSK were to receive such evidence, it would be obligated to revise its label in spite of the FDA's directive in May 2007. In fact, when it issued its instruction that GSK revise Paxil's label, the FDA advised GSK that if GSK disagreed with the FDA's belief that Paxil-specific analysis should be included in the SSRI labeling revisions, GSK could request a meeting with the FDA. Tucker Br. (Reconsideration) Ex. 1. The FDA's offer, upon which GSK did not act, is consistent with GSK's ongoing obligations under the regulations. In other words, the FDA's revisions were not necessarily the final word on Paxil's label and did not put GSK into a position where it was impossible for GSK to comply with both state and federal law

*Tucker*, 596 F. Supp. 2d at 1235-36.    Likewise, in rejecting GSK's identical argument, Judge Stadtmueller of the Eastern District of Wisconsin held:

> GSK does provide evidence that the FDA denied proposed label language in 2007, three years after Mr. Forst's suicide attempt. However, it does not meet the demanding "clear evidence" requirement. In denying the proposed language, the agency did not prohibit all enhanced warnings. Instead, the FDA merely required removal of Paxil-specific language from a particular portion of Paxil's label in favor of uniform class-wide labeling for all SSRI's. The agency's action did not preclude Paxil-specific language changes to other areas of the labeling or prevent GSK from pursing a label change through submission of a separate supplement. In addition, the cases which GSK cites to support its position— cases finding that federal law preempts state law failure-to-warn claims—were decided before issuance of *Levine* and rely upon the threat of possible federal enforcement action for "misbranding," a justification that Levine views with extreme skepticism.

*Forst*, 639 F. Supp. 2d at 954.16    In sum, *Levine*, *Tucker* and *Forst* confirm that GSK has failed to meet its demanding burden of demonstrating by clear evidence that the FDA would have

---

16 Both *Tucker* and *Forst*, were suicide/suicide attempt cases involving *adult* Paxil patients, they concerned the identical preemption arguments GSK has raised in this case, and they were adjudicated by district courts within this Circuit, yet unexplainably, GSK's oversized brief fails to even cite to, much less discuss, either of these two key and highly instructive cases.

rejected a Paxil-specific adult suicide warning had GSK taken the FDA up on its request to

schedule a formal meeting or submit a separate supplement to add the Paxil-specific adult suicide

warnings.17

> **E.** **Plaintiffs' Claims Would Not Interfere With the FDA's and Congress'
> Objectives of Providing Safe and Effective Drugs to American Consumers**

The last shot in GSK's preemption sling is its fleeting one sentence contention that

---

17 GSK contends that Plaintiff has failed to point to any "newly acquired information" that would justify the implementation of an enhanced suicide warning. ██████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████. As plaintiff's experts explain, when the analysis is performed properly, it results in a greater than eight fold increased risk of suicidal behavior for adult patients on Paxil. *See e.g.*, Glenmullen Report at 4-7; Ross Report at 12. GSK's reliance on the First Circuit case *In Re Celexa & Lexapro Mktg & Sales Practices Litig.,* 779 F.3d 34 (1st Cir. 2015), is misplaced. In *In re Celexa*, the drug at issue, Lexapro, was approved in March 2009 for the treatment of adolescent depression. *In re Celexa* , 779 F.3d at 36. At that time, a new label was issued, indicating that the drug was effective for the treatment of adolescent depression— previously the label had indicated that it was not approved for the treatment of pediatric depression. Id. at 36-37. The plaintiffs alleged that, starting with the 2009 approval, the Lexapro label was inaccurate because, Lexapro is actually "no more clinically effective than a placebo" in treating in adolescent depression. *Id.* at 37-38. The court, however, held that, unless the plaintiff could allege post-approval information indicating that Lexapro was not effective, the defendant was not permitted to make changes to the label stating that the drug was clinically ineffective. Id. at 42-43. The court "scrutinized the complaint itself to see if it might plausibly be read as relying on "newly acquired information" in contending that Forest could have changed its label through the CBE procedures" but could not find any. *Id.* At no time did the First Circuit endorse the view that the complaint must allege newly acquired information obtained after each iteration of a drug label. Indeed, the First Circuit expressed the exact opposite: "[T]he line so drawn lets the FDA be the exclusive judge of safety and efficacy based on information available at the commencement of marketing, while allowing the states to reach contrary conclusions when new information not considered by the FDA develops." *Id.* at 41 (emphasis added). As soon as new information develops, post-approval, the duty is triggered and GSK is allowed to use the CBE regulation to change the label. And indeed in this instance, the FDA asked GSK to submit a supplement with its Paxil specific data or schedule a formal meeting, yet GSK failed to follow up on the FDA's request/recommendations. Accordingly, *In re Celexa*, which dealt with the issue of efficacy (as opposed to warning/safety) and conduct which occurred prior to the drug being approved by the FDA, is factually and legally inapposite.

Plaintiff's claims would somehow interfere with the purposes of FDA regulations and that her claims stand as an obstacle to Congress' intent.   GSK's Br. at 43.   In making this argument, GSK completely ignores the fact that FDA's *primary* objective is to protect consumers from harmful products.   *Levine*, 555 U.S. at 574 ("Congress enacted the FDCA to bolster consumer protection against harmful products").

The Supreme Court in *Levine* firmly rejected the argument that lawsuits stand as an obstacle to the goals and objectives of Congress.   Rather, the Court held that such lawsuits complement the goals and objectives of Congress by adding an additional layer of consumer protection and providing an incentive for drug manufacturers to disclose safety risks promptly. *Levine,* 555 U.S. at 578 ("state law offers an additional, and important, layer of consumer protection that complements FDA regulation."); *see also Id.* at 575 ("Congress did not regard state tort litigation as an obstacle to achieving its purposes").   As the Supreme Court recognized, tort suits complement the FDA regulations because tort suits "uncover drug hazards and provide incentives for drug manufacturers to disclose safety risks promptly," "motivate injured persons to come forward with information," and "lend force to the FDCA's premise that manufacturers, not the FDA, bear responsibility for their drug labeling at all times."   *Id.* at 578.

In arguing that Plaintiffs' claims stand as an obstacle, GSK continues to recite the mantra that Paxil does not pose an increased risk of suicidality and, thus, if it were to issue a warning, it would be "overwarning" patients and physicians.   This argument has been rejected by multiple district courts, including the *Forst* court.   *Forst v. Smithkline Beecham Corp.,* 639 F. Supp. 2d 948, 955 (E.D. Wis. 2009) ("this court refuse[s] to find that Paxil does not increase suicidality as a matter of law"); *Forst v. SmithKline Beecham Corp*., 602 F.Supp.2d 960, 967 (E.D.Wis.2009) (same);   *see also Tucker v. SmithKline Beecham Corp*., 596 F. Supp. 2d 1225, 1233 (S.D. Ind.

2008) (rejecting GSK's "overwarning" argument and noting that "GSK has not provided any examples of the FDA punishing it or any other drug manufacturer for overwarning.")

Notwithstanding *Levine* and *Forst's* conclusions on this issue, GSK chooses to ignore these precedents and instead marshals inapplicable cases involving unrelated issues. GSK cites *American Home Prods. Corp. v. Johnson & Johnson*, 672 F.Supp. 135 (S.D.N.Y 1987); *Brooks v. Howmedica*, 273 F.3d 785 (Cir. 2001); and *Thomas v. Hoffman-La Roche, Inc.*, 949 F.2d 806 (5th Cir. 1992) for the proposition that "over warning" should not be permitted. *See* GSK's Br. at 31. Each of these cases is distinguishable. First, *Thomas* was not even a preemption case, rather the Court, applying *Mississippi* law, held that a label should not "understate or overstate" a risk. GSK has not explained how Mississippi law has any relevance to this case. The *Brooks* case involved a medical device, which, unlike prescription drugs, contains an express preemption clause and is, thus, not relevant to this case, which involves a prescription drug. *See Levine*, 555 U.S. at 574 (noting that prescription drugs and medical devices are treated differently since Congress enacted a preemption clause for devices but not for prescription drugs).[18] Finally,

---

[18] Likewise GSK's passing reliance upon *Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861 (2000) and *Riegel v. Medtronic, Inc.*, 128 S.Ct. 999 (2008) is misplaced because those cases involved regulations containing *express* preemption clauses, whereas the regulations that govern prescription drugs such as Paxil do not contain an express preemption clause. *See Levin*, 129 S.Ct. at 1200 & 1203 (distinguishing *Riegel* and *Geier*).

Equally misplaced is GSK's reliance upon the Seventh Circuit decision in *Robinson v. McNeil Consumer Healthcare*, 615 F.3d 861 (7th Cir. 2010). Robinson concerned an over-the-counter medication (Motrin) wherein Virginia law applied and the issue before the court was whether the jury's verdict should be set aside in light of the fact that the jury had found the plaintiff to be contributorily negligent. Under Virginia law (unlike Illinois law), a finding of contributory negligence (regardless of the level of negligence) is a complete defense to liability. Preemption was not an issue before the court, although the court cited *Levine* in two instances to reiterate the "clear evidence" proposition. The *Robinson* court stated that, under the facts present in Motrin, the FDA had apparently considered and rejected the very warning at issue for the over-the-counter drug, but notably had allowed the warning for the prescription version of Motrin. *Robinson*, 615 F.3d at 873 & 868. Accordingly, the *Robinson* case, which primarily concerned the issue of contributory negligence, involved an over-the-counter medication (as opposed to a

33

*American Home Products* is likewise of little assistance because it involves a Lanham Act (unfair competition) claim between two pharmaceutical giants and not a products liability claim. Further, that case actually supports Plaintiffs' contentions because the court noted that an injured consumer should be allowed to obtain compensation from the manufacturer even though the manufacturer supplied the FDA approved label. Specifically the court held:

> It would be manifestly unfair if a person grievously injured by the use of an unsafe product without adequate warning of the hazard, should be denied recovery merely because the manufacturer's trade association, through aggressive lobbying, had succeeded in persuading the regulatory agency that the hazard was not sufficiently well established to require a label warning.

*American Home Products*, 672 F.Supp. at 143. GSK also cites to various FDA regulations in support of its claims. *See* GSK's Br. at 44-45. GSK's citation to 44 Fed.Reg. 37434 (June 26, 1979) actually supports Plaintiffs' contentions because, in that regulation, the FDA specifically noted that the manufacturer is permitted to voluntarily enhance its warning without FDA approval. See 44 Fed.Reg. at 37447. GSK's reliance upon the 2006 FDA Preamble, 71 Fed.Reg. 3935 (Jan. 24, 2006) (" Preamble") and the 2008 FDA Rule, 73 Fed. Reg. 49603-01 (Aug. 22, 2008) ("2008 Final Rule"), however, should be viewed with caution as these regulations have been criticized by all three branches of government, including the Supreme Court, Congress and the President.

The Supreme Court in *Levine* **refused to give any weight or deference** to the FDA's 2006 Preamble because (a) the Preamble is procedurally flawed and "inherently suspect"; (b) is "at odds" with Congressional intent; and (c) it "represents a dramatic change in position" *Levine,* 129 S.Ct. at 1201-02 ("the FDA's 2006 preamble does not merit deference").

---

prescription drug which is governed by a different regulatory procedure) and concerned facts wherein the FDA had apparently made a specific decision to not allow certain warnings on over-the-counter version of the drug. Thus, it is inapposite to this case which concerns a prescription drug for which the FDA has never rejected an enhanced suicide warning and, indeed, the FDA even invited GSK to schedule a meeting and submit an application to add Paxil-specific suicide warnings.

Likewise, the FDA's 2008 Final Rule has been sharply criticized by members of Congress who claim that the Rule "contradicts" Congressional intent.  See PFF 174-175[19].  If that were not enough to cast a shadow on the validity of the 2006 and 2008 FDA statements, on May 20, 2009, the President of the United States issued a memorandum noting the importance of federalism and ordering each federal agency, including the FDA, to review the regulations and preambles of the last decade to ascertain whether any preemption language in these regulations needs to be eliminated.  *See* 74 Fed.Reg. 24693 (May 20, 2009).   In sum, as the Supreme Court held in *Levine* and as confirmed by *Mason, Forst* and *Tucker*, Plaintiffs' claims do not interfere with the goals and objectives of Congress.

## V.      PLAINTIFF'S CLAIMS ARE NOT PREEMPTED BY *BUCKMAN* SINCE SHE HAS NOT ALLEGED A CAUSE OF ACTION FOR FRAUD ON THE FDA

Plaintiff anticipates that GSK, as it has unsuccessfully done *in other cases*, will use its Reply to argue that Plaintiff's claims should be preempted by *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 343 (2001).   As a preliminary matter, GSK's anticipated *Buckman*

---

[19]   The 2008 new Final Rule amends the FDA regulations regarding when a manufacturer is allowed to make labeling changes by providing that labeling changes must be based on "newly acquired information."  Importantly, the term "newly acquired information" is defined as "data, whether derived from new clinical studies, reports of adverse events, *or new analysis of previously submitted data (e.g., meta-analysis)*."  73 Fed.Reg. at 49604, 49609. The information that caused GSK to issue its adult suicidality warning in 2006 was not new, but was based on a meta-analysis of data dating back to the 1990s.  Further, the 2008 Final Rule provides that "Sponsors are still required to act promptly to add risk information to labeling."  73 Fed.Reg. at 49606. Thus, even under the umbrella of the 2008 Final Rule, GSK would have had an obligation to revise its label based on the knowledge in its possession concerning the suicidality risks – ████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████  *See also Levine*, 555 U.S. at 569 (refusing to decide whether the 2008 Final Rule was consistent with the FDCA, but holding that, even under the 2008 Rule, the manufacturer has a duty to issue warnings that are based upon new analysis of previously submitted data – "If the sponsor submits adverse event information to FDA, and then later conducts a new analysis of data showing risks of a different type or of greater severity or frequency than did reports previously submitted to FDA, the sponsor meets the requirement for 'newly acquired information.' ").

35

defense should not be considered because it was not substantially raised in its moving papers. *James v. Sheahan*, 137 F.3d 1003, 1008 (7th Cir.1998) ("Arguments raised for the first time in a reply brief are waived."). Notwithstanding the untimeliness of GSK's anticipated argument, GSK's *Buckman* defense is without merit and has been flatly rejected by other courts.

      *Buckman* held that a plaintiff's naked "fraud on the FDA" cause of action was preempted. *Buckman*, 531 U.S. at 347. Plaintiff **has not** pled a cause of action for "fraud on the FDA." As such, *Buckman* does not bar or preempt Plaintiff's claims. In fact, in the context of this motion for summary judgment, the only reason Plaintiff has raised the issue of GSK's improper statistical analyses of its clinical trials is to rebut GSK's "conflict preemption" defense. In rejecting GSK's *Buckman* defense, one court noted:

> Defendant either misunderstands the nature of Plaintiffs allegations or attempts to mischaracterize them in an effort to hide behind *Buckman*. Plaintiffs do not now suggest that Defendant should be penalized by the FDA for not bringing this information to the FDA sooner. Rather, they assert that, having either not received clinical trials regarding pediatric usage of Paxil or having received allegedly improperly coded data, the FDA could not have possibly considered the propriety of the warning proposed by Plaintiffs. Plaintiffs go on to argue that, under FDA regulations, Defendant should have then unilaterally issued a warning sooner based on the evidence in its possession. Such allegations do not fall within the bounds of *Buckman*'s holding.

*Knipe,* 583 F.Supp.2d at 583, n.31. Likewise, the Second Circuit has confirmed that *Buckman* does not preempt a plaintiff who is merely showing evidence of fraud as a "defense" to a defendant's claim for immunity. *Desiano v. Warner-Lambert & Co.*, 467 F.3d 85, 97(2nd Cir. 2007), *aff'd Warner-Lambert Co., LLC v. Kent*, 128, S.Ct. 1168 (2008); *see also Levine*, 129 S.Ct. at 1199 (refusing to find preemption because Wyeth failed to provide the FDA with an evaluation or analysis concerning the specific dangers). The Seventh Circuit has likewise rejected *Buckman* preemption under such scenarios. *Bausch v. Stryker Corp.*, 630 F.3d 546, 556-558 (7th Cir. 2010) (the Seventh Circuit held that *Buckman* did not impliedly preempt plaintiff's products liability

claims against a device manufacturer since plaintiff was not alleging that the FDA had been defrauded rather she is alleging that she was harmed as a result of the manufacturer's conduct and she is entitled to, inter alia, rely upon the manufacturer's violation of FDA regulation as a basis of her common law state tort claims). Accordingly, GSK's anticipated *Buckman* argument should be rejected because Plaintiffs are not advancing an independent cause of action for "fraud on the FDA."[20]

## CONCLUSION

A century ago, the Supreme Court noted: "The right to sue and defend in the courts is the alternative of force. In an organized society it is the right conservative of all other rights, and lies at the foundation of orderly government. It is the highest and most essential privileges of citizenship." *Chambers v. Baltimore & Ohio Railroad Co.*, 207 U.S. 142 (1907). The profane expansion of the preemption defense in the past decade seriously threatened those sacred rights. As Judge Wilson of the Eastern District of Arkansas poignantly observed:

> Over the past several years I believe all three branches of government have become more and more distrustful of juries. They seem to forget that a jury is a cross section of the citizens who elected them to office (or elected those who appointed them). In political campaigns these citizens are paragons of virtue; but when they are called for jury service, they somehow become incapable of making important decisions. The language in the decisions favoring preemption is high flown; but, at bottom, it reflects distrust of the randomly selected citizens who sit on juries. Perhaps our public officials, including judges, have read too much Plato and too little Alexis de Tocqueville. [¶] Trial by jury is the essence of government reposed in the people. We should trust this institution in fact, not just in word.

---

[20]    Furthermore, in the instant case, the FDA has already made a determination that GSK manipulated its data by improperly classifying suicide events as emotional lability. (PFF Nos. 45-46). Thus, even if *Buckman* weres implicated (which it is not), this case would fall within the exception noted in Justice Stevens' concurring opinion in *Buckman* – that a fraud on the FDA claim would not be preempted if, prior to the litigation, the FDA had determined that the manufacturer had made misrepresentations. *Buckman* , 531 U.S. at 354.

*Scroggin v. Wyeth*, 4:04CV01169-WRW (E.D.Ark., April 16, 2008).[21]   The Supreme Court, in

*Levine*, thankfully, agreed—confirming that the jury system and tort claims continue to be an

integral part of our democratic system.   Mrs. Dolin respectfully requests that the Court deny

GSK's preemption motion and allow her the opportunity to present her evidence to a jury of peers.

Respectfully submitted,

Dated: September 14, 2015           By:      /s/ R. Brent Wisner

R. Brent Wisner, Esq. (*pro hac vice*)
Michael L. Baum, Esq. (*pro hac vice*)
Bijan Esfandiari, Esq. (*pro hac vice*)
Frances M. Phares, Esq. (*pro hac vice*)
BAUM HEDLUND ARISTEI & GOLDMAN, P.C.
12100 Wilshire Blvd., Suite 950
Los Angeles, CA 90025
(310) 207-3233
(310) 207-4204 (fax)

and

David E. Rapaport, Esq.
Lindsey A. Epstein, Esq.
RAPOPORT LAW OFFICES, P.C.
20 North Clark Street, Suite 3500
Chicago, IL 60602
(312) 327-9880
(312) 327-9881 (fax)

*Attorneys for Plaintiff, Wendy Dolin*

---

[21]     A copy of which Judge Wilson's Order is attached as Exhibit 93.

## CERTIFICATE OF SERVICE

I, R. Brent Wisner, hereby certify that on September 14, 2015, I served a copy of the foregoing **PLAINTIFF'S OPPOSITION TO GSK'S MOTION FOR SUMMARY JUDGMENT (FEDERAL PREEMPTION)** on the following counsel via electronic mail:

Todd P. Davis, Esq.
Heather Howard, Esq.
KING & SPAULDING, LLP
1180 Peachtree Street, N.E.
Atlanta, GA 30309-3521
E-Mail: tdavis@kslaw.com
E-Mail: hhoward@kslaw.com

*Pro Hac Counsel for Smithkline Beecham Corp., d/b/a/ Glaxosmithkline*

Alan Scott Gilbert, Esq.
Melissa Angelica Economy, Esq.
SNR DENTON US, LLP
233 South Wacker Drive, Suite 7800
Chicago, IL 60606
E-Mail: Alan.Gilbert@snrdenton.com
E-Mail: Melissa.Economy@snrdenton.com

*Attorneys for Glaxosmithkline*

David E. Rapaport, Esq.
Lindsey A. Seeskin, Esq.
RAPOPORT LAW OFFICES
20 N. Clark Street, Suite 3500
Chicago, IL 60602
E-Mail: drapoport@rapoportlaw.com
E-Mail: lseeskin@rapoportlaw.com

*Co-Counsel for Plaintiff, Wendy Dolin*

/s/ R. Brent Wisner
R. Brent Wisner